1   Michael W. Sobol (SBN 194857)
    msobol@lchb.com
2   David T. Rudolph (SBN 233457)
    drudolph@lchb.com
3   Jallé H. Dafa (SBN 290637)
    jdafa@lchb.com
4   John D. Maher (SBN 316157)
    jmaher@lchb.com
5   Nabila Abdallah (SBN 347764)
    nabdallah@lchb.com
6   LIEFF CABRASER HEIMANN
        & BERNSTEIN, LLP
7   275 Battery Street, 29th Floor
    San Francisco, CA  94111
    Telephone:  415.956.1000
8   Facsimile:  415.956.1008

9   *Attorney for Plaintiffs and the Class*

10

11                  **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
12                      **SAN FRANCISCO DIVISION**

13   Michael Katz-Lacabe and Dr. Jennifer        Case No. 3:22-cv-04792-RS
     Golbeck, on behalf of themselves and all
14   others similarly situated,                  **PLAINTIFFS' MEMORANDUM OF POINTS**
                                                 **AND AUTHORITIES IN OPPOSITION TO**
15                        Plaintiffs,            **ORACLE'S [THIRD] MOTION TO DISMISS**
                                                 **PORTIONS OF PLAINTIFFS' SECOND**
16             vs.                               **AMENDED COMPLAINT**

17   ORACLE AMERICA, INC., a corporation         Judge: Hon. Richard Seeborg
     organized under the laws of the State of
18   Delaware,                                   Date: March 14, 2024
                                                 Time: 1:30pm
19                        Defendant.             Courtroom: 3

20
                                                 Date Action Filed: August 19, 2022
21                                               Trial Date: None set

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ........................................................................................................ 2

      B.    Plaintiffs Have Stated a Claim for Violation of ECPA And Have
            Adequately Pled A Basis For The Application Of The "Exception to the
            Exception" ................................................................................................... 2

            1.    Oracle's Further Tortious Use of the Fruits of the Interception
                  Constitutes a "Tortious Purpose" ................................................... 4

            2.    The SAC Sufficiently Alleges Oracle's Tortious Intent ............... 8

                  a.    Oracle Regards Privacy as an Illusion That Should Not
                        Interfere With Its Commercial Surveillance Apparatus ................ 9

                  b.    Oracle Acknowledges That Its Technical Defenses to
                        Privacy-Invasive Behavior is "Ridiculous" ................................ 9

                  c.    Oracle Uses Personal Data To Disrupt People's Autonomy,
                        Even At the Expense of Enabling Alcoholics ............................. 11

                  d.    Oracle Deliberately Deprecates Its Own "Privacy Tools" ........... 11

                  e.    Oracle Must Be Aware Of Its Privacy-Invasive Conduct,
                        Because It Has Called Out Other Companies For Engaging
                        In The Same Conduct .................................................................. 12

                  f.    Oracle's Attempt to Mislead the Public Regarding Its Sale
                        of Political Segments Demonstrates Tortious Intent ................... 14

      C.    Plaintiffs State a Cognizable Claim for ECPA Violation Regardless of
            Whether The Exception to the Exception Applies ............................................ 16

      D.    Plaintiffs Have Stated a Claim for Intrusion Upon Seclusion under Florida
            Law ............................................................................................................ 18

            1.    Plaintiffs Sufficiently Allege Oracle has Intruded Into Dr.
                  Golbeck's Home ......................................................................... 18

            2.    Plaintiffs Sufficiently Allege Oracle has Intruded Into Dr.
                  Golbeck's Devices ...................................................................... 20

            3.    Plaintiffs Sufficiently Allege That Oracle's Conduct Was Highly
                  Offensive to a Reasonable Person ................................................ 23

III.  CONCLUSION ................................................................................................... 25

2923652.9

# TABLE OF AUTHORITIES

**Page**

**Cases**

*All-Pro Reps, Inc. v. Lukenbill*,
  961 F.2d 216 (9th Cir. 1992)................................................................................. 3

*Allstate Ins. Co. v. Ginsberg*,
  863 So. 2d 156 (Fla. 2003)................................................................................. 21

*ASARCO, LLC v. Union Pac. R.R. Co.*,
  765 F.3d 999 (9th Cir. 2014)................................................................................. 16

*Aschroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 2

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)................................................................................. 9

*Boddie v. Am. Broad. Companies, Inc.*,
  881 F.2d 267 (6th Cir. 1989)................................................................................. 4

*Brown v. Google LLC*,
  525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......................................................... *passim*

*Calhoun v. Google LLC*,
  526 F. Supp. 3d 605 (N.D. Cal. 2021) ................................................................. 17

*Caro v. Weintraub*,
  618 F.3d 94 (2d Cir. 2010)................................................................................. 6

*Celestine v. Capital One*
  No. 17-20237-Civ-Scola, 2017 WL 2838185 (S.D. Fla. June 30, 2017)............................... 24

*Cohen v. Casper Sleep Inc.*,
  No. 17CV9325, 2018 WL 3392877 (S.D.N.Y. July 12, 2018)................................................. 6

*Deteresa v. Am. Broadcasting Cos., Inc.*,
  121 F.3d 460 (9th Cir. 1997)................................................................................. 5, 6

*Doe v. Meta Platforms, Inc.*,
  No. 22-CV-03580-WHO, 2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) ............................... 17

*Gracenote, Inc. v. Musicmatch, Inc.*,
  No. C 02-3162 CW, 2004 WL 1918889 (N.D. Cal. Aug. 26, 2004) ........................................ 3

*Hammer v. Sorensen*,
  824 F. App'x 689 (11th Cir. 2020) ................................................................. 18, 21

2923652.9

**TABLE OF AUTHORITIES**
(continued)

Page

*Harris v. Cnty. of Orange*,
  682 F.3d 1126 (9th Cir. 2012)..................................................................................... 2

*Holmes v. Tenderloin Hous. Clinic, Inc.*,
  No. C 09-5781 PJH, 2010 WL 1929586 (N.D. Cal. May 12, 2010) ........................ 10, 11, 12

*In re DoubleClick Inc. Priv. Litig.*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001).................................................................... 6, 7

*In re Facebook, Inc. Internet Tracking Litig.*
  956 F.3d 589 (9th Cir. 2020).................................................................................. 7, 20

*In re Google Cookie Placement Consumer Priv. Litig.*,
  806 F.3d 125 (3d Cir. 2015)..................................................................................... 4

*In re Google Inc.Gmail Litig..*,
  No. 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ............................ 6

*In re Google RTB Consumer Priv. Liti*g.,
  606 F. Supp. 3d 935 (N.D. Cal. 2022) ...................................................................... 17

*In re Grp. Health Plan Litig.*,
  No. 23-CV-267, 2023 WL 8850243 (D. Minn. Dec. 21, 2023)................................. 4, 5, 7, 9

*In re Intuit Priv. Litig.*,
  138 F. Supp. 2d 1272 (C.D. Cal. 2001)..................................................................... 5

*In re Meta Pixel Healthcare Litig.*,
  647 F. Supp. 3d 778 (N.D. Cal. 2022) ...................................................................... 5

*In re Nickelodeon Consumer Priv. Litig.*,
  No. CIV.A. 12-07829, 2014 WL 3012873 (D.N.J. July 2, 2014)................................... 6

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)................................................................................. 12

*In re Toys R Us, Inc., Priv. Litig.*,
  No. 00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001)................................. 5, 6

*Jackman v. Cebrink-Swartz*
  334 So. 3d 653 (Fla. Dist. Ct. App. 2021) .............................................................. 20

*Jacome v. Spirit Airlines Inc.*,
  No. 2021-000947-CA-01, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021) ................... 22, 23

*N.A.S. v. Morada-Haute Furniture Boutique LLC*,
  No. 20-24676-CIV, 2021 WL 5547626 (S.D. Fla. Aug. 24, 2021) .......................... 25

**TABLE OF AUTHORITIES**
(continued)

Page

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................................... 22

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    214 F. Supp. 3d 808 (N.D. Cal. 2016) ................................................ 5

*Post-Newsweek Stations Orlando, Inc. v. Guetzloe*,
    968 So. 2d 608 (Fla. Dist. Ct. App. 2007) ........................................ 24

*Rebalko v. City of Coral Springs*,
    No. 19-60569-CIV, 2020 WL 6446042 (S.D. Fla. Nov. 3, 2020) ......................................... 19

*Regions Bank v. Kaplan*,
    No. 17-15478, 2021 WL 4852268 (11th Cir. Oct. 19, 2021)................................................. 24

*Rodriguez v. Google*
    LLC, No. 20-CV-04688-RS, 2021 WL 2026726 (N.D. Cal. May 21, 2021) ................. *passim*

*Rowe v. Educ. Credit Mgmt. Corp.*,
    559 F.3d 1028 (9th Cir. 2009).................................................................. 2

*Spilfogel v. Fox Broad. Co.*,
    No. 09-CV-80813, 2010 WL 11504189 (S.D. Fla. May 4, 2010) .................................. 18, 21

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011)................................................................. 2

*Stasiak v. Kingswood Co–Op, Inc.*
    8:11-cv-1828-T-33MAP, 2012 WL 527537 (M.D. Fla. Feb. 17, 2012) ................................ 24

