1  TIFFANY CHEUNG (CA SBN 211497)
   TCheung@mofo.com
2  CHRISTIN HILL (CA SBN 247522)
   CHill@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California  94105-2482
   Telephone:    415.268.7000
5  Facsimile:    415.268.7522

6  PURVI G. PATEL (CA SBN 270702)
   PPatel@mofo.com
7  WHITNEY O'BYRNE (CA SBN 325698)
   WOByrne@mofo.com
8  ERIK MANUKYAN (CA SBN 340307)
   EManukyan@mofo.com
9  EMMA BURGOON (CA SBN 348097)
   EBurgoon@mofo.com
10 MORRISON & FOERSTER LLP
   707 Wilshire Boulevard, Suite 6000
11 Los Angeles, California  90017-3543
   Telephone:    213.892.5200
12 Facsimile:    213.892.5454

13 Attorneys for Defendant
   ORACLE AMERICA, INC.

14 *Additional counsel on next page*

15

## UNITED STATES DISTRICT COURT

16

## NORTHERN DISTRICT OF CALIFORNIA

17

## SAN FRANCISCO DIVISION

18

19

| | |
|---|---|
| MICHAEL KATZ-LACABE, ET AL., | Case No. 3-22-cv-04792-RS |
| Plaintiffs, | **DEFENDANT ORACLE AMERICA, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| v. | |
| ORACLE AMERICA, INC., a corporation organized under the laws of the State of Delaware, | Judge:  Hon. Richard Seeborg |
| Defendant. | Date:  March 14, 2024<br>Time:  1:30 p.m.<br>Courtroom:  3 |
| | Date Action Filed:  August 19, 2022<br>SAC Filed:  November 17, 2023<br>Trial Date:  Not set |

20

21

22

23

24

25

26

27

28

ZACHARY S. NEWMAN (NY SBN 5651518)
(Admitted *pro hac vice*)
ZNewman@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019-9601
Telephone:    212.468.8000
Facsimile:    212.468.7900

KYLE ZIPES (CA SBN 251814)
Kyle.Zipes@oracle.com
NARGUES M. EDER (CA SBN 260289)
Nargues.M.Eder@oracle.com
ORACLE AMERICA, INC.
500 Oracle Parkway
Redwood Shores, California 94065
Telephone:    650.506.7000

Attorneys for Defendant
ORACLE AMERICA, INC.

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

3
I.    INTRODUCTION ........................................................................................................... 1

4
II.   ARGUMENT .................................................................................................................. 1

5
      A.    Oracle's Alleged Collection of Web Activity and Shopping Information Is
            Not a "Highly Offensive" Intrusion into a "Private Quarter" Under Florida
            Law............................................................................................................................ 1

6

7
            1.    Golbeck does not plausibly allege that Oracle intruded into her
                  home or into a private space within her electronic devices ........................ 1

8
            2.    Golbeck does not plausibly allege conduct that would be considered
                  highly offensive to a reasonable person ...................................................... 3

9
      B.    Plaintiffs Do Not Plausibly Allege That Oracle Runs Its AdTech Business
            For Tortious Purposes ............................................................................................... 5

10
            1.    Plaintiffs' allegation that Oracle subsequently used their data does
                  not establish tortious intent ......................................................................... 5

11
            2.    Plaintiffs' other allegations do not plausibly allege tortious intent............ 8

12
                  a.    Larry Ellison's alleged statements are insufficient to plead
                        tortious intent .................................................................................. 8

13
                  b.    Oracle's criticisms of Google do not establish tortious intent ........ 9

14
                  c.    Oracle's alleged continued sale of alcohol-based advertising
                        does not reflect a tortious intent .................................................... 10

15

16
                  d.    A supposed former employee's comments do not suggest
                        Oracle knew its business was harmful ........................................... 11

17
                  e.    Oracle's alleged misrepresentation of its sale of political
                        affiliation segments does not establish tortious intent ................. 12

18
            3.    Because Plaintiffs cannot invoke the crime-tort exception, ECPA's
                  one-party consent defense completely bars the claim.............................. 13

19
III.  CONCLUSION ............................................................................................................. 15

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brown v. Google,*
   525 F. Supp. 3d 1049 (N.D. Cal. 2021) ................................................................... 7, 11, 13, 14

*Calhoun v. Google LLC,*
   526 F. Supp. 3d 605 (N.D. Cal. 2021) ..................................................................................... 14

*Capitol Recs. Inc. v. Thomas-Rasset,*
   No. 06-1497,
   2009 WL 1664468 (D. Minn. June 11, 2009) ....................................................................... 6, 7

*Carvalho v. Equifax Info. Servs., LLC,*
   629 F.3d 876 (9th Cir. 2010) ..................................................................................................... 15

*Celestine v. Cap. One,*
   No. 17-20237-Civ-Scola,
   2017 WL 2838185 (S.D. Fla. June 30, 2017) ........................................................................ 4, 5

*Crittenden v. Apple, Inc.,*
   No. 5:21-CV-04322-EJD,
   2022 WL 2132224 (N.D. Cal. June 14, 2022) ......................................................................... 11

*Deteresa v. Am. Broad. Cos.,*
   121 F.3d 460 (9th Cir. 1997) ................................................................................................... 5-6

*Doe v. Meta Platforms, Inc.,*
   No. 22-cv-03580-WHO,
   2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) ......................................................................... 14

*In re DoubleClick Inc. Priv. Litig.,*
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................................. *passim*

*In re Google Assistant Priv. Litig.,*
   457 F. Supp. 3d 797 (N.D. Cal. 2020) ..................................................................................... 13

*In re Google Inc. Gmail Litig.,*
   No. 13-MD-02430-LHK,
   2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) .................................................................. 6, 12-13

*In re Google RTB Consumer Priv. Litig.,*
   606 F. Supp. 3d 935 (N.D. Cal. 2022) ..................................................................................... 14

*Holmes v. Tenderloin Hous. Clinic, Inc.*,
No. C 09-5781 PJH, 2010,
WL 1929586 (N.D. Cal. May 12, 2010),
*aff'd*, 526 F. App'x 749 (9th Cir. 2013) ........................................................................... 10

*In re Intuit Privacy Litigation*,
138 F. Supp. 2d 1272 (C.D. Cal. 2001) ............................................................................. 8