*Stirling Int'l Realty, Inc. v. Soderstrom*,
    No. 6:14-CV-1109-ORL-40T, 2015 WL 403318 (M.D. Fla. Jan. 28, 2015)........................ 21

*Sussman v. Am. Broad. Companies, Inc.*,
    186 F.3d 1200 (9th Cir. 1999)............................................................... 4, 6

*TLS Mgmt. v. Rodriguez-Toledo*,
    260 F. Supp. 3d 154 (D.P.R. 2016)........................................................... 5

*U.S. Commodity Future Trading Comm'n v. Monex Credit Co.*,
    931 F.3d 966 (9th Cir. 2019)................................................................. 16

*United States v. Phillips*,
    540 F.2d 319 (8th Cir.)......................................................................... 4

*United States v. Trader*,
    981 F.3d 961 (11th Cir. 2020)............................................................ 22, 23

**TABLE OF AUTHORITIES**
(continued)

Page

*Ward v. Casual Rest. Concepts Inc.*,
No. 8:10-CV-2640-T-17TGW, 2011 WL 2600511 (M.D. Fla. June 29, 2011) .................... 21

*Williams v. Facebook, Inc.*,
384 F. Supp. 3d 1043 (N.D. Cal. 2018) ................................................................. 25

*Zorn v. McNeil*
No. 6:16-CV-1-ORL-41TBS, 2016 WL 547619 (M.D. Fla. Sept. 29, 2016) ........................ 20

**Statutes**

ECPA ................................................................................................. *passim*

Fla. Stat. Ann. § 934.03 ...................................................................................... 1

**Other Authorities**

Senate Report 90-1097, S. Rep. No. 1097, 90th Cong., 2d Sess. 1968,
1968 U.S.C.C.A.N. 2112, 1968 WL. 4956 (Leg. Hist.) ............................................... 7

## I.    **INTRODUCTION**

On its third motion to dismiss in this matter, Oracle challenges the two of Plaintiffs' nine causes of action in Plaintiffs' Second Amended Complaint (Dkt. No. 87, "SAC") that the Court dismissed without prejudice in its October 3, 2023 Order on Oracle's [Second] Motion to Dismiss (Dkt. No. 77, "October 3 Order"): violation of the Electronic Communications Privacy Act ("ECPA") and intrusion upon seclusion under Florida common law ("Florida Intrusion"). *See* Motion to Dismiss Portions of the Second Amended Complaint, Dkt. No. 88 ("Mot.").[1] The October 3 Order identifies discrete and specific shortcomings in the allegations for the ECPA and Florida Intrusion claims which Plaintiffs' amendments to the SAC have fully addressed.

With respect to the ECPA claim, the Court found that Plaintiffs had "not alleged sufficient facts that Oracle intercepted data with the primary motivation or purpose of committing torts," that would allow the application of the "exception to the exception" doctrine to vitiate Oracle's "consent" defense under that statute. October 3 Order at 11. Plaintiffs have added a new section to the SAC containing six additional sets of allegations which, construed in the light most favorable to Plaintiffs, sufficiently plead that Oracle intentionally engaged in conduct violating the ECPA with the knowledge and purpose of committing privacy torts on the general population of U.S. internet users. *See* SAC section, VI.F, "Oracle Knowingly and Intentionally Invaded Plaintiffs' and Class Members' Privacy" (¶¶ 119-133). Oracle's Motion either ignores the new allegations or plainly misinterprets them. Further, the ECPA claim is adequately pleaded regardless of whether the exception to the exception applies because, as Plaintiffs' allegations make clear, there is no reasonable interpretation of Oracle's policies or disclosures which could provide third party websites with a basis to consent to Oracle's exploitation of the personal data taken from their

---

[1] Consistent with the Court's choice-of-law analysis in its October 3, 2023 Order, Plaintiffs no longer allege a claim for unjust enrichment on behalf of a United States class, but instead allege it solely on behalf of California and Florida residents. *See* SAC ¶ 134. However, the seven remaining, unchallenged, claims go forward: Invasion of Privacy Under the California Constitution (on behalf of the California Class); Intrusion Upon Seclusion Under California Common Law (on behalf of the California Class;); Violation of the California Invasion of Privacy Act (on behalf of the CIPA Sub-Class); Violation of the FSCA, Fla. Stat. Ann. § 934.03 (on behalf of the FSCA Class); Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, et. seq. (on behalf of the ECPA Class); Action Unjust Enrichment under California Common Law (on behalf of the California Class); Unjust Enrichment under Florida Law (on behalf of the Florida Class; and Declaratory Judgment.

2923652.9

1  websites.

2       With respect to Florida Intrusion, the Court found that Dr. Golbeck had failed to sufficiently

3  allege "an intrusion into a 'private place' or 'private quarter.'" October 3 Order at 7. The SAC more

4  specifically pleads that Oracle has intentionally invaded both the privacy of her home and her

5  private electronic spaces. SAC ¶¶ 179-183. Oracle's arguments to the contrary either misconstrue

6  these allegations or misinterpret Florida law. Moreover, while Oracle challenges the offensiveness

7  of the conduct described in the SAC (an issue not identified as a deficiency by the Court in its prior

8  order), the question of whether Oracle's constant surveillance of millions of Floridians in the same

9  manner is highly offensive under Florida law is a question of fact for the jury.

10       Oracle's motion to dismiss should be denied in full.

11  ## II.    ARGUMENT

12       Oracle is correct that Plaintiffs' core allegations remain unchanged: this case seeks to

13  remedy Oracle's systematic violations of Plaintiffs' deeply-entrenched and historically recognized

14  Constitutional, common law, and statutory rights to privacy. As set forth below, Plaintiffs'

15  relatively narrow amendments in the SAC address the deficiencies in their claims that the Court

16  identified in its October 3 Order.

17      **A.**    **Legal Standard**

18       The Court must "accept all factual allegations in the complaint as true and construe the

19  pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp*.,

20  559 F.3d 1028, 1029-30 (9th Cir. 2009). The complaint need only "contain[] 'sufficient factual

21  matter, accepted as true, to state a claim of relief that is plausible on its face.'" *Harris v. Cnty. of*

22  *Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

23  "If there are two alternative explanations, one advanced by defendant and the other advanced by

24  plaintiff, both of which are plausible, [a] plaintiff's complaint survives a motion to dismiss under

25  Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

26      **B.**    **Plaintiffs Have Stated a Claim for Violation of ECPA And Have Adequately Pled A Basis For The Application Of The "Exception to the Exception"**

27

28  Oracle seeks dismissal of the ECPA claim solely upon the applicability of the "exception to

the exception." The ECPA provides that "consent" to the otherwise unlawful interception of the contents of an electronic communication provides no defense where "such communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). As this Court has noted, to successfully plead this so-called "exception to the exception" (i.e., the tort exception to the consent exception), Plaintiffs must allege that "the primary motivation or a determining factor in the interceptor's actions has been to injure plaintiffs tortiously." *Rodriguez v. Google* LLC, No. 20-CV-04688-RS, 2021 WL 2026726, at *6 fn. 8 (N.D. Cal. May 21, 2021).

In *Brown v. Google LLC*, the court held that using intercepted data to build—just as Oracle has done here—individual profiles, that themselves tortiously invade privacy interests, is sufficient to establish the exception to the exception. 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021). In distinguishing *Brown* in its October 3 Order, this Court found Plaintiffs' allegations lacking with regard to Oracle's primary, tortious motivation, referencing Oracle's example "that the plaintiffs in *Brown* had identified internal Google communications referring to the company's privacy practices as problematic." October 3 Order at 11. Of course, at the pleading stage and before the completion of discovery, no plaintiff can reasonably be held to the standard of alleging the content of an adversary's internal communications, but Plaintiffs here understand the Court's more general holding that the facts in the prior pleading were insufficient. Accordingly, Plaintiffs' revised allegations in the SAC provide greater detail on Oracle's motivations and knowledge. As argued herein, Plaintiffs' amended allegations demonstrate Oracle well understood the practices described in the SAC to be harmful and pernicious, i.e., they provide sufficient detail to show that not only did Oracle intentionally engage in conduct amounting to a violation of the ECPA, it also deliberately invaded the privacy interests of Plaintiffs and the Class through a further use of intercepted data.

Oracle does not meaningfully raise any dispute as to whether Plaintiffs plausibly *allege* the requisite intent, but rather raises factual disputes as to its *actual* intent, all but conceding that there is now a factual dispute for the trier of fact. The question of intent is a paradigmatic factual issue that cannot be resolved at the pleadings stage. *See, e.g., All-Pro Reps, Inc. v. Lukenbill*, 961 F.2d 216 (9th Cir. 1992) (intent "is an intensely factual matter."); *Gracenote, Inc. v. Musicmatch, Inc.*,

PLAINTIFFS' OPPOSITION TO ORACLE'S MOTION
TO DISMISS PORTIONS OF THE SECOND
AMENDED COMPLAINT; CASE NO. 3:22-CV-04792

2923652.9

No. C 02-3162 CW, 2004 WL 1918889, at *11 (N.D. Cal. Aug. 26, 2004) ("intent is an intensely factual question"). This is especially so in the context of determining intent under the ECPA. *In re Grp. Health Plan Litig.*, No. 23-CV-267 (JWB/DJF), 2023 WL 8850243, at *8 (D. Minn. Dec. 21, 2023) ("While Plaintiffs have alleged HealthPartners' motivations [for violating the ECPA], determination of HealthPartners' *actual* purpose for installing and using the Pixel Code requires a factual undertaking."). With respect to the 'exception to the exception', "the determination of whether an interception was made with a purpose to commit any criminal, tortious or injurious act, must be made on a 'case-by-case basis.'" *Boddie v. Am. Broad. Companies, Inc.*, 881 F.2d 267, 275 (6th Cir. 1989) (quoting *United States v. Phillips*, 540 F.2d 319, 325 (8th Cir.)).