*Jackman v. Cebrink-Swartz*,
334 So. 3d 653 (Fla. Dist. Ct. App. 2021) ........................................................................ 2

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .............................................................................. 13

*Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos.*,
30 F. Supp. 2d 1182 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002) .............................. 6

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......................................................................... 6, 7

*N.A.S. v. Morada-Haute Furniture Boutique LLC*,
No. 20-24676-Civ,
2021 WL 5547626 (S.D. Fla. Aug. 24, 2021) .................................................................... 4

*Oppenheim v. I.C. Sys., Inc.*,
695 F. Supp. 2d 1303 (M.D. Fla. 2010), *aff'd*, 627 F.3d 833 (11th Cir. 2010) ....................... 4

*Planned Parenthood Federation of America, Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022) .......................................................................................... 8

*Post-Newsweek Stations Orlando, Inc. v. Guetzloe*,
968 So. 2d 608 (Fla. Dist. Ct. App. 2007) ................................................................... 4, 5

*Regions Bank v. Kaplan*,
Nos. 17-15478, 18-13220,
2021 WL 4852268 (11th Cir. Oct. 19, 2021) .................................................................... 4

*Rodriguez v. Google LLC*,
No. 20-cv-04688-RS,
2021 WL 2026726 (N.D. Cal. May 21, 2021) ....................................................... 6, 10, 13

*Spilfogel v. Fox Broad. Co.*,
433 F. App'x 724 (11th Cir. 2011) ............................................................................... 2, 3

*Stasiak v. Kingswood Co-op, Inc.*,
No. 8:11-cv-1828-T-33MAP,
2012 WL 527537 (M.D. Fla. Feb. 17, 2012) ................................................................. 4, 5

*TLS Management v. Rodriguez-Toledo*,
260 F. Supp. 3d 154, 165 (D.P.R. 2016) ........................................................................... 8

*In re Toys R Us, Inc., Priv. Litig.*,
   No. 00-CV-2746,
   2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ........................................................... 7, 8

*In re Trilegiant Corp.*,
   No. 3:12-CV-0396 (VLB),
   2016 WL 8114194 (D. Conn. Aug. 23, 2016),
   *aff'd sub nom. Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018) ......................... 6

*United States v. Watkins*,
   278 F.3d 961 (9th Cir. 2002) .................................................................................. 13

*Ward v. Casual Rest. Concepts Inc.*,
   No. 8:10-CV-2640-T-17TGW,
   2011 WL 2600511 (M.D. Fla. June 29, 2011) ........................................................... 3

*Westwood Apex v. Contreras*,
   644 F.3d 799 (9th Cir. 2011) .................................................................................. 13

*Zorn v. McNeil*,
   No. 6:16-cv-1-Orl-41TBS,
   2016 WL 5476195 (M.D. Fla. Sept. 29, 2016) .......................................................... 2

**Statutes**

18 U.S.C.
   § 2511(1)(a) ........................................................................................................ 13
   § 2511(1)(c) ........................................................................................................ 13
   § 2511(1)(d) ........................................................................................................ 13
   § 2511(2)(d) .................................................................................................... 6, 13

1    **I.    INTRODUCTION**

2         Plaintiffs' opposition confirms that they have not corrected the numerous deficiencies that

3    compelled the Court to dismiss the Florida intrusion upon seclusion and ECPA claims.  Although

4    they attempt to mischaracterize Oracle's arguments as disputed facts, as Oracle demonstrated,

5    Plaintiffs rely on implausible and unreasonable inferences untethered to the factual allegations in

6    the Second Amended Complaint ("SAC").  Plaintiffs' allegations and cited sources show that

7    Oracle's activities as a registered data broker consist of nothing more than creating and selling

8    "sanitized" and "anonymous audience[s]" based on benign consumer interests like being in the

9    market to purchase a car.[1]  As a result, the claims are far from well-pleaded.

10        With respect to Golbeck's intrusion claim, the opposition confirms that Oracle's alleged

11   collection of her *web browsing activity* does not amount to an intrusion into the "private quarters"

12   of her home or password-protected devices.  Nor is the creation of anonymous audiences with

13   that data "highly offensive."  With respect to their ECPA claim, Plaintiffs rely on implausible

14   inferences and misrepresentations of their cited documents to contend that Oracle, a publicly

15   traded company with tens of thousands of employees, operates its advertising technology business

16   with the purpose of doing harm to consumers and its customers.  The charge has no basis in fact,

17   is unsupported by the allegations in the SAC, and defies common sense.  For these reasons, the

18   Court should dismiss both the Florida intrusion upon seclusion and ECPA claims, with prejudice.

19   **II.   ARGUMENT**

20        **A.    Oracle's Alleged Collection of Web Activity and Shopping Information Is Not
              a "Highly Offensive" Intrusion into a "Private Quarter" Under Florida Law**

21
                 **1.    Golbeck does not plausibly allege that Oracle intruded into her home
22                     or into a private space within her electronic devices**

23        Golbeck's renewed Florida intrusion upon seclusion claim suffers from the same defect

24   that previously prompted the Court to dismiss it: Golbeck does not plausibly allege that Oracle

25   intruded into the "private quarters" of her home or her devices.  (ECF No. 77 at 7.)  The

26   opposition confirms that Golbeck's new allegations do not remedy this deficiency.

27
     ───────────────
28        [1] (ECF No. 88-1 at 85; *see also* SAC ¶¶ 57, 64, 74-76 (discussing Oracle's sale of advertising
     "segments," not individual profiles).)

**Golbeck's Home.**  In a failed attempt to substantiate her intrusion claim, Golbeck sensationalizes the routine collection of online data by claiming it amounts to home surveillance. (ECF No. 90 ("Opp.") at 18-19 (arguing that Oracle intruded into her home through *web* tracking technologies).)  She further claims that Oracle's alleged "targeting [of] households within a specific radius" sets the SAC apart "significantly from its predecessor." (*Id*. at 19.)  But exaggerating that "targeting a household" for advertising purposes is the equivalent of "erecting a camera *in* her home" is insufficient.  (SAC ¶ 178 (emphasis added).)  Indeed, the only plausible reading of her allegations is that Oracle can direct ads at consumers who may be associated with a given location and use the consumer's purchase activities at physical stores (by definition, outside of her home) to determine the location.  (*See id*. ¶ 64(a) ("Offline data ties the identity graph to *real people living at a real address*"); *id*. ¶ 64(e) (image) ("contact information" is gleaned from "visits" to physical "store[s]").)  As such, Oracle's purported "targeting" of households bears no connection to an actual private "place" at all, precluding any claim of intrusion.[2]  *See Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 727 (11th Cir. 2011) ("Florida law explicitly requires an intrusion into a private place and not merely into a private activity.").