### 1.    Oracle's Further Tortious Use of the Fruits of the Interception Constitutes a "Tortious Purpose"

Oracle's further, tortious use of intercepted data shows that the interception was for "the purpose of committing [a] tortious act," and thus the exception to the exception applies. 18 U.S.C. § 2511(2)(d). In *Brown*, plaintiffs alleged that Google "intercepted their communications for the purpose of associating their data with preexisting user profiles," which the court held sufficiently alleged that the "primary motivation or a determining factor in [the interceptor's] actions has been to injure plaintiffs tortiously," thereby satisfying the requirements of the exception to the exception. *Brown*, 525 F. Supp. 3d at 1067. Plaintiff's allegations are on all fours with this aspect of *Brown*: Oracle's own "association of Plaintiffs' data with preexisting user profiles" is a "further use of Plaintiffs' data that satisfies this exception." *Id.*

The Ninth Circuit has explained that the crime-tort exception to the ECPA's consent defense focuses on whether "the purpose for the interception—*its intended use*—was criminal or tortious." *Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (emphasis in original) (quotation marks and citation omitted). As the Third Circuit stated in *In re Google Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015), "all authority of which we are aware indicates that the criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving *tortious or criminal use of the interception's fruits*." *Id.* at 145 (emphasis added).

2923652.9

Courts, including within this District, have repeatedly found that the further use of intercepted communications to compile electronic profiles for profit, in violation of the plaintiffs' privacy rights, is an intentional "tortious act" under the ECPA. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796–97 (N.D. Cal. 2022) (citing cases from the Ninth Circuit and the Northern District of California and holding "[t]here is a not-insignificant chance, then, that plaintiffs may be able to show that the crime-tort exception applies" where personal data was used for advertising purposes); *Brown*, 525 F. Supp. 3d at 1067; *In re Toys R Us, Inc., Priv. Litig.*, No. 00-CV-2746, 2001 WL 34517252, at *8 (N.D. Cal. Oct. 9, 2001) ("plaintiffs allege [defendant] intercepted plaintiffs' communications with Web sites for tortious purposes, specifically 'to spy' on plaintiffs and collect their personal information without consent or compensation"); *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *8 (Plaintiffs properly alleged the defendants' primary motivation for interception was to commit tortious acts, "namely, the use of patient data for advertising in the absence of express written consent," where the use "for marketing and revenue generation was in violation of HIPAA and an invasion of privacy."); *TLS Mgmt. v. Rodriguez-Toledo*, 260 F. Supp. 3d 154, 165 (D.P.R. 2016) (allegation that defendants "benefit[ed] economically from the confidential information they intercepted" was sufficient to apply exception). Judge Orrick also applied the exception where subsequent use of the "fruits of the interception . . . could constitute the further tortious act." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,* 214 F. Supp. 3d 808, 828 (N.D. Cal. 2016).

Here, the Court has already determined that Plaintiffs' allegations regarding Oracle's further use of the fruits of its wiretapping activities sufficiently state a claim for the tort of intrusion upon seclusion. April 6, 2023 Order on Motion to Dismiss, Dkt. No. 49 at 11-13 ("April 6 Order"). Within the Ninth Circuit, facilitating such an "inva[sion of a plaintiff's] privacy" is a recognized tortious purpose providing a basis for the exception to the exception. *Deteresa v. Am. Broadcasting Cos., Inc.*, 121 F.3d 460, 467 n.4 (9th Cir. 1997) (tortious purposes include "invading [a plaintiff's] privacy . . . defrauding her, or . . . committing unfair business practices."); *see also Planned Parenthood*, 214 F.Supp.3d at 828 (recognizing that "further invading the privacy of plaintiffs' staff" sufficed to state crime-tort exception to consent exception); *In re Intuit Priv. Litig.*, 138 F.

2923652.9

Supp. 2d 1272, 1279 (C.D. Cal. 2001) (intercepting electronic communications with the purpose of facilitating violation of California Constitutional right to privacy would suffice for Section 2511 to apply (citing *Sussman,* 186 F.3d at 1202-1203)). Indeed, Oracle's own authority notes that Ninth Circuit has "implicitly recognized invasion of privacy as a tort that could provide the necessary intent to bring a recording within the purview of the Wiretap Act." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) (citing *Deteresa* 121 F.3d 460, 467 n. 4); Mot. at 10 (citing *Caro*, 618 F.3d at 99–100).[2]

Accordingly, contrary to Oracle's argument, this Court's reference to *In re DoubleClick's* statement that the exception to the exception does not apply where the defendant's "purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money," does not militate against application of the exception here. *See* April 6 Order, Dkt. No. 49, at 16 (citing *Rodriguez*, 2021 WL 2026726 at *6 n.8, in turn quoting *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 518 (S.D.N.Y. 2001)) ("*DoubleClick*"). Simply put, the existence of a lawful purpose does not "sanitize a[n interception] that was also made for an illegitimate purpose." *Sussman*, 186 F.3d at 1202 ("the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose"). The allegations here saliently mirror those in *In re Toys R Us*. There, the court rejected the argument that the presence of a lawful purpose "end[ed] the discussion," holding that allegations of effectuating a "commercial" purpose by invading plaintiffs' privacy allows the application of the ECPA's exception to the exception. *In re Toys R Us, Inc.,* 2001 WL 34517252, at *8 n.17. The *Toys R Us* court thus expressly noted that the presence of a tortious purpose in that case distinguished it from *DoubleClick. Id.* at 8; *see DoubleClick,* 154 F. Supp. 2d at 519 (noting the "utter lack of evidence" of tortious intent). Here, Oracle had a purpose of enriching itself through commercial use of personal data, but did so through tortious means,

---

[2] Oracle's authorities are similarly distinguishable. *See Cohen v. Casper Sleep Inc.*, No. 17CV9325, 2018 WL 3392877, at *4 (S.D.N.Y. July 12, 2018) (finding exception did not apply where was alleged tortious act was violation of GBL, but where the plaintiff had failed to properly allege a claim for violation of the GBL); *In re Nickelodeon Consumer Priv. Litig.*, No. CIV.A. 12-07829, 2014 WL 3012873, at *14 (D.N.J. July 2, 2014) (exception embodied in section 2511(2)(d) inapplicable where plaintiff had failed to allege separate tortious act); *In re Google Inc.Gmail Litig.*, No. 13-MD-02430-LHK, 2014 WL 1102660, at *18 (N.D. Cal. Mar. 18, 2014) (same, where plaintiffs alleged violations only of wiretapping statutes); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 526 (S.D.N.Y. 2001) (court dismissed invasion of privacy claim).

2923652.9

1    making it subject to the governance of the ECPA through the application of the exception to the

2    exception.

3         Moreover, the court in *DoubleClic*k made that holding "[i]n light of the abundant evidence

4    that DoubleClick's motivations have been licit and commercial and the utter lack of evidence that

5    its intent has been tortious." *DoubleClick,* 154 F. Supp. 2d at 519. In contrast here, the allegations

6    of Oracle's illicit behavior abound. In the twenty years since *DoubleClick*'s ruling, made in the

7    early days of the internet, courts have repeatedly recognized that comprehensive electronic dossier-

8    building based on tracking of plaintiffs' internet activity is potentially invasive and harmful, i.e,.

9    tortious. *See, e.g., In re Facebook, Inc. Internet Tracking Litig.* 956 F.3d 589, 601 (9th Cir. 2020);

10   *Brown*, 525 F. Supp. 3d at 1075–80; *Rodriguez*, 2021 WL 2026726 at 8; *In re Grp. Health Plan*

11   *Litig.,* 2023 WL 8850243, at *8. Moreover, the court's analysis in *DoubleClick* does not expressly

12   consider the ramifications of "profiling" upon the application of the exception to the exception.

13        The ECPA only requires that the defendant intend to commit a further *tortious act*—there

14   is no additional scienter requirement that the defendant know or understand that their conduct

15   constitutes a tort under the law. To the extent *DoubleClick* is interpreted to require a specific *mens*

16   *rea* to *cause harm*, as opposed to the intention to commit a "tortious act"—such as invading a

17   plaintiffs' privacy through extensive online and offline surveillance—*DoubleClick* incorrectly

18   injected into the plain language of the ECPA a judgement call about the *level of insidiousness* of

19   the tortious act. Respectfully, *DoubleClick*'s logic is infirm: blackmail and theft of trade secrets are

20   both tortious acts that are clearly intended to "make money"—and can both be accomplished

21   *without the actor understanding they are illegal*—yet either would unquestionably qualify for the

22   exception.[3] So too with Oracle's invasion of Plaintiffs' privacy through its creation of profiles

23   based on collection, compilation, and analysis of their online *and* offline activities, i.e., the "further

24   use" of the fruits of its wiretapping conduct. The above-cited rulings in this District have wisely

25   not grafted such an extra-statutory requirement on to the exception to the exception, and Plaintiffs

26

_____

27   [3] The legislative history of the ECPA gives as examples of tortious acts within the meaning of the statute that would trigger the exception "blackmail," and "stealing business secrets"—yet both are clearly directed at "making money." *See* 2 U.S.Code Cong. & Ad.News, 90th Cong., 2d Sess., p.