Golbeck's argument that the "steady accretion of small pieces of information" to "create comprehensive profiles" amounts to intrusion fares no better.  (Opp. at 19.)  She cites no authority for that proposition, and cannot explain why aggregating individual data files—data tied to conduct online and in brick-and-mortar stores—means Oracle intruded into the physical space of her home.  Rather, she is rehashing an argument the Court has rejected.  (ECF No. 77 at 6 ("courts have declined to extend Florida's protections against the invasion of privacy tort . . . to instances in which a party accesses *digital files*" (emphasis added)).)

---

[2] Golbeck argues that Oracle's alleged collection of her web browsing activity is somehow *more* intrusive into her home than in *Jackman* where the defendant secretly recorded a neighbor's backyard "twenty-four hours a day, seven days a week" and *Zorn* where the plaintiff was inundated with "sexually explicit phone calls, . . . photographs[,] and videos" while at home. (*See* Opp. at 20 (citing *Jackman v. Cebrink-Swartz*, 334 So. 3d 653, 655, 657 (Fla. Dist. Ct. App. 2021) and *Zorn v. McNeil*, No. 6:16-cv-1-Orl-41TBS, 2016 WL 5476195, at *10 (M.D. Fla. Sept. 29, 2016).)  But the comparison exceeds the bounds of reasonable argument. Golbeck alleges that Oracle collected her *browsing history* on the open internet, irrespective of her location, and combined that with purchase information from retail locations *outside* the home.  (SAC ¶¶ 14-17.)

**Golbeck's Devices.**  Seeking to allege an intrusion into a "private quarter," Golbeck recasts the alleged intrusion into her "web browsing" activity (*see* SAC ¶¶ 12, 14-15) as an intrusion into her "devices" writ large (Opp. at 20-21).  But this does not help.  *First*, Golbeck fails to identify a single instance of Oracle accessing local files on her devices, or intruding into any other spaces that might be considered "password protected."  (*Contra id.*; *see also* ECF No. 88 ("Mot.") at 3-4 (introducing that distinction).)  Again, the SAC alleges that Oracle accesses data from Golbeck's web history, not that Oracle somehow bypassed device passwords to access locally stored data.  (SAC ¶¶ 14-15.)  *Second*, while Golbeck cites cases stating that "electronic spaces" such as password protected email accounts or telephone lines may qualify under Florida's private "place" requirement, she glosses over the fact that there are no allegations that Oracle accessed Golbeck's telephone lines or password protected email accounts.  (Opp. at 21 (citing cases).)  *Third*, Golbeck argues Oracle intruded by placing cookies on her browser, but presents no basis to conclude that her browser, rather than her devices, was itself a *private* electronic space.  (*Contra id.* at 21-22 (citing *Ward v. Casual Rest. Concepts Inc.*, No. 8:10-CV-2640-T-17TGW, 2011 WL 2600511, at *4 (M.D. Fla. June 29, 2011) for the proposition that the contents of a phone may constitute a private electronic space).)[3]  Despite her attempt to shoehorn Oracle's conduct into the requirements for an intrusion claim, Golbeck is again precluded by the Eleventh Circuit's mandate the she illustrate an "intrusion into *a private place* and *not merely into a private activity*."  *Spilfogel*, 433 F. App'x at 726 (emphasis added).

### 2.    Golbeck does not plausibly allege conduct that would be considered highly offensive to a reasonable person

Golbeck fails to cite a single case under Florida law supporting the idea that

---

[3] Golbeck further wrongly claims Oracle is estopped from arguing that it did not intrude into her *devices*' local files given Oracle's earlier argument that the alleged web tracking occurred where "her browsers and devices are located."  (Opp at 22 n.15.)  The location of Golbeck's *devices* was relevant only to the extent it indicated the location of her *browser*—*i.e.*, separate software installed on her devices that enables her to receive and send signals on the open internet.  Her "browsing history"—gleaned from open conduct on the web and taking place on her *browser*—is separate from the "locally saved content on her . . . devices."  (*Contra id.* at 22.)  Golbeck's conduct on the web (which is routed through a browser) is neither password protected nor private.  (Mot. at 4.)  Golbeck offers no authority to conclude otherwise.

"combin[ing]" data into marketing "profiles" (an exceedingly common activity in digital advertising) constitutes a highly offensive intrusion.  (Opp. at 23.)  Instead, she takes issue with Oracle's cases, attempting to distinguish them on the basis that they involve different privacy torts.  (*Id*. at 24.)  The "highly offensive" inquiry, however, is the same under all of Florida's privacy torts.  *Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d 1303, 1309-10 (M.D. Fla. 2010), *aff'd*, 627 F.3d 833 (11th Cir. 2010).  Beyond this surface-level distinction, she fails to address why aggregating consumer preferences should be deemed more "offensive" than the capture of financial information and private medical records—information Florida courts have deemed insufficiently sensitive to support a claim.  (*Compare* Opp. at 23 (citing ECF No. 75-1) *with Regions Bank v. Kaplan*, Nos. 17-15478, 18-13220, 2021 WL 4852268, at *13 (11th Cir. Oct. 19, 2021) (social security number) and *Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 613 (Fla. Dist. Ct. App. 2007) (medical records).)  Plaintiffs do not allege that these types of information are present in the "OARRRs" they reference.[4]