28   2182 (1968).

PLAINTIFFS' OPPOSITION TO ORACLE'S MOTION
                                                 TO DISMISS PORTIONS OF THE SECOND
                                                 AMENDED COMPLAINT; CASE NO. 3:22-CV-04792

1    respectfully submit this Court should not do so either.

2          Nonetheless, as set forth below, to the extent the Court determines that *DoubleClick*'s *mens*

3    *rea* requirement should be applied, the revised allegations of the SAC sufficiently plead that Oracle,

4    beyond committing the statutory tort of interception within the meaning of the ECPA, engaged in

5    that behavior with the ulterior motive to further invade the privacy of Plaintiffs and the class.

6                   **2.       The SAC Sufficiently Alleges Oracle's Tortious Intent**

7          The SAC alleges that Oracle was well aware of the invasive and harmful nature of its

8    conduct, but chose to continue with it. SAC ¶¶ 119-133. Oracle thus did not act under the "mere

9    possibility [that] Oracle's data collection activities could at some future date be deemed tortious;"

10   it acted with a "culpable mind." October 3 Order at 11, fn. 11.

11         To buttress the prior allegations about Oracle's publicly announced disregard for people's

12   privacy, the SAC adds six sets of allegations further demonstrating Oracle's tortious intent: ***First,***

13   Oracle's CEO publicly stated privacy is an "illusion" and therefore should not seriously be

14   considered while Oracle was creating an invasive national surveillance system through the Oracle

15   ID Graph; ***Second,*** an Oracle senior executive acknowledged that the notion that Oracle is a "first

16   party" to Plaintiffs' communications with websites is "ridiculous," even though the statement flatly

17   contradicts Oracle's stated position in this litigation; ***Third,*** Oracle internally acknowledged that

18   its alcohol-related profiling based on intercepted personal data was harmful and "enabling

19   alcoholics," but continued to do so nonetheless; ***Fourth,*** a former Oracle employee publicly

20   revealed that Oracle's supposed user privacy tools were "*purposefully* never updated and *knowingly*

21   inaccurate," allowing Oracle to hide its invasive conduct and frustrate people's ability to evade

22   Oracle's practices; ***Fifth,*** Oracle's understanding of the privacy-invasive nature of its own conduct

23   is demonstrated by Oracle's submissions to government entities lambasting its business rival

24   Google's practices as privacy-invasive, even though those practices are saliently identical to

25   Oracle's own as described in the SAC; ***Sixth,*** Oracle trades in political profiling and targeting

26   despite claiming publicly and before this Court that it does not. These new allegations show that

27   Oracle was aware, at a minimum, that "the company's privacy practices [were] problematic."

28   October 3 Order at 11.

2923652.9

### a. <u>Oracle Regards Privacy as an Illusion That Should Not Interfere With Its Commercial Surveillance Apparatus</u>

Oracle's former CEO and current CTO, Larry Ellison, has publicly stated that privacy is an "illusion." SAC ¶ 120. In 2001, Ellison "call[ed] for the creation of a national ID system," and Oracle since has "at Ellison's direction, eventually effectuated the equivalent of a 'national ID system'" for itself. *Id.* ¶¶ 120-121. These allegations add context to Ellison's 2016 description of Oracle amassing personal profiles through its ID Graph, which he acknowledged was privacy-invasive and potentially illegal; that is, "a combination of real-time looking at all of their social activity, real-time looking at where they are, including, micro-locations – *this is scaring the lawyers who are shaking their heads and putting their hands over their eyes* – knowing how much time you spend in a specific aisle of a specific store and what is in that aisle of a store." *Id.* ¶ 122. Still, Ellison justified going forward with this privacy-invasive conduct because, "[a]ll you have to give up is your illusions, not any of your privacy." *Id.* ¶ 120. Ellison's scienter, as the CEO providing a detailed overview of his company's tortious conduct, is imputed to Oracle. *See, e.g., Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 989 (9th Cir. 2008). Taken together, these statements demonstrate Oracle's goal of tracking and compiling the online and offline activity of all Americans, in a way that Oracle recognized was uniquely privacy-invasive. *See Id.* ¶¶ 119-122.

In its Motion, Oracle does not address the plain meaning of Mr. Ellison's statements, but instead suggests that his statements only evince that "Oracle intended to sell its technologies to potential customers." Mot. at 7. Oracle claims (without explanation) that the statement is taken "out-of-context," but it is the context itself that makes the statement so damning: Ellison was in fact *introducing* the privacy-invasive operations of Oracle's ID Graph to the world during his keynote presentation at Oracle's annual "Openworld" event. SAC ¶ 122. Moreover, the question of Mr. Ellison's *actual* intent and meaning in making this statements is a wholly factual one to be determined through discovery. *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at \*8.

### b. <u>Oracle Acknowledges That Its Technical Defenses to Privacy-Invasive Behavior is "Ridiculous"</u>

In this litigation, Oracle has argued that it could not be liable for violation of the ECPA because it is a "party" to the communications between Plaintiffs and websites, and as such its

2923652.9

consent to its own wiretapping conduct defeated Plaintiffs' ECPA claim. *See* Dkt. No. 23 at 19. But in a 2021 public-facing blog post on Oracle's website criticizing its rival Google's privacy-invasive practices, an Oracle Executive Vice President—clearly writing on behalf of Oracle—characterized an identical argument made by Google, as "ridiculous:"

> When I call my dad using Verizon, I assume my dad and I are the only people in the conversation. The two of us are the first parties. I did not call my dad and Verizon; there aren't three of us on the call. But under Google's rules, Verizon is a first party to the call, and they should be able to advertise to us based on the restaurants or movies—or health or financial issues—we discussed on our call.

> So let's follow the phone call analogy to the web. Let's say I sit down and "call" the New York Times using my Chrome web browser—HTTP instead of my phone. Here, the consumer considers the New York Times a first party—just like when I call my dad. The New York Times also considers the consumer its first party (i.e. customer). *It's ridiculous to consider Google a first party to this interaction just because I am using Chrome, even if the New York Times hires Google to place ads or track analytics on its website*.

SAC ¶ 125 (emphasis added). Yet Oracle subsequently made this very same "ridiculous" argument before this Court, arguing that it could not be liable under the ECPA because it was a "first party" to the communications between Plaintiffs and the websites where Oracle embeds its bk-coretag.js JavaScript interception mechanism. *See* Dkt. No. 23 at 19. Adding to this irony, at least until August 2022, Oracle's bk.coretag.js JavaScript code was in fact on the *New York Times* website, and Oracle thereby intercepted (and subsequently used) the contents of Plaintiffs' communications with that website. *See* SAC ¶¶ 6, 126. This allegation demonstrates Oracle well understood that its conduct was invasive and illegal, but pivoted to exculpatory arguments it had previously characterized as "ridiculous" when it found it legally expedient (but ultimately fruitless[4]) to do so.

Oracle's motion to dismiss fails to address this allegation at all; it therefore concedes this statement demonstrates Oracle's understanding of the privacy-invasive nature of its own conduct. *Holmes v. Tenderloin Hous. Clinic, Inc.*, No. C 09-5781 PJH, 2010 WL 1929586, at *3 (N.D. Cal. May 12, 2010), *aff'd*, 526 F. App'x 749 (9th Cir. 2013) (declining to dismiss claim where defendant "fail[ed] to address [certain] allegations at all"). Indeed, in driving the point home, the Oracle executive went on to say that "if Google were genuine in its privacy conversion," it would cease the very conduct that Plaintiffs allege *Oracle* itself engages in: "[i]t would stop tracking individuals

---

[4] The Court rejected Oracle's "party exception" defense to the ECPA and CIPA claims. Dkt. No. 49 at 14-15.

2923652.9

browsing," "[i]t would offer consumers opt-in control over their data," and "it would stop tracking individuals across devices."[5] *Cf.* SAC ¶¶ 6-15 (Oracle tracks Plaintiffs' web browsing); *id.* ¶¶ 99-118 ("Class Members Have Not and Cannot Consent to Oracle's Collection or Use of their Personal Information"); *id.* ¶ 55 ("Oracle monitors Class members' activities across their devices through cross-device tracking."). There is no reasonable interpretation of these statements other than that Oracle recognizes that the conduct it engages in invades class members' privacy.