Golbeck's only other response is that the "highly offensive" inquiry should be left to a factfinder.  (Opp. at 24-25.)  The only Florida case Golbeck cites concerns an alleged invasion into a homeowner's "toiletries, underwear, pillows, beds, [and] prescription drugs."  *N.A.S. v. Morada-Haute Furniture Boutique LLC*, No. 20-24676-Civ, 2021 WL 5547626, at *5 (S.D. Fla. Aug. 24, 2021).  But Florida courts routinely resolve this question on the pleadings.  *See, e.g.*, *Celestine v. Cap. One*, No. 17-20237-Civ-Scola, 2017 WL 2838185, at *4 (S.D. Fla. June 30, 2017) (access to credit information insufficiently egregious to support intrusion claim); *Stasiak v. Kingswood Co-op, Inc.*, No. 8:11-cv-1828-T-33MAP, 2012 WL 527537, at *3 (M.D. Fla. Feb. 17, 2012) (same).  Again, Golbeck does not address how the purported "sale" of pseudonymized ad segments is closer to the plaintiffs' allegations in *N.A.S.* than the allegations found insufficient

---

[4] To the extent Golbeck's claim that Oracle "compiles [and sells] cradle-to-grave profiles" is meant to imply that Oracle sells individual consumer profiles, that is unsupported by her own allegations.  (Opp. at 23.)  Plaintiffs allege that Oracle sells advertising "segments" rather than individualized profiles.  (SAC ¶¶ 57, 64, 74-76.)  And further allege that the "OARRRs" are compiled pursuant to a data "access request" from a consumer under California law, and not for sale to a third party.  (*Id.* ¶¶ 4, 20.)  Golbeck's attempt to prop up her claims with baseless and over-the-top rhetoric should be rejected.

1   to move past the pleadings in *Post-Newsweek, Celestine*, and *Stasiak*.

2   **B.      Plaintiffs Do Not Plausibly Allege That Oracle Runs Its AdTech Business For
        Tortious Purposes**

3

4          The Court has twice dismissed Plaintiffs' ECPA claim on the grounds that the crime tort

5   exception is not applicable in this case.  (ECF No. 49 at 16; ECF No. 77 at 11.)  In their attempt

6   to rehabilitate this claim, Plaintiffs argue that the claim should survive because: (1) Oracle's

7   "further use" of web user data is itself sufficient to establish a tortious purpose; (2) alleged

8   statements by Oracle establish an independent tortious purpose; and (3) even if the crime-tort

9   exception does not apply, Oracle's customers could not have consented to the alleged interception

10  without knowledge of Oracle's alleged "further use."  None of these arguments provide a basis

11  for the Court to depart from its prior orders dismissing the claim.

12  **1.      Plaintiffs' allegation that Oracle subsequently used their data does not
        establish tortious intent**

13         Plaintiffs argue that Oracle's purported "further use" of web user data is, without more,

14  sufficient to apply the crime-tort exception.  (Opp. at 4.)  But the Court has already settled this

15  question by rejecting Plaintiffs' prior argument that Oracle's "association of Plaintiffs' data with

16  preexisting user profiles . . . satisfie[d] [the crime-tort] exception" (*See* ECF No. 67 at 22; ECF

17  No. 77 at 11.)  None of Plaintiffs' new allegations remedies this deficiency.

18         Nevertheless, Plaintiffs insist that Oracle's advertising conduct satisfies the exception

19  because "ECPA only requires that the defendant intend to commit a further *tortious act* . . .

20  [rather than] a specific *mens rea* to *cause harm*."  (Opp. at 7.)  Plaintiffs point to the Court's

21  finding that their "further use" allegations were sufficient to state an intrusion claim under

22  California law.  (*Id.* at 5 (citing ECF No. 49).)  The Court's prior orders foreclose this argument

23  too.  Despite allowing the California intrusion claim to proceed, the Court has twice found that

24  "[t]he mere possibility [that] Oracle's data collection activities could at some future date be

25  deemed tortious does not justify application of the crime-fraud exception."  (ECF No. 77 at 11

26  n.11.)  In other words, the critical inquiry is whether Plaintiffs adequately alleged that Oracle

27  acted with a "culpable mind," not whether it committed a "tortious act."  (*Id.* (citing *In re*

28  *DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 518-19 (S.D.N.Y. 2001))); *see also Deteresa*

1   *v. Am. Broad. Cos.*, 121 F.3d 460, 467 (9th Cir. 1997) (claim that recorder "commit[ed] [a]

2   crime[] [or] tort[]" in and of itself does not establish tortious purpose).

3       Moreover, the Court's rulings on the *mens rea* requirement is consistent with the statute's

4   legislative history and with the weight of the caselaw.  As explained in *DoubleClick*, the

5   legislative history "make[s] clear that the 'criminal' or 'tortious' purpose requirement is to be

6   construed narrowly" such that only an "'insidious' intent to harm plaintiffs or others" is sufficient

7   to apply the exception.  *DoubleClick*, 154 F. Supp. 2d at 515, 518.  As such, "[c]ourts applying

8   § 2511(2)(d) have consistently ruled that a plaintiff cannot establish that a defendant acted with a

9   'criminal or tortious' purpose simply by proving that the defendant committed any tort or crime."

10  *Id.* at 516 (collecting cases); *see also Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos.*, 30 F.

11  Supp. 2d 1182, 1205 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002) (plaintiff failed to allege

12  defendant recorded for the purpose of tortiously interfering with contract relations); *Capitol Recs.*

13  *Inc. v. Thomas-Rasset*, No. 06-1497 (MJD/RLE), 2009 WL 1664468, at *4 (D. Minn. June 11,

14  2009) (intercepting data to gather evidence in a way that may violate private detective licensing

15  statutes does not invoke exception).

16      Plaintiffs contend that *DoubleClick*'s *mens rea* requirement has not been followed.  (Opp

17  at 7.)  To the contrary, this Court and others have not applied the exception without a showing

18  that "the primary motivation or a determining factor in the interceptor's actions has been to injure

19  plaintiffs tortiously."  *Rodriguez v. Google LLC*, No. 20-cv-04688-RS, 2021 WL 2026726, at *6

20  n.8 (N.D. Cal. May 21, 2021) (interceptor's purpose was "plainly not [] to perpetuate torts on

21  millions of Internet users, but to make money") (quoting *DoubleClick Inc.*, 154 F. Supp. 2d at

22  518); *see also In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2014 WL 1102660, at *18

23  n.13 (N.D. Cal. Mar. 18, 2014) ("*In Re Gmail*") (same).  Indeed, *In re Meta Pixel Healthcare*

24  *Litig.*, a decision Plaintiffs rely on, confirms that *DoubleClick's mens rea* requirement reflects *at*