### c.     Oracle Uses Personal Data To Disrupt People's Autonomy, Even At the Expense of Enabling Alcoholics

Plaintiffs allege that sources within Oracle stated to the press in 2019 that Oracle believed that alcohol-based targeting was harmfully "enabling alcoholics," yet Oracle continued to offer alcohol-related segment targeting for years afterwards, demonstrating its knowledge and intent with respect to the tortious nature of its conduct. SAC ¶ 127. In its own words, Oracle knowingly "enable[d] alcoholi[sm]" through the privacy-invasive profiling conduct described in the SAC. *Id.* Oracle completely misconstrues these allegations regarding Oracle's understanding of the harmfulness of its conduct: Plaintiffs do not allege, as Oracle seems to claim, that Oracle "misled" anyone about its alcohol-related profiling and targeting practices. *See* Mot. at 9 ("There is no statement in the article that Oracle itself represented to consumers that it would cease selling alcohol-based segments"). To the contrary, Plaintiffs allege Oracle openly continue to offer alcohol-related targeting as a service even after acknowledging doing so was harmful. SAC ¶ 127. Oracle does not join issue with the substance of this allegation, making no effort to square its alleged statements to the press on the harmfulness of its conduct with its subsequent failure to cease that conduct. Oracle therefore again concedes this allegation demonstrates tortious intent. *Holmes v. Tenderloin Hous. Clinic, Inc.*, 2010 WL 1929586, at *3.

### d.     Oracle Deliberately Deprecates Its Own "Privacy Tools"

As alleged in the SAC, in June of 2020, an anonymous former Oracle employee stated: "It should be known that [Oracle's data opt-out tool] is purposefully never updated and knowingly

---

[5] Ken Glueck, *Google's Privacy Sandbox – We're all FLoCed,* Oracle Blog (Mar. 7, 2021), https://www.oracle.com/news/announcement/blog/google-privacy-sandbox-030721/ (emphasis added) [https://perma.cc/GMR7-DHHX] cited in SAC ¶ 125.

2923652.9

inaccurate." SAC ¶ 133. Thus, this former Oracle employee stated publicly that Oracle's opt-out tool—which Oracle has touted[6] in this litigation as evidence of its privacy-protective practices—was *intentionally* "never updated and knowingly inaccurate"—in other words, a farce. *Id.* Oracle employees were therefore well aware not only that the company's privacy practices were problematic, but that Oracle intentionally and deliberately frustrated Class members' ability to opt out of its tracking and profiling practices. *Id.*

Oracle attempts to spin the statement as relating to only *one part* of Oracle's opt-out "tool." Mot. at 11. Plaintiffs disagree, and their allegations must be interpreted in the light most favorable to them on this motion. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). Whether it is Plaintiffs or Oracle who is correct in this interpretation is plainly a factual matter to be resolved on the merits, after discovery as to Oracle's employees' *actual* beliefs and intentions in rendering this tool "never updated and knowingly inaccurate." Moreover, even if Oracle is correct that the employee's statement admits that 'only' one part of Oracle's opt-out tool is intentionally "never updated and knowingly inaccurate," that does nothing to contravene the reasonable inference that Oracle's employees understood Oracle's activities to be privacy-invasive and actively endeavored to hide that from class members. SAC ¶ 133.[7]

      **e.**    **Oracle Must Be Aware Of Its Privacy-Invasive Conduct, Because It Has Called Out Other Companies For Engaging In The Same Conduct**

The SAC alleges that Oracle must know that its own conduct tortiously intrudes on people's privacy, because in submissions to government entities it has labeled the practices of its business rival Google as privacy-invasive, even though its practices are nearly identical to Oracle's own practices. According to Oracle, Google's "shadow profiles" are:

> [M]assive, largely hidden datasets of online and offline activities. This information is collected through an extensive web of Google [*cf.* Oracle] services, which is

---

[6] *See, e.g.,* Dkt. No. 63 at 1-2 (complaining that "Plaintiffs ignore that Oracle is lawfully operating within laws designed to protect California consumers . . . [they] ignore that internet users *are given the choice to opt out of the alleged data collection practices*." (emphasis added)); Dkt. No. 70 at 13 (attempting to distinguish Oracle's conduct from that of other privacy-invasive data aggregators on the grounds that "Oracle readily and broadly allows opt-outs").

[7] Oracle improperly attempts to raise a factual dispute as to the former employee's actual intentions and beliefs by seeking that Court consider material extraneous to that quoted by the SAC. Plaintiffs oppose that attempt. *See* Opposition to Request for Consideration of Documents, filed herewith.

2923652.9

difficult, if not impossible to avoid. *It is largely collected invisibly and without consumer consent.* [*cf. e.g.*, SAC ¶ 101[8]] by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes," activities and more. [*cf. e.g.*, SAC ¶¶ 60-71,[9]].

*See* SAC ¶ 123. Oracle further states that Google's conduct—which precisely mirrors Oracle's own as alleged the SAC—"works to provide *everything but privacy* for the consumer":

> Google [*cf.* Oracle] generates the majority of its revenue through advertising, powered by its ability to generate and combine large amounts of specific consumer data about consumer behavior on the internet with real time consumer activity and location data from mobile phones [*cf. e.g.*, SAC ¶¶ 41-59,[10] *supra*], as well as a myriad of other surreptitious collection points, such as internet cookies and application metadata. Google [*cf.* Oracle] uses the location data it collects from mobile devices over time to establish patterns of life for consumers and acknowledges tracking both signed in and signed out consumers to infer interest in a location and inform a profile for the purposes of selling ads [*cf. e.g.*, SAC ¶ 69[11]].

*See* SAC ¶ 124. But for the references to "Google," these paragraphs could have been lifted from Plaintiffs' own allegations regarding Oracle's privacy-invasive conduct, demonstrating Oracle's understanding of the significantly problematic nature of this conduct.

Oracle states without explanation that "Plaintiffs plainly misconstrue the document they cite," but does acknowledge that it submitted its criticism of Google's conduct (again, as the SAC alleges, nearly identical to Oracle's conduct) in the context of proposals of changes to Australian *privacy* laws. Mot. at 7. Oracle makes a weak attempt to characterize the document as somehow relating only to Google's anti-competitive practices, but even a cursory review of this document demonstrates that Oracle emphasizes the privacy-invasive nature of Google's conduct in its submission. *Id.* at 8. For example, describing Google's practice of "combin[ing] users' search histories with personal information obtained from other Google services," which mirrors Oracle's

---

[8] Stating in relevant part: "Oracle sits atop a complex data collection and processing apparatus feeding its labyrinthine multinational data marketplace, making it impossible for ordinary persons to reasonably understand the true purpose and extent of Oracle's data collection, compiling of digital dossiers, and other data exploitation practices, which are opaque, if not invisible, to ordinary data subjects."

[9] Describing Oracle's aggregation and analysis of Class members' data to create intimate portraits of their activities.

[10] Describing Oracle's use of cookies, pixels, JavaScript, and other means to surreptitiously collect data from Class members and combining that with offline purchase and location information.

[11] Oracle CEO Larry Ellison stated: "By collecting this data and marrying it to things like micro location information, Internet users' search histories, websites visits and product comparisons along with their demographic data, and past purchase data, Oracle will be able to predict purchase intent better than anyone."

2923652.9

conduct as described in the SAC (*see, e.g.,* SAC ¶¶ 6-15), Oracle noted that "Privacy advocates and commentators condemned Google for its failure to allow users to opt out of this unprecedented invasion of privacy." Dkt. No. 88-1 (Patel Declaration), Ex. A at 58. But as Plaintiffs allege, class members likewise do not and cannot consent to Oracle's analogous conduct. SAC ¶¶ 99-118. And, as explained in the SAC, Plaintiffs are not the only ones to interpret this submission as ironic and hypocritical given Oracle engages in the same conduct it criticizes Google for: the hypocrisy of Oracle's lobbying efforts on this front has been noted by commentators in the press. *See* SAC ¶ 98.[12]

### f. Oracle's Attempt to Mislead the Public Regarding Its Sale of Political Segments Demonstrates Tortious Intent

Plaintiffs allege Oracle has stated in both its privacy policies and in this litigation that Oracle does "not use any data it receives from customers to create sensitive interest segments," including those related to "political" orientation, "and prohibits its customers from doing the same;" as such, "Consumers are not and cannot be harmed by Oracle's practices[.]" Dkt. No. 63 at 3; SAC ¶ 128. However, as the SAC explains in detail, recent reporting indicates that, despite Oracle's representations to the public and this Court, Oracle has continued to offer "sensitive interest segments" for sale, including those based on political orientation. SAC ¶¶ 128-131. In June of 2023, nonprofit news publication The Markup analyzed a database of 650,000 "audience segments," which were "newly unearthed on the website of Microsoft's ad platform Xandr." *Id.* ¶ 130. The trove of data indicates that advertisers could also target people based on sensitive information," including political orientation, through audience segments made available by Oracle. *Id.* The database demonstrates that Oracle appears to continue (or at least continued as of May 2021) to offer political interest advertising segments for sale, including segments such as supporters of

---

[12] Citing Mike Masnick, *Oracle's Projection: As It Accuses Google on Snooping on You, It Has Built a Huge Data Operation That it Doesn't Want Regulated*, techdirt (Apr. 9, 2021, 9:37 AM) https://www.techdirt.com/2021/04/09/oracles-projection-as-it-accuses-google-snooping-you-it-has-built-huge-data-operation-that-it-doesnt-want-regulated/ [https://perma.cc/X8WZ-ZUWJ] ("It kind of makes you wonder how much of that lobbying is attacking Google by claiming that Google is doing… what Oracle is *actually* doing in undermining privacy . . . considering how much effort Oracle seems to be putting into demonizing Google's practices, and how much it's spending on lobbying, **when it appears that Oracle's own strategy is to be much more abusive in secretly collecting data on everyone**, it seems worth questioning just what Oracle's actual strategy here is, beyond attacking a competitor.") (bold emphasis added).