25  *least* the majority rule in this District.  647 F. Supp. 3d 778, 797 (N.D. Cal. 2022).[5]  *Meta Pixel*

26      [5] This District is no outlier, as courts nationally apply the *mens rea* requirement absent a
    plausible allegation of a "purpose and intent [] to commit [] a tort or crime."  *See, e.g.*, *In re*
27  *Trilegiant Corp.*, No. 3:12-CV-0396 (VLB), 2016 WL 8114194, at *11 (D. Conn. Aug. 23,
    2016), *aff'd sub nom. Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018) ("evidence of

28

1   considered a request for a preliminary injunction as to Facebook's alleged sale of private health

2   data to third parties.  *See* 647 F. Supp. 3d at 797.  The court denied the request "in light of the

3   authority in this district finding that . . . the crime-tort exception to the Wiretap Act is

4   inapplicable where the defendant's primary motivation was to make money, not to injure

5   plaintiffs tortiously."  (*Id.*)

6            Plaintiffs' other cases are not to the contrary.  ***First***, Plaintiffs continue to rely on dicta in

7   *Brown v. Google*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021), arguing that Oracle's alleged

8   "further use" of their data is similar to Google's purported "association of [p]laintiffs' data with

9   preexisting user profiles."[6]  (Opp. at 4.)  In that case, however, plaintiffs alleged that "internal

10  Google communications" showed its employees "recognized" Google's disclosures were

11  "problematic," supporting a plausible inference that Google acted with a "culpable mind" when it

12  collected users' data while they browsed in Chrome's "Incognito" mode.  *Brown*, 525 F. Supp. 3d

13  at 1079; *cf. DoubleClick*, 154 F. Supp. 2d at 519 ("a culpable mind does not accompany every

14  tortious act").  The Court has already expressly considered and rejected Plaintiffs' invocation of

15  *Brown*, ruling that their earlier allegations—concerning collection of their browsing activity on

16  the open internet—failed to show tortious intent.  (*See* ECF No. 77 at 11 n.11.)  As discussed in

17  the motion and further below, Plaintiffs' new allegations fare no better.  ***Second,*** Plaintiffs claim

18  their allegations "saliently mirror those in *In re Toys R Us*."  (Opp. at 6.)  Not so.  If anything,

19  Plaintiffs' allegation that Oracle builds "audiences" of consumer interest trends using device

20  identifiers (SAC ¶ 74) "saliently mirror" the allegations in *DoubleClick*, which concerned the

21  creation of anonymous web-user profiles.  In contrast, in *Toys R Us*, the plaintiffs alleged that

22  defendants "spied on" users and "misappropriate[d] [their] personalty" by collecting *personally*

23  *identifying information* (*e.g.*, name, address, telephone number, shipping and billing addresses)

24  the mere commission of a tortious or criminal act in furtherance of an otherwise legitimate
    business plan is insufficient to establish [tortious intent]"); *Capitol Recs. Inc.*, 2009 WL 1664468,

25  at *4 ("exception applied [only] when recorder's purpose is evil") (citation omitted).

26      [6] In *Brown*, the court did not need to analyze whether the crime-tort exception applied to
    resolve the ECPA claim because the court found that neither end users nor the websites they

27  communicated with consented to the interception. *See* 525 F. Supp. 3d at 1062-68 ("Google does
    not demonstrate that websites consented to, or even knew about, the interception of their

28  communications with users who were in private browsing mode.").

1   that could be sold to third parties. *In re Toys R Us, Inc., Priv. Litig.*, No. 00-CV-2746, 2001 WL

2   34517252, at *2, *8 (N.D. Cal. Oct. 9, 2001).  Moreover, as in *DoubleClick*, plaintiffs'

3   allegations[7] provide "abundant evidence that [Oracle's] motivations [were] licit and commercial."

4   *DoubleClick*, 154 F. Supp. 2d at 519.[8]

5           **2.**     **Plaintiffs' other allegations do not plausibly allege tortious intent**

6        In the event the Court determines that *DoubleClick's mens rea* requirement should be

7   applied, Plaintiffs fall back on six sets of allegations intended to show tortious intent. (*See* SAC

8   Section VI.)  The opposition largely reiterates the allegations, ignoring Oracle's arguments.  New

9   or old, the allegations do not overcome the sound reasoning of the Court's two prior rulings.

10          **a.**     **Larry Ellison's alleged statements are insufficient to plead**

11              **tortious intent**

12       Plaintiffs ignore that the Court has twice previously considered and rejected their

13  allegations regarding 2016 statements attributed to Oracle's former CEO Larry Ellison

14  concerning the power of Oracle's products.  (*See* ECF No. 1 ¶ 54 (using "microlocations," Oracle

15  can know "how much time someone spends in a specific [] store"); ECF No. 72 ("FAC") ¶ 227

16  (similar); SAC ¶ 122 (same).)  At each turn, the Court found that, as alleged, Oracle's "purpose

17  has plainly not been to perpetuate torts on millions of Internet users, but to make money."  (ECF

18  No. 49 at 16; ECF No. 77 at 11.)  Plaintiffs now attempt to pivot to an added allegation

19  concerning a 2001 comment from Mr. Ellison in favor of a national ID system as supposed

20

21        [7] (*See* SAC ¶¶ 21, 26, 39, 89, 105 (Oracle's activities as a registered data broker); *id*. ¶¶ 42, 268, 275, 280 (Oracle's "monet[ization]" of web user data "for substantial profits").)

22        [8] Plaintiffs cite three other unhelpful cases to avoid the exception's *mens rea* requirement. ***First***, in *TLS Management v. Rodriguez-Toledo*, the court expressly credited an allegation that the defendant acted with "tortious intent" because the defendant intercepted confidential business files to use them to steal the plaintiff's clients.  260 F. Supp. 3d 154, 165 (D.P.R. 2016).