2923652.9

"Donald Trump," donors to "Progressive Causes," backers of the "Tea Party," and an array of political labels like "Conservative," "Liberal," "Independent," and "Undecided Voter." *Id.*

The SAC alleges that Oracle deliberately conceals from the public that it creates profiles of them based on sensitive information such as their political orientation "because it knows the conduct it engages in is harmful and invasive of Class members' privacy and would be immediately recognized as such once publicly revealed." SAC ¶ 131. Indeed, Oracle's denial before this Court of having created political segments was made in the context of arguing "*[c]onsumers are not and cannot be harmed* by Oracle's practices[.]" Dkt. No. 63 at 3 (emphasis added). In attempting to neutralize these allegations, Oracle pivots to a new position—rather than denying it engages in political profiling and targeting, it now attempts to characterize Plaintiffs' allegations as *only* relating to conduct taking place between 2016 and 2021, while Plaintiffs' SAC points to Oracle's misrepresentations in privacy policies in effect as of the filing of this action in 2022. Mot. at 9. It likely focuses on this supposed disparity because Oracle clearly intended to convey to the Court in its motion to dismiss filed earlier this year that Oracle *has not* engaged in political profiling and targeting; to minimize this statement, it will presumably argue in reply that it was only phrased in the *present* tense, and therefore is not inconsistent with Plaintiffs' allegations in the SAC. Dkt. No. 63 at 3. But Plaintiffs explicitly allege that Oracle "*appears to continue* (or at least continued as of May 2021)," and further allege (in the present tense) that Oracle "creates profiles" based on political information, contrary to the representations in its privacy policies as of the filing of this Action. Plaintiffs thus sufficiently allege Oracle *continues* to offer political segments despite its current representations.[13]

---

[13] Oracle improperly, if indirectly, attempts to argue the facts on its motion to dismiss, suggesting that it ceased offering political segments at some indefinite time. *See* Mot.at 9. However, Plaintiffs have pleaded facts consistent with internal documents produced during discovery that contradict Oracle's assertion, SAC ¶¶ 130-131, and which should be regarded as true for purposes of this motion. In fact, Plaintiffs expressly allege that Oracle's policy statement is "false" in this regard. SAC ¶ 128; compare Oracle Data Cloud Privacy Policy, updated December 24, 2019, available at https://www.oracle.com/legal/privacy/marketing-cloud-data-cloud-previous-privacy-policy-122419.html ("Oracle does not create any online interest segments that reflect personal information that we consider sensitive . . . such as religious, *political*, or sexual orientation" with SAC ¶ 130 (citing report that after 2019, Oracle continued to "offer political interest advertising segments for sale,180 including segments such as supporters of "Donald Trump," donors to "Progressive Causes," backers of the "Tea Party," and an array of political labels like "Conservative," "Liberal," "Independent," and "Undecided Voter."). Should the Court entertain Oracle's request for fact

Oracle also misconstrues the relevance of these allegations to the ECPA exception to the exception. Whether or not Plaintiffs or class members were actually misled by Oracle's misrepresentations is irrelevant to this point—what matters is that Oracle sought to hide this conduct because it understood that it was privacy-invasive and harmful. Oracle's *attempt* to mislead the public as to the nature of its conduct—irrespective of whether it did so effectively—is evidence in and of itself of tortious intent. *Cf. Brown* 525 F. Supp. 3d at 1070 (exception to exception applied in case where "Google's representations regarding private browsing 'obscure[d] Google's intent to engage in such interceptions.'").

## C. Plaintiffs State a Cognizable Claim for ECPA Violation Regardless of Whether The Exception to the Exception Applies

The ECPA claim is adequately pleaded regardless of whether the exception to the exception applies because, as Plaintiffs' allegations make clear, there is no reasonable interpretation of Oracle's policies or disclosures which could provide third party websites with a basis to consent to Oracle's exploitation of the personal data taken from their websites. A complaint need not anticipate or plead against affirmative defenses. *U.S. Commodity Future Trading Comm'n v. Monex Credit Co*., 931 F.3d 966, 972 (9th Cir. 2019); *see also Lusnak v. Bank of Am*., N.A., 883 F.3d 1185, 1194 n.6 (9th Cir. 2018). To the contrary, granting a motion to dismiss based on an affirmative defense is only appropriate if "the defendant shows some obvious bar to securing relief on the face of the complaint." *ASARCO, LLC v. Union Pac. R.R. Co*., 765 F.3d 999, 1004 (9th Cir. 2014). Oracle has failed to show on this motion that it is "obvious" that website owners consented to its tortious further uses as described in the SAC. This Court previously found that "[a]s [Oracle's] customers must have chosen to deploy Oracle's tools on their websites, it necessarily follows that 'one of the parties to the communication'—the websites themselves—gave 'prior consent to such interception.'" April 6 Order at 16 (citing *Rodriguez*, 2021 WL 2026726 at *6). However, as the SAC's revised allegations now make clear, Oracle has attempted to mislead the public as to the privacy-invasive conduct. SAC ¶¶ 123-125, 128 132. Accordingly, Plaintiffs renew their assertion that Oracle has failed to demonstrate the websites consented to Oracle's interceptions in light of

finding on this Motion, Plaintiffs respectfully request that they be granted leave to lodge the documents obtained during discovery and/or leave to amend to address Oracle's factual assertions.

2923652.9

1   this further exploitation of the intercepted data.

2   　　　　Other courts have found in analogous circumstances that where the defendant's disclosures

3   failed to sufficiently apprise the public about the defendant's tortious practices, consent could not

4   be imputed to website owners at the pleadings stage, even though the websites had voluntarily

5   installed the defendant's code. *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949

6   (N.D. Cal. 2022); *Brown*, 525 F. Supp. at 1068 ("[T]he Court concludes that Google has not met

7   its burden to establish consent because, even assuming that Google has established that websites

8   generally consented to the interception of their communications with users, Google does not

9   demonstrate that websites consented to, or even knew about, the interception of their

10  communications with users who were in private browsing mode."); *Calhoun v. Google LLC*, 526

11  F. Supp. 3d 605, 624 (N.D. Cal. 2021); *see also Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-

12  WHO, 2023 WL 5837443, at *5 (N.D. Cal. Sept. 7, 2023) (finding Meta failed to show on motion

13  to dismiss healthcare provers had consented to interception of healthcare information).

14  　　　　In light of the manifest dearth of any indication that Oracle made any reference whatsoever

15  to these third parties as to its "further" and tortious use of the personal data taken from them, this

16  Court should defer determination of whether website operators *as a matter of law* have consented

17  to Oracle's conduct to the fact-finding stage. *Id.* at *5 ("These evidence-bound determinations are

18  inappropriate to reach on this motion."). As the SAC alleges, not only are Oracle's public-facing

19  disclosures misleading as to Oracle's practices (*see* SAC ¶¶ 110-113, alleging *inter alia* that

20  "Oracle's privacy policies fail to meaningfully disclose what Oracle does with internet users'

21  information"), but Oracle, by decrying the practices alleged in the SAC as privacy-invasive when

22  engaged in by Google, has implicitly misrepresented to the public the further uses *Oracle itself* has

23  put the intercepted contents to. SAC ¶¶ 123-125. This fact distinguishes this case from *Rodriguez*:

24  Plaintiffs do not allege here that websites only consented to interceptions consistent with Plaintiffs'

25  own expectations; rather Plaintiffs' allegations give rise to the plausible inference that the websites

26  themselves do not understand or consent to the scope of Oracle's further uses of the

27  communications it intercepted. *Cf. Rodriguez*, 2021 WL 2026726, at *5 (rejecting argument that

28  developers consented to "collecting user data only insofar as that collection comports with each

-17-

2923652.9

user's individual privacy expectations"). Oracle has failed to show the only reasonable interpretation of the facts alleged is that website owners have consented to Oracle's privacy-invasive conduct as a matter of law.

### D.     Plaintiffs Have Stated a Claim for Intrusion Upon Seclusion under Florida Law

Florida law on intrusion upon seclusion requires an intrusion into a "private place" that is highly offensive to a reasonable person. *Hammer v. Sorensen*, 824 F. App'x 689, 695 (11th Cir. 2020). Intrusions can be either physical or electronic, as can the "private place" intruded upon. *Id.* at 696; *Spilfogel v. Fox Broad. Co.*, No. 09-CV-80813, 2010 WL 11504189, at *5 (S.D. Fla. May 4, 2010), *aff'd*, 433 F. App'x 724 (11th Cir. 2011). Responding to the Court's October 3 Order, Dr. Golbeck now alleges with more specificity that Oracle has intruded into two private places: (1) Dr. Golbeck's home, (2) Dr. Golbeck's password-protected devices, in a manner highly offensive to a reasonable person.