23

24  Plaintiffs make no plausible allegation that Oracle acted with any similar intent to cause harm. ***Second***, in *Planned Parenthood Federation of America, Inc. v. Newman*, the Ninth Circuit

25  rejected application of the exception and reversed the jury's verdict on the ECPA claim because the defendants' interception and later RICO violations shared the same tortious purpose of

26  "destroying Planned Parenthood."  51 F.4th 1125, 1135-36 (9th Cir. 2022) (statute "requires that the criminal or tortious purpose be *independent of and separate from* the purpose of the

27  recording") (emphasis added).  ***Third***, in *In re Intuit Privacy Litigation*, the court *denied* the ECPA claim, concluding that plaintiffs failed to allege the interception was "for the purpose of

28  committing a tortious or criminal act." 138 F. Supp. 2d 1272, 1278 (C.D. Cal. 2001).

1    "context" for the failed 2016 allegations.  (Opp. at 9 (discussing SAC ¶¶ 120-21).)  Plaintiffs fail

2    to explain how the twenty-two-year-old comment, made in the days immediately following the

3    9/11 attacks, bears any connection to the 2016 statements or reflects any intent to harm

4    consumers.  Nor do they justify their over-the-top claim that Oracle's ID Graph offers the

5    "equivalent" of a national identification program; as their citations make plain, ID Graph merely

6    facilitates the generation of "sanitized" and "anonymous audience[s]" reflecting possible

7    consumer interests associated with online identifiers.  (ECF No. 88-1 at 85; *see also* SAC ¶¶ 57,

8    64, 74-76.)  With or without "context," these allegations still fail to allege a tortious purpose.

9                **b.**      **Oracle's criticisms of Google do not establish tortious intent**

10           Plaintiffs once again argue that Oracle's criticisms of Google's data collection practices

11   show that Oracle undertakes purportedly similar practices with a "privacy-invasive" purpose.

12   (Opp. at 12.)  Neither their prior allegation (repeated in the SAC) nor their new allegation

13   plausibly allege tortious intent.  Moreover, Plaintiffs continue to miss the actual focus of Oracle's

14   statements, implausibly characterizing them as indictments of the AdTech industry at large.

15           ***Oracle's submission to Australia's competition regulator on Google's anticompetitive***

16   ***practices has no bearing on this case.***  Plaintiffs largely recite their allegation that the conduct

17   criticized in the report is somehow similar to Oracle's own business practices, but ignore that the

18   Court previously dismissed the ECPA claim on substantively identical allegations.  (*Compare*

19   FAC ¶ 98 *with* SAC ¶ 123 ("Oracle has argued . . . [that] Google wrongfully builds 'shadow

20   profiles'").)  As the Court ruled, Plaintiffs did not plead "sufficient facts here to show Oracle had

21   tortious motivation."  (ECF No. 77 at 11.)  Moreover, Plaintiffs fail to engage with the substance

22   of Oracle's concern reflected in the report.  There, Oracle points out that Google combined its

23   web user datasets with those of an acquired company without allowing users to opt in to the

24   combination.  (*See* ECF 88-1 at 46.)  The move, which violated the terms of Google's privacy

25   policy as well as a 2011 consent decree, effectively "created a 'data moat' that . . . limit[ed] the

26   likelihood that any serious competitor[] to Google [would] emerge."  (*Id.* at 27.)  In light of these

27   anticompetitive moves, Oracle called for changes to Australian privacy laws to ensure "no other

28   company will be able to abuse substantial market power . . . in the manner that Google has."  (*Id.*

at 5.)  The criticisms cannot, therefore, be read as an indictment of the basic tools of the AdTech industry mentioned in the report.  Nor can they be read to infer that Oracle runs its own business for the purpose of "perpetuat[ing] torts on millions of Internet users."  (ECF No. 49 at 16 (quoting *Rodriguez*, 2021 WL 2026726, at *6 n.8).)

***Oracle's purported criticism in a blog post of Google's practices with respect to user browsing data is irrelevant.***  Plaintiffs argue that a blog post that they attribute to Oracle executive Ken Glueck demonstrates Oracle "understood that its conduct was invasive and illegal."  (Opp. at 10.)  Plaintiffs claim to find some contradiction between the alleged criticism of Google and Oracle's later argument before this Court that Oracle is an "extension" of its customers for purposes of Plaintiffs' wiretapping claims.  Plaintiffs misrepresent the blog post, which in no way asserts that collecting web user data is wrongful.  Rather, the post reflects the concern that, through its blockade of third-party cookies, Google "us[ed] privacy as a pretext . . . [to] wipe[] out the competition for consumer data and . . . online advertising."  (Reply Declaration of Purvi G. Patel ("Patel Decl.") Ex. C at 2.)  Oracle's views as to Google's semantic distinction between itself and its competitors for purposes of Google's own data sharing practices says nothing about the merits of Oracle's party-to-the-communication defense.  Nor does Oracle's legal argument that it should be considered an "extension" of its customers under applicable case law have anything to do with Plaintiffs' burden to adequately allege a tortious purpose.[9]

          **c.**    **Oracle's alleged continued sale of alcohol-based advertising does not reflect a tortious intent**

Plaintiffs contend that Oracle does not address the core of their allegation that it knowingly "enable[d] alcoholi[sm]" through its alcohol-based advertising.  (Opp. at 11.)  But they ignore Oracle's argument that finding tortious intent based on this allegation is implausible

_____

[9]Plaintiffs incorrectly claim that Oracle "conceded" any argument concerning the blog post by not explicitly referring to the allegation in its opening brief.  *Cf. Holmes v. Tenderloin Hous. Clinic, Inc.,* No. C 09-5781 PJH, 2010 WL 1929456, at *3 (N.D. Cal. May 12, 2010), *aff'd*, 526 F. App'x 749 (9th Cir. 2013) (finding a concession only where defendant did not make "any substantive argument in support of its assertion that [an entire] cause of action . . . should be dismissed").  Plaintiffs' allegations concerning the criticism of Google in the blog fail for the same reasons Oracle identified with respect to other alleged criticisms of Google.  (Mot at 7-8.)

1   given that the sale of such segments is lawful and, as they allege, motivated by the company's

2   profit incentive.  (*See* Mot. at 10.)  Further, Plaintiffs' position that Oracle knowingly "enabled

3   alcoholism" misrepresents the September 2019 industry news article they cite.  The article states

4   that Oracle would "discontinue alcohol-based targeting . . . which felt too close to enabling

5   alcoholics," but the statement is unattributed to any source within the company, by name or

6   otherwise.  (SAC ¶ 127.)  Even if attributed, the statement would not support a plausible

7   inference that selling alcohol-based segments thereafter was *for the purpose of* enabling

8   alcoholics.  Nowhere do Plaintiffs allege that Oracle acted with such a purpose or that they, or

9   anyone else, have been harmed by any alcohol-based advertising.