### 1.     Plaintiffs Sufficiently Allege Oracle has Intruded Into Dr. Golbeck's Home

Oracle contends the SAC fails to allege intrusion into Dr. Golbeck's home because (i) its allegations are "essentially identical" to those in the prior First Amended Complaint ("FAC"), and (ii) the new evidence cited in the SAC does not support Plaintiffs' allegations. Mot. at 4. Neither assertion is correct.

**First**, the SAC does not simply rehash prior allegations. The prior FAC did broadly allege that Oracle's surveillance extended to the home and this constituted intrusion upon seclusion, but the SAC expands upon this substantially. The SAC newly alleges, *inter alia*, that Oracle "enables its clients to surveil and manipulate Florida Class members in their homes by 'targeting households within a specific radius,'" that "a central function of the ID Graph is to surveil and target Florida Class members in their homes and link that activity to the digital dossiers it compiles on them," and that "Oracle represents the ID Graph as linking 'real people' in their homes to the various other identifiers in its datasets." *Id.* ¶ 182 (internal alterations and citation omitted). The SAC also newly alleges that "Oracle intentionally electronically intruded into Dr. Golbeck's home by placing tracking devices on her devices which allowed Oracle to engage in pervasive surveillance of Dr.

1  Golbeck's activities taking place on her devices, within the physical confines of her home,"

2  (including her "communications over the internet") and that Oracle's conduct is "the equivalent of

3  employing an electronic listening device or 'bug' within a person's home to surreptitiously monitor

4  aural conversations." *Id.* ¶ 183.

5      Oracle is correct that the SAC, like the FAC before it, alleges Oracle intruded upon Dr.

6  Golbeck's seclusion by surveilling her inside her home. However, the SAC differs significantly

7  from its predecessor in explaining how Oracle conducts its surveillance inside homes and what

8  conduct is surveilled in homes (*Id.* ¶¶ 177–78, 180–81, 183, 185–87, 189), how Oracle worsens the

9  intrusion by combining this data with other sources in profiles (*id.* ¶¶ 184, 187–91), and how that

10  in-home surveillance is a key part of Oracle's conduct (*Id.* ¶¶ 182, 187, 190).

11      **Second**, Oracle misconstrues the SAC's allegation that Oracle's "targeting households

12  within a specific radius" can "only" mean that Oracle can tie individuals' online data to their IP

13  address. *Id.* ¶ 182 (citation omitted). Oracle ignores that Plaintiffs' new allegations specifically

14  show that it surveils and targets *households*, not simply individuals. *Id.* ("[t]he ID graph enables

15  Oracle to reach 115 million *households* in the US today, and after removing cookies and MAIDs,

16  Oracle will still be able to reach 99% of those *households*.") (emphasis added).

17      Moreover, Oracle's argument elides that Plaintiffs' theory of the case is that Oracle uses its

18  steady accretion of small pieces of information—including both online and offline data—to create

19  comprehensive profiles of class members. The SAC alleges that much of this surveillance occurs

20  while class members are at home, a point Oracle does not dispute. *See also Rebalko v. City of Coral*

21  *Springs*, No. 19-60569-CIV, 2020 WL 6446042 at *29 (S.D. Fla. Nov. 3, 2020) (noting "Florida's

22  courts have said precious little" about what constitutes a private quarter but "a person's home"

23  plainly qualifies). The SAC further alleges that Oracle uses the ID Graph to tie profiles to class

24  members' actual homes and then targets them on its clients' behalf. *Id.* ¶¶ 182–83. Oracle argues

25  that the Court should ignore its conduct because "online data such as URLs, website titles, and click

26  events," collected from class members' homes, are harmless in isolation. Mot. at 5. But Oracle's

27  business relies on ensuring that these data points do not stay isolated; it stitches them together into

28  comprehensive profiles. SAC ¶¶ 9–10, 19, 37–38, 48, 51, 61–71, 72–88. Indeed, the Court has

PLAINTIFFS' OPPOSITION TO ORACLE'S MOTION
TO DISMISS PORTIONS OF THE SECOND
AMENDED COMPLAINT; CASE NO. 3:22-CV-04792

already recognized the fundamental flaw with Oracle's argument: "It would be perverse to hold an individual entitled to no protection where a company amalgamates many pieces of information about that individual's preferences on the grounds that revealing any one preference is no big deal." October 3 Order at 17 (sealing OARRRs on this basis); *see also* April 6 Order at 12 (declining to dismiss California intrusion-upon-seclusion claim because the Ninth Circuit has "found a reasonable expectation of privacy from 'allegations that Facebook allegedly compiled highly personalized profiles from sensitive browsing histories and habits'" (quoting *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020)).

Florida law supports the conclusion that Plaintiffs have stated a claim for intrusion upon seclusion. In *Jackman v. Cebrink-Swartz*, the court found plaintiffs were entitled to a preliminary injunction because they were likely to succeed on the merits of their intrusion upon seclusion claim based on their neighbors' use of a video camera to surveil their home. 334 So. 3d 653, 657 (Fla. Dist. Ct. App. 2021); *see id.* (listing similar cases). Oracle's online tracking may be less conspicuous, but the end result (household-linked profiles sold to unidentified clients) is, if anything, more intrusive than in *Jackman* (videos of a backyard that were not shared with third parties). *See id.* at 656–67. And in *Zorn v. McNeil* the defendant's alleged calls to the plaintiff were sufficient to state a claim for intrusion upon seclusion because the plaintiff alleged "that she received these calls and messages while at home and, taking all inferences in favor of [plaintiff], that [defendant] knew she was at home when he initiated them." No. 6:16-CV-1-ORL-41TBS, 2016 WL 5476195, at *10 (M.D. Fla. Sept. 29, 2016). Oracle's intrusion into class members' homes extends far beyond mere phone calls, and was further knowingly directed towards class members' activity taking place within the confines of their homes. SAC ¶ 182. The SAC alleges that Oracle has engaged in conduct *more* intrusive than in *Jackman* and *Zorn*, and that this was directed at Dr. Golbeck while she was at her home. Plaintiffs have thus satisfied the first element of an intrusion upon seclusion claim under Florida law.

### 2.   Plaintiffs Sufficiently Allege Oracle has Intruded Into Dr. Golbeck's Devices

Dr. Golbeck's devices constitute "electronic spaces" under Florida law. Intrusion upon

2923652.9

seclusion safeguards "the right of a private person to be free from public gaze." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003). Accordingly, Florida law provides that intrusion upon seclusion claims arise where a defendant has intruded "into a *place* or area—whether it be a physical space, such as a bedroom or into an electronic space, such as a telephone line—in which the plaintiff had a reasonable expectation of privacy." *Spilfogel*, 2010 WL 11504189, at *5 (emphasis in original). This includes electronic spaces such as telephone lines and email accounts. *Id.*; *Stirling Int'l Realty, Inc. v. Soderstrom*, No. 6:14-CV-1109-ORL-40T, 2015 WL 403318, at *6 (M.D. Fla. Jan. 28, 2015). Given the volume and sensitivity of data on them, modern cell phones and laptop computers are generally kept "free from public gaze." SAC ¶ 179. Florida courts have specifically recognized that accessing a "[p]laintiff's phone and search[ing] through its contents" constitutes intrusion into a private "place." *Ward v. Casual Rest. Concepts Inc.*, No. 8:10-CV-2640-T-17TGW, 2011 WL 2600511, at *4 (M.D. Fla. June 29, 2011). Florida courts further recognize a reasonable expectation of privacy in electronic spaces, such as email accounts, where access to the electronic space was generally kept private. *Stirling*, 2015 WL 403318, at *6 (finding plaintiff stated a claim for Florida intrusion upon seclusion because defendant accessed his email account and forwarded information); *see Hammer v. Sorensen*, 824 F. App'x 689, 696 (11th Cir. 2020) (electronic email addresses can be "associated with private quarters" *i.e.* accessed privately, for the purposes of an intrusion claim").

Consistent with this authority, the SAC alleges Dr. Golbeck's devices are electronic spaces that constitute "private places." SAC ¶ 180. Specifically, the SAC alleges Dr. Golbeck "kept access to her devices, including her laptop and cell phone, and the information therein, including her web browsing history and communications with websites taking place therein, private," that her "devices are and were password protected," that she "generally did not allow others to access any them," and that "Oracle intruded into these electronic spaces by, *inter alia*, intercepting the contents of her communications with websites and otherwise systematically surveilling her activities on her devices." *Id.* ¶ 180. Oracle argues Plaintiffs "conflate[] the locally saved contents of [Dr. Golbeck's] devices' files and her browsing history," and "make[] no allegation that Oracle accessed any locally saved content on her 'password protected' devices." Mot. at 3. Oracle is mistaken. The

SAC alleges that Oracle collects data on individuals' internet use by means of "proprietary 'cookies' …. *that are stored on Internet users' web browsers*." by means of "bk-coretag.js JavaScript" that "Oracle *places … on Internet users' electronic devices*," and by means of "tracking pixels" that Oracle "*loads … on website visitors' browsers*." SAC ¶ 43, 45, 56 (emphases added) (citation omitted).[14] Oracle creates profiles by combining data obtained from these on-device cookies with data from other sources. *Id.* ¶¶ 43, 44–50, 51–53, 56, 61.