10                  **d.      A supposed former employee's comments do not suggest Oracle**
                           **knew its business was harmful**
11

12          Plaintiffs repeat their allegation that a supposed former employee's anonymous message

13   board comment shows Oracle's supposed tortious intent and contend that any contrary argument

14   presents a question of fact.  (Opp. at 12.)  Plaintiffs misunderstand Oracle's argument: Oracle

15   challenges the inference Plaintiffs urge the Court to draw because it is unsupported by the plain

16   text of the comment and implausible in light of the same user's other comments on the same

17   message board.[10]  *See Crittenden v. Apple, Inc*., No. 5:21-CV-04322-EJD, 2022 WL 2132224, at

18   *3 (N.D. Cal. June 14, 2022) (plaintiffs' characterization of "anonymous online postings"

19   implausible "given the full context of the Internet sources [they] cite[]").  Far from reflecting an

20   internal recognition that Oracle's practices are "a mess" or "problematic," *Brown*, 525 F. Supp.

21   3d at 1068, the single comment Plaintiffs rely on offers no judgment call as to the purported

22   inaccuracy.  (*Contra* Opp. at 12 (suggesting comment shows that "employees understood

23   Oracle's activities to be privacy-invasive").)  The user's other comments, however, strongly

24   suggest they understood that any inaccuracies *do not translate to a harm to consumers*.  That's

25   because, as the user noted, Oracle "sanitize[s]" and "anonym[izes]" consumer data and restricts

26

27          ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
            [10] Contrary to Plaintiffs' assertion (ECF No. 89 at 1), Oracle does not seek to incorporate by
     reference *all* of the comments throughout the thread; Oracle only seeks to incorporate the same
28   commenter's other posts.

1    access to any potentially sensitive data it collects. (ECF No. 88-1 at 85 (noting that information

2    about specific individuals is "[s]tored differently, [with] different user access, [and with] different

3    rules" than "huge anonymous audience data").)[11]  Plaintiffs ignore the context of the anonymous

4    quote, preferring instead to cherry-pick whatever they deem useful.

5                              **e.      Oracle's alleged misrepresentation of its sale of political
                                        affiliation segments does not establish tortious intent**

6

7            Plaintiffs repeat their incorrect assertion that Oracle's privacy policy misrepresents its sale

8    of political affiliation audiences, ignoring entirely Oracle's argument that,[12] even if true, "such

9    allegations would still fail to plausibly allege that Oracle intended to harm web users." (Mot. at

10   9.)  As an initial matter, Plaintiffs point to no statute that makes creating or selling anonymized

11   interest segments concerning political views unlawful.  And, as the Court has already recognized,

12   Plaintiffs allege repeatedly that Oracle acted with a commercial purpose in selling consumer

13   interest segments.  (*See* ECF No. 49 at 16; ECF No. 77 at 11 n.11; *see also* SAC ¶¶ 42, 268, 275

14   (discussing Oracle's "plan to profit from" putative class members' data).)  Moreover, even if

15   Plaintiffs sufficiently alleged that Oracle's privacy policy "mislead[s]" or even "actively

16   obscures" with respect to the sale of political affiliation segments, the exception cannot apply

17   absent a further allegation that the interceptor intended harm.  *In re Gmail* is instructive.  There,

18   the court found that certain of Google's disclosures "mislead" and "actively obscure" Google's

19   practice of scanning user emails for ads.  2014 WL 1102660, at *15.  The court, however,

20   nevertheless found no suggestion that Google's "primary motivation or a determining factor . . .

21   [was to] injure plaintiffs tortiously."  *Id*. at 18 n.13 (quoting *DoubleClick*, 154 F. Supp. 2d at

22          [11] Plaintiffs improperly include argument regarding the user's comments in their response to
     Oracle's incorporation-by-reference request, effectively obtaining surplus pages for their

23   opposition.  (ECF No. 91 at 3.)  The single comment Plaintiffs fixate on, however, provides no
     indication as to *why* the tool is inaccurate or plausibly support *any inference* as to the purpose

24   motivating Oracle's advertising business.  The user's other comments Oracle cites show that the
     user does not understand Oracle's operations to cause any harm, regardless of the tool's purported

25   inaccuracies.  Finally, Plaintiffs' focus on the (clearly *unintended*) data breach that prompted the
     comment thread do not satisfy their burden to plausibly allege that Oracle *intends* to cause harm.

26
            [12] Looking outside the pleadings, Plaintiffs attempt to bolster their allegations by insinuating

27   that Oracle misrepresented its sale of these interest segments to the Court.  (Opp. at 15 n.13.)
     Oracle stands by its prior representation that it "does not use any data it receives from customers

28   to create sensitive interest segments, including . . . political [] orientation."  (ECF No. 63 at 3.)

1   518); *see also Rodriguez*, 2021 WL 2026726, at *5 (exception inapplicable even though

2   "plaintiffs did not consent [in the privacy policy] to the practice they now challenge").  The

3   allegation that Oracle misrepresented its sale of audiences based on political affiliation in its

4   privacy policy is insufficient to apply ECPA's crime-tort exception.

5           **3.     Because Plaintiffs cannot invoke the crime-tort exception, ECPA's
                      one-party consent defense completely bars the claim**

6

7           On the issue of consent, the Court previously ruled that Oracle's customers' consent

8   "necessarily follow[ed]" from their choice "to deploy Oracle's tools on their websites." (ECF No.

9   49 at 16.)  To avoid the Court's ruling, Plaintiffs now speculate that such consent was ineffective

10  given Oracle's purportedly undisclosed "further exploitation of the intercepted data." (Opp. at 16-

11  18.)  Plaintiffs' argument is undermined by: (i) the plain text of the statute, (ii) Plaintiffs' own

12  case law, and (iii) and the very allegations they make throughout the SAC.