Moreover, Oracle previously argued against applying California law to Dr. Golbeck's claims because, according to Oracle, its surveillance physically occurred in Florida where "*her browsers and devices are located*"—an argument it prevailed on.[15] Now, however, Oracle takes the opposite view—it argues its surveillance was only of Dr. Golbeck's "browsing history" rather than "any locally saved content on her … devices." Mot. at 3. Oracle cannot have it both ways: if Oracle's surveillance occurred on Dr. Golbeck's "browser and devices" physically located in Florida as Oracle previously argued, then Plaintiffs have successfully alleged that Oracle intruded into Dr. Golbeck's private devices. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase") (citations omitted).

Oracle's cases do not compel a contrary conclusion. Mot. at 4 (citing *Jacome v. Spirit Airlines Inc.*, No. 2021-000947-CA-01, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021) and *United States v. Trader*, 981 F.3d 961 (11th Cir. 2020)). *Trader* is a *Georgia* search-and-seizure criminal case in which the defendant was charged with sexually abusing children. It does not concern Florida common law and, at most, suggests defendants lack a Fourth Amendment right against the government obtaining IP addresses and emails they provide to messaging apps as part of a criminal

---

[14] Cookies' presence on devices is also a necessary implication because they can only track individuals via being deployed on browsers.

[15] Oracle argued that "'[Golbeck's] interactions with the third-party websites'—the activity underlying her unjust enrichment claim—'presumably [did] not' occur 'in California' and her new allegations fail to demonstrate otherwise. Rather, as the Court has already found, 'the state where the last event necessary to make the actor liable occurred' was Florida—where she and her browsers and devices are located.'" *See* Dkt. No. 63 at 8 (quoting April 6 Order at 22); *accord* Dkt. No. 23 at 11-12 ("Because Golbeck and Ryan accessed the internet on devices located outside California the alleged tracking necessarily occurred outside the territorial scope of the UCL.").

2923652.9

1    investigation. *Trader*, 981 F.3d at 967–68. As for *Jacome*, the plaintiff sued the owner of a website

2    he interacted with for violations of the FSCA. 2021 WL 3087860, at *7. The court found that a

3    plaintiff cannot expect to keep information shared with a website private from that website's owner.

4    The court did not hold, however, that the plaintiff had no reasonable expectation of privacy with

5    respect to parties other than the website owner, such as Oracle. *Id.* Neither case undermines

6    Plaintiffs' allegation that Dr. Golbeck's home and devices are private places in which she has a

7    reasonable expectation of privacy.

8           **3.      Plaintiffs Sufficiently Allege That Oracle's Conduct Was Highly
                      Offensive to a Reasonable Person**

9
10          Oracle next argues that a reasonable person could not find its conduct "highly offensive"

11   because Florida courts deny privacy claims involving supposedly more sensitive data. This theory

12   ignores the gravamen of Plaintiffs allegations. Oracle's argument is that the data it collects is itself

13   unproblematic and that Plaintiffs have hence failed to allege a "highly offensive" intrusion. This

14   analysis elides what *Oracle does with the data once it is collected.* The gravamen of Plaintiffs' case

15   is that Oracle's surveillance is highly offensive because it combines the vast trove of data it collects

16   into intrusive profiles and sells them to unidentified customers. *See* SAC, *passim*. This Court has

17   recognized why this is problematic, finding that the contents of Oracle profiles "indicate more than

18   simple likes or dislikes and instead communicate intimate details of Plaintiffs' daily lives." October

19   3 Order at 17. The OARRRs underscore the point. Dkt. No. 75-1 (Maher Declaration), Ex. A (Katz-

20   Lacabe OARRR) and Ex. B (Golbeck OARRR). For example, the OARRRs contain health

21   information, sensitive purchases, vehicle information, specific businesses and restaurants

22   frequented, specific products purchased, specific television shows watched, plus financial

23   accounts and transactional activity. Ex A, Lines 280, 313, 362, 747, 963, 979, 1028, 1074,

24   1112, 1185; Ex. B, Lines 61–66, 155–57, 516–54. Oracle's profiles extend to the point of

25   listing specific retail purchases, including date, item, price, and even SKU number. Ex. B Line

26   1202. In short, Oracle secretly, compiles cradle-to-grave profiles and sell access thereto. A

27   reasonable juror could find such conduct highly offensive.

28          Oracle's cases do not compel a contrary conclusion. Mot. at 5. To start, Oracle is incorrect

-23-

2923652.9

1   that the information at issue in those decisions is "*more* sensitive" than it the profiles it creates of

2   class members. *Id.* (emphasis in original). Even if the information were of comparable sensitivity—

3   and it is not—Oracle's cases are inapposite. Two of the four do not discuss intrusion upon seclusion

4   at all. *Regions Bank v. Kaplan*, No. 17-15478, 2021 WL 4852268 (11th Cir. Oct. 19, 2021); *Post-*

5   *Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 613 (Fla. Dist. Ct. App. 2007). Their

6   relevance is thus unclear, as they concern a different variant of the invasion of privacy tort

7   (publication of private facts) that is focused on a different harm (wrongful publication of private

8   personal information). Nor are the facts similar. *Post-Newsweek* is a First Amendment appeal by a

9   television broadcaster of an injunction barring it from publishing the private papers of a public

10  figure. 968 So. 2d at 609–10, 613–14. *Regions Bank* stems from a bank reporting a suspected

11  fraudster's social security number. 2021 WL 4852268, at *1–3, 12–13. Neither set of facts is

12  analogous to a defendant amassing detailed profiles on members of the general public without their

13  knowledge or consent.

14       Oracle's remaining cases are likewise inapposite. In *Celestine v. Capital One*, a *pro se*

15  plaintiff sued financial institutions (to whom he may have owed money) for accessing his credit

16  report, which the court found under the circumstances did not rise to the requisite level of

17  offensiveness; there was no allegation that the defendants had surveilled him and compiled

18  disparate sources of information on him. No. 17-20237-Civ-Scola, 2017 WL 2838185, at *1-3 (S.D.

19  Fla. June 30, 2017). In *Stasiak v. Kingswood Co–Op, Inc.*, plaintiffs authorized the defendant to

20  conduct "any investigation of my . . . financial and credit record through any investigation or credit

21  agencies or bureaus of your choice" but proceeded to file suit when the defendant accessed their

22  credit reports. No. 8:11-cv-1828-T-33MAP, 2012 WL 527537, at *1–3 (M.D. Fla. Feb. 17, 2012).

23  Businesses using credit reports to evaluate customers with whom they directly transact is not

24  comparable to Oracle secretly compiling vastly more detailed profiles and then selling them to

25  advertisers. *See, e.g.,* SAC ¶¶ 37–38, 61–71, 72–88.

26       In sum, Plaintiffs have alleged that Oracle's conduct is highly offensive. *See. e.g.,* SAC ¶¶

27  174–197. To the extent any ambiguity about the matter exists, it should be left to the factfinder. *See*

28  *See* April 6 Order at 12-13 ("[D]eterminations of the egregiousness of the privacy intrusion are not

-24-

1  usually resolved at the pleading stage."); *see also Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043,

2  1054 (N.D. Cal. 2018) (Seeborg, J.) (Whether conduct rises to the level of highly offensive "is indeed

3  a factual question 'best left for a jury.'"); *N.A.S. v. Morada-Haute Furniture Boutique LLC*, No. 20-

4  24676-CIV, 2021 WL 5547626, at *6 (S.D. Fla. Aug. 24, 2021) (declining to dismiss Florida intrusion

5  upon seclusion claim because a "reasonable juror" could find the conduct "highly offensive").

6  **III.    <u>CONCLUSION</u>**

7          Plaintiffs respectfully submit that the Court should deny Oracle's Motion to Dismiss

8  Portions of the Second Amended Complaint in its entirety, but that any dismissal, in whole or in

9  part, should be without prejudice and with leave to amend.

10

11  Dated: January 22, 2024                    */s/* Michael W. Sobol
                                              Michael W. Sobol (SBN 194857)
12                                            msobol@lchb.com
                                              David T. Rudolph (SBN 233457)
13                                            drudolph@lchb.com
                                              Jallé H. Dafa (SBN 290637)
14                                            jdafa@lchb.com
                                              John D. Maher (SBN 316157)
15                                            jmaher@lchb.com
                                              Nabila Abdallah (SBN 347764)
16                                            nabdallah@lchb.com
                                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
17                                            275 Battery Street, 29th Floor
                                              San Francisco, CA  94111-3339
18                                            Telephone:  415.956.1000
                                              Facsimile:  415.956.1008

19                                            *Attorneys for Plaintiffs and the Class*

20

21

22

23

24

25

26

27

28

2923652.9

1

**<u>CERTIFICATE OF SERVICE</u>**

2     I, Michael W. Sobol, certify that I caused the foregoing document to be served on all

3 counsel for all parties to this action by filing it through the Court's ECF system.

4

5 Dated: January 22, 2024                    <u>*/s/ Michael W. Sobol*</u>
                                            Michael W. Sobol

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO ORACLE'S MOTION
TO DISMISS PORTIONS OF THE SECOND
AMENDED COMPLAINT; CASE NO. 3:22-CV-04792

2923652.9