13          *First,* ECPA states that "it shall not be unlawful under this chapter" for another to

14  "intercept a wire, oral, or electronic communication" where a party to the communication "has

15  given prior consent to such ***interception***." 18 U.S.C. § 2511(2)(d) (emphasis added).  It does not

16  say "given prior consent to such interception ***and all potential further uses***." *See United States v.*

17  *Watkins*, 278 F.3d 961, 965 (9th Cir. 2002) ("We are mindful of the rule that a court should not

18  read words into a statute that are not there.").  The consent defense's singular focus on

19  interception is evident when reading the "statute[] as a whole." *See Westwood Apex v. Contreras*,

20  644 F.3d 799, 804 (9th Cir. 2011) (quoting *Harbison v. Bell*, 556 U.S. 180 (2009) (Roberts, C.J.,

21  concurring)).  Liability under ECPA is contingent on an "***interception*** of a wire, oral, or

22  electronic communication ***in violation of this subsection***." 18 U.S.C. §§ 2511(1)(c)-(d)

23  (emphasis added); *see, e.g.*, *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021)

24  (dismissing disclosure claim under ECPA for failure to plead a "predicate interception" under §

25  2511(1)(a)); *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 819 (N.D. Cal.

26  2020) (same).  Thus, based on a plain and holistic reading of the statute, ECPA's one-party

27  consent defense asks only whether a party provided prior consent to the interception.

28          *Second*, Plaintiffs' cases do not support the conclusion they urge.  In *Brown*, the court

1 considered whether web publishers consented to Google's alleged interception of user data in

2 Chrome's "Incognito" mode, finding nothing that evinced the web publishers' awareness that

3 interception may take place when the feature was turned on.  525 F. Supp. 3d at 1068.  In *Meta*

4 *Platforms*, the court found that, while web publishers consented to the presence of the Meta pixel

5 on their websites, Meta failed to disclose that it would intercept sensitive healthcare data.  *Doe v.*

6 *Meta Platforms, Inc.*, No. 22-cv-03580-WHO, 2023 WL 5837443, at *5 (N.D. Cal. Sept. 7,

7 2023).[13]  Contrary to Plaintiffs' suggestion, neither decision concerns web publishers' consent to

8 purported "[further] tortious practices." (Opp. at 17.)

9       Here, by comparison, Plaintiffs allege, through detailed technical documentation and

10 deployment guides, that Oracle disclosed to its customers not only the fact of the data collection,

11 but also the *how*, *when*, *where,* and *what* of the collection.  In fact, Plaintiffs allege that customers

12 fully control and individually tailor each of these aspects of the data collection:

13
14
- **How:** Oracle's customers are responsible for "[c]onfiguring the Oracle Data Cloud core tag," which entails "generating the tag code [they] will deploy" with the goal of ultimately "organiz[ing] the online user attributes [they] are ingesting."  (SAC ¶ 44 n.18.)

15
16
- **When:** "[T]echnical documentation" informs customers that the core tag "simultaneously copies and sends" internet users' communications back "to Oracle."  (*Id*. ¶ 44.)

17
18
- **Where:** Oracle's customers—not Oracle—"implement the Oracle Data Cloud CoreTag on [their] desktop and mobile sites to extract online user attributes and import them into the Oracle Data Cloud platform."  (*Id*. ¶ 44 n.18.)

19
20
- **What**: That same "technical documentation" explains that the core tag collects "user attributes such as product views, purchase intent, [and] add-to-cart actions" as well as "other communications that users have with websites," including referrer URLs.  (*Id*. ¶ 44; *see also id.* ¶ 47 n.19 (discussing capture of "referrer URL[s]").)

21 Plaintiffs thus allege that Oracle's customers *themselves engineered* the *how*, *when*, *where,* and

22 *what* of the data collection, and they point to no aspect of the collection that Oracle's customers

23 were not involved in.  Applying their own cases, Plaintiffs' renewed consent argument fails.

24

25     [13] *Calhoun* and *In re Google RTB* are not on point. *Calhoun* is irrelevant as it fails to consider ECPA's one-party consent defense at all.  *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 626

26 (N.D. Cal. 2021) (dismissing Wiretap Act claim because "Plaintiffs fail to allege that Google divulged the contents of any communication to a third party").  *In re Google RTB* found that

27 Google could not rely on its consumer-facing privacy policy to establish that its corporate customers consented to the alleged interceptions where they were not party to the privacy policy.

28 *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022).

*Third*, even if Plaintiffs' interpretation of the statute were correct, their own allegations completely undercut the premise that Oracle's customers were unaware of Oracle's "further use" of the data. (*Contra* Opp. at 16-17.) In Plaintiffs' words, "[t]he gravamen" of their case is that Oracle "combines the vast trove of data it collects into intrusive profiles and sells them to unidentified customers." (*Id.* at 23.) As Plaintiffs allege, the purported "further use" is the entire reason website publishers seek out Oracle's products. (*See* SAC ¶ 72 ("Oracle, its partners, and its customers work in parallel to compile personal data[.]").) Indeed, the SAC is replete with quotes from public marketing documents, press releases, and presentations describing the benefits of Oracle's "further use" of web-user data for customers:

- "Oracle ID Graph lets its customers 'connect identities across disparate marketing channels and devices to one customer' by 'seamlessly pull[ing] together the many IDs . . . enabling marketers to tie their interactions to an actionable customer profile'" (*Id.* ¶ 63);

- Oracle collects data from "$90B in transactions tied to real people every week," provides "digital ID graphing on 115MM+ households" and combines that into "a single, universal view of identity" (*id.* ¶ 64); and

- Oracle's advertising technology can know "how much time you spend in a specific aisle of a specific store and what is in that aisle of a store" (*id.* ¶ 122).

Plaintiffs' current argument thus contravenes the very gravamen of their case. Plaintiffs cannot have it both ways. Because their allegations demonstrate that Oracle's customers consented to its conduct—whether that was the alleged interception itself or the alleged further use of that data for advertising—their ECPA claim should be dismissed.

## III.   CONCLUSION

Plaintiffs have not cured the deficiencies in the Florida intrusion upon seclusion or ECPA claim. As such, Oracle respectfully asks the Court to grant its motion to dismiss these claims with prejudice. *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010).

Dated: February 12, 2024                    MORRISON & FOERSTER LLP

                                            By:   */s/ Purvi G. Patel*
                                                  Purvi G. Patel

                                            *Attorneys for Defendant*
                                            *Oracle America, Inc.*