**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
MICHAEL KATZ-LACABE, et al.,   )
                               )
          Plaintiffs,          )
                               )
  VS.                          )    NO. 3:22-CV-04792-RS
                               )
ORACLE AMERICA, INC.,          )
                               )
          Defendant.           )
                               )
```

San Francisco, California
Thursday, March 28, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
    LIEFF, CABRASER, HEIMANN AND BERNSTEIN, LLP
    Embarcadero Center West
    275 Battery Street, 29th Floor
    San Francisco, CA 94111
    **BY:  DAVID T. RUDOLPH**
         **MICHAEL W. SOBOL**
         **ATTORNEYS AT LAW**

For Defendant:
    MORRISON & FOERSTER, LLP
    425 Market Street
    San Francisco, CA 94105
    **BY:  TIFFANY CHEUNG**
         **ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                        Official United States Reporter

|   |   |   |
|---|---|---|
| 1 | **Thursday - March 28, 2024** | **2:26 p.m.** |

2                  **P R O C E E D I N G S**

3                    ---o0o---

4         **THE COURTROOM DEPUTY:** The next matter we're calling

5  is 22-CV-4792, Katz-Lacabe, et al. versus Oracle America.

6  Appearances please, first starting with the plaintiff and then

7  defendant.

8         **MR. RUDOLPH:** David Rudolph, Lieff, Cabraser, Heimann

9  and Bernstein, for the plaintiffs.

10        **MR. SOBOL:** Michael Sobol, also from Lieff Cabraser,

11 for the plaintiffs, Your Honor.

12        **MS. CHEUNG:** Good afternoon, Your Honor. Tiffany

13 Cheung, of Morrison & Foerster, on behalf of defendant Oracle.

14        **THE COURT:** Good afternoon.

15    So this is our third motion to dismiss, if I'm counting

16 correctly, and we're now down to a battle about two of the

17 causes of action in the second amended complaint, the

18 Electronic Communications Privacy Act claim and the intrusion

19 upon seclusion claim under Florida law, I believe.

20    So that being what we're discussing, Ms. Cheung, you're

21 moving to dismiss, so I'll let you start.

22        **MS. CHEUNG:** Thank you, Your Honor.

23    Of course, this is our third time as you're well aware,

24 Your Honor, so I will not belabor the extensive history here,

25 except to say that the two claims that are at issue in this

1  case left, which is the Florida intrusion upon seclusion claim
2  and the ECPA claim have been previously dismissed by this
3  Court; the ECPA claim actually twice before.  So this is now
4  the third time the plaintiffs have attempted to plead that
5  claim.  And the bottom line is, Your Honor, the plaintiffs'
6  amended complaint has not cured the deficiencies that Your
7  Honor found warranted dismissal the first time around.
8       As to the Florida intrusion upon seclusion claim, we'll
9  just start with that one.  The plaintiffs essentially have
10 added three to four paragraphs in their support of that claim,
11 but those new allegations continue to fail to show that Oracle
12 intruded into her home, which is a required element of the
13 claim, or a private space on her devices.
14      Further, they fail to allege the element that --
15          **THE COURT:**  And there's no private -- we're not
16 talking about, as you just characterized it, private places on
17 her electronic devices, because this is activity on the web.
18          **MS. CHEUNG:**  That's right.
19          **THE COURT:**  Public activity.
20          **MS. CHEUNG:**  That's right.  It's public activity on
21 the Internet, and that's the --
22          **THE COURT:**  On the Internet, I should say.
23          **MS. CHEUNG:**  -- relevant domain that is at issue that
24 they are claiming Oracle allegedly violated her privacy on the
25 Internet.  That is obviously a public domain.  And that's

1   regardless of whether she was in her home at the time she was
2   accessing the Internet or not.  She could have been anywhere
3   else, and it would not have mattered for her claim.
4        So she fails to allege the private space that is required,
5   and the cases cited are clearly inapposite, because they deal
6   with surveillance of somebody's private backyard 24/7 -- that
7   is clearly not at issue here -- or telephone calls by someone
8   who was sexually harassing the plaintiff and waited for the
9   plaintiff to go home before those -- that harassment was made.
10  So those cases just simply are a far cry from the allegations
11  we have in this case, which is allegedly an innovation of her
12  privacy while she was surfing the Internet.  So the private
13  space element just simply is not, is not met.
14       Her other theory which is somehow, or her private devices
15  are a private space also fail, because she doesn't allege that
16  Oracle somehow was able to access the local files on her quote-
17  unquote password-protected devices, which is her alternative
18  theory, that somehow a password-protected device is a private
19  space.  But there's no allegation that Oracle somehow invaded
20  the privacy or had access to the local files on any password-
21  protected device.
22       The other element that is required that she fails to
23  adequately allege is the highly offensive requirement.  And we
24  cite to a number of Florida cases finding that much more
25  sensitive information allegedly disclosed did not meet the

1  requirements for the outrageousness that is required to meet
2  the highly offensive requirement.
3      So, for example, sensitive financial information in a
4  credit report, an unredacted Social Security number, private
5  medical records, attorney/client communications.  We cited a
6  number of cases that show none of those types of communications
7  rise to the level of highly offensive that is required for a
8  Florida intrusion upon seclusion claim, and the information at
9  issue here, which is effectively activity on the Internet
10 regarding retail visits, other types of activity in terms of
11 browsing history, none of that rises to the level of the highly
12 offensive conduct that would be required to state a claim.
13     So based on two -- the failure to allege those required
14 elements, that Florida intrusion upon seclusion claim should be
15 dismissed with prejudice.
16     Turning to the ECPA claim, Your Honor.  Again, Your Honor
17 has dismissed this claim twice already.  You've generously
18 given the plaintiffs a third chance to try to cure the
19 deficiencies in the complaint, and they have failed again.  At
20 bottom, they have not alleged anything that is materially new
21 that would change, that was different from what they alleged
22 before.
23     So, for example, Your Honor, they have added allegations,
24 additional statements allegedly made by Oracle's CEO Larry
25 Ellison.  Your Honor considered the -- many of the statements

1     that they have alleged in their second amended complaint.  The
2     only one they've added is actually an older statement back in
3     2001 that was a statement that came following the 9/11 attacks
4     and related to, you know, potential security issues.  But
5     again, this is well before even the earliest date of the class
6     period in this case.  So that additional statement by
7     Mr. Ellison certainly doesn't change Your Honor's findings that
8     the other statements they had previously alleged were
9     insufficient.
10          In addition to that one statement by Mr. Ellison, they now
11    point to alleged criticisms of Google that Oracle publicly
12    posted that were -- the thrust of the statements were that
13    Google's -- Google has far more access to information about
14    individuals than Google's competitors do.  So the criticism
15    there is that Google is actually engaging in anticompetitive
16    conduct, because Google is able to amass much more significant
17    information about individuals through Google's services and
18    products, such as the Chrome browser, through YouTube, through
19    Google searches.
20          The plaintiffs are pointing to Oracle's criticisms that
21    Google has access to an extremely vast amount of information
22    that Oracle doesn't have access to, nor does any of Google's
23    competitors.  So the fact that Oracle is criticizing Google's
24    conduct that is materially different from what Oracle is doing
25    because Google has a much different market position than Oracle

1  does, doesn't show any kind of tortious intent, which is what
2  plaintiffs would need to show in order to -- in order to meet
3  the requirements of the exception to the ECPA statute.
4      Next, setting aside the Google documents, plaintiffs then
5  turn to, again, statements taken out of context in an article
6  related to alcohol-based advertising, where they seem to
7  suggest that Oracle, an unidentified Oracle representative or
8  perhaps simply just the author of the article, stated that
9  Oracle would discontinue alcohol-based advertising.  There's no
10 reason to think that there was anyone authorized to say that or
11 that, as plaintiffs suggest, somehow the fact that Oracle may
12 be continuing alcohol-based advertising enables alcoholics.
13 There's just simply no reason, or record, or even an allegation
14 to suggest that that was the intent of Oracle if we take as
15 true that, as plaintiffs allege, that Oracle is continuing to
16 create alcohol-based segments.  And, again, we're taking that
17 as true for purposes of this motion, but there is simply no
18 evidence or no allegation of any intent, tortious intent.
19     And then we go to their focus on a blog post by a
20 purported former employee.  Again, there is absolutely no
21 identification of who this purported former employee may be.
22 This post is dated in June 2020, so we don't even know if
23 this -- who this former employee may be, whether this person
24 actually is a former employee, and even if we take that at face
25 value, when this employee may have been employed by Oracle.  It

1   could have been certainly years before, and certainly
2   potentially well before the class period in this case.  And if
3   that's the case, there's -- there is absolutely no reason to
4   think that any statements by this unidentified anonymous blog
5   poster is stating anything that's accurate or even relevant to
6   the time period at issue here, which starts in 2018.  So we
7   don't now have any idea when the timing of this potential
8   employee may have been employed, again, assuming that this
9   person is telling the truth.
10       But beyond that, even looking at the quote that they point
11  to, which is that certain of Oracle's -- certain of Oracle's --
12  they characterize it as Oracle's opt-out mechanism, although if
13  you go to the link that they cite to, it's not necessarily
14  related to an opt-out mechanism.  They claim, well, clearly
15  what this person is saying is the opt-out mechanism is
16  inaccurate, and at face value that's not clear at all from what
17  the poster is saying, because there's absolutely no context and
18  we have no idea what the poster may be referring to when they
19  say something is not updated.  Without any context into what
20  that statement may mean, it just simply is not enough to show
21  tortious intent, which is what is required here.
22       Finally, they, plaintiffs, purport to make an argument
23  that somehow Oracle's sensitive data provisions in its privacy
24  policy are inaccurate.  So plaintiffs' last-ditch effort is the
25  fact that Oracle, in its privacy policy, says it does -- it

1  doesn't create online segments that relate to sensitive
2  information, and it provides a very detailed definition of what
3  that sensitive information is, plaintiffs say, well, Oracle
4  doesn't follow its own privacy policy.  And again, none of the
5  allegations at issue here, including the allegations plaintiffs
6  say it would allege if you gave them yet another chance to
7  amend, show that there's any violation of Oracle's privacy
8  policy.  None of the information shows that at all.
9       And so we certainly would oppose any further amendment of
10 the complaint at this point to try, yet again, to make a claim
11 that they've failed to make so far.
12           **THE COURT:**  Okay.
13           **MR. RUDOLPH:**  Thank you, Your Honor.
14      So just the situation that we're in here is that we have a
15 properly alleged ECPA claim.  ECPA requires the interception of
16 electronic communications while they're in transit.  That's not
17 at issue.  It requires that interception be the result of
18 intentional activity.  That's not at issue.  This issue is now
19 Oracle's defense essentially that the websites have -- from
20 which the data was extracted were -- consented to the conduct,
21 and plaintiffs allege that that consent is vitiated by the
22 exception to the exception.  And the exception to the exception
23 applies where the communication's intercepted for the purpose
24 of committing any criminal or tortious act, and the tortious
25 act has to be separate from the -- from the ECPA violation

1    itself.
2         And, in fact, that's what Ninth Circuit cases and other --
3              **THE COURT:**  I don't think that anybody's disputing
4    any of what you just said.
5              **MR. RUDOLPH:**  Okay.  Right.
6              **THE COURT:**  So what is your averments of tortious
7    intent?
8              **MR. RUDOLPH:**  So our averments is that the separate
9    act of engaging in tortious conduct -- all Oracle has to intend
10   is to engage in that conduct, conduct that is tortious.
11             **THE COURT:**  What is it?
12             **MR. RUDOLPH:**  That is -- that is the profiling -- the
13   collection of information, using it to create these highly
14   invasive profiles through an optic surveillance, everything
15   that we've alleged in the complaint.  So it's this separate act
16   of taking --
17             **THE COURT:**  I don't follow you.
18             **MR. RUDOLPH:**  Okay.
19             **THE COURT:**  What is -- you barrel down to exactly
20   what you have to show, but I don't hear what that -- I've said
21   it was insufficient, and I've said that more than once.
22        And so now I have what purports to be some new averments,
23   but I don't see where those averments show tortious intent.
24   And you may disagree with me, but going back and saying, oh,
25   all sorts of stuff that was in the complaint before showed

1  tortious intent, I already told you I don't think so.  So you
2  gotta tell me what the new stuff, why that gets you over this
3  hurdle.  And candidly I don't see it, but I want to give you an
4  opportunity to address it.
5           **MR. RUDOLPH:**  And so -- thank you.
6      We added a significant new set of factual allegations that
7  relate to Oracle's tortious intent.  There's actually six new
8  sets of fact allegations.  The first has to do with --
9           **THE COURT:**  Quantity is not enough.  It's quality we
10 want to focus on here.
11          **MR. RUDOLPH:**  Right, right, right.
12     So Mister -- we quote Mr. Ellison's statements regarding
13 privacy is an illusion.  He called for the creation of a
14 national identification system.  We allege that that's
15 essentially what the --
16          **THE COURT:**  As a general matter, if -- I won't push
17 back at all with you that senior executives can make statements
18 that will be either admissions or binding on the company, but
19 sort of generalized statements like the ones you're
20 identifying, you're then trying to ascribe those into some sort
21 of specific tortious intent, and I don't see it.
22          **MR. RUDOLPH:**  So those statements, his views on
23 privacy --
24          **THE COURT:**  Yes.
25          **MR. RUDOLPH:**  -- his views on whether some sort of

1  national identification system should be created, give context
2  to the statement that he made in 2016.
3              **THE COURT:**  Well, don't you need -- the context is
4  fine, but don't you then need to have a link that context then
5  becomes conduct of some kind?  And where is that?  I mean,
6  you've got -- you've got expressions and views.  Where does
7  that then get put into practice?  Where is your facts that show
8  it gets put into practice such that it shows tortious intent?
9              **MR. RUDOLPH:**  Mr. Ellison, when he was introducing
10  the ID graph to the world -- so this was a video, a videotaped
11  event where he was introducing the ID graph, and he said
12  this -- this is -- this is scaring the lawyers or putting a
13  face over their head, and he's describing the extent of the
14  information and the precision with which Oracle collects that
15  information.
16      Oracle has not made any effort to rehabilitate that
17  statement.  It says what it says, that this is scaring the
18  lawyers, putting their hands over their face.  His prior
19  statements provide context to that.  So this is basically an
20  open acknowledgment that this conduct is invasive, that it's
21  legally problematic, but Oracle is going to do it anyway.  This
22  is essentially how the statement --
23              **THE COURT:**  Isn't there an awful lot of leaps between
24  that statement and what you say it shows in terms of the actual
25  conduct of the company?

1          **MR. RUDOLPH:**  I don't think so.

2          I think in part because the other allegations that we have

3     show a pattern of recognizing that conduct that Oracle engages

4     in is problematic, and we added these allegations specifically

5     to address Your Honor's observation in distinguishing *Brown*,

6     *Brown versus Google*, from this case, where you said that -- and

7     what was important in *Brown* was that the -- there was some

8     internal evidence that Google employees had recognized that

9     their privacy practices were problematic.

10         So this is -- we're alleging -- what we've alleged here is

11    actually far more than that.  We've alleged the CEO has made

12    statements.  We've alleged statements that appear to have been

13    made by current or former employees.

14         For example, the news article about alcohol targeting

15    notes that if -- the article appears to be quoting a source

16    saying, this was too close to enabling alcoholics, so we're

17    going to stop doing that.  But they didn't end up stopping it.

18    So it's our understanding that their conduct is problematic.

19         There was the statement from the anonymous Google

20    employee, who posted that their opt-out tool was knowingly

21    inaccurate and intentionally never updated.  That also -- it's

22    hard to understand what that could mean other than there's a

23    problem with this.

24         **THE COURT:**  Well, some unnamed Google employee, or

25    Oracle employee making some statement, how -- I mean, I

1  understand why you say Ellison, for example, his statements
2  are -- have an impact on the -- on what the -- what is ascribed
3  to the company, but some unnamed employee, I mean, how can you
4  rely on that?
5          **MR. RUDOLPH:**  So it was -- it was in the context of a
6  discussion board statement about an article that was talking
7  about a leak of personal data that was very revealing.
8          **THE COURT:**  How do we even know it's a real employee?
9  I mean, do we?
10         **MR. RUDOLPH:**  We -- the employee said that, I am a
11 former employee of BlueKai.  This is -- we need discovery to
12 determine --
13         **THE COURT:**  Well, yeah, but you gotta get to the
14 point where you're entitled to have discovery.
15         **MR. RUDOLPH:**  Right.
16         **THE COURT:**  And the initial burden is on you --
17         **MR. RUDOLPH:**  Right.
18         **THE COURT:**  -- to present a cognizable claim.  Then
19 you can get the discovery.
20         **MR. RUDOLPH:**  Right.
21         **THE COURT:**  But relying on some comment by someone
22 who's identified themselves as an employee of the company is
23 pretty thin.
24         **MR. RUDOLPH:**  Well, and then that's in addition to
25 Oracle's own statements about Google's conduct that actually

1  mirrors Oracle's.  So Oracle noting that, you know, the
2  creation of the shadow profiles using information that's
3  collected surreptitiously without people's consent is highly
4  privacy invasive.
5       Plaintiffs aren't the only ones who have picked that out
6  and said this is hypocritical.  This -- the fact of that has
7  been noted in the press.  Oracle is basically engaging in the
8  same conduct that it is calling out Google for.  That also
9  evinces some understanding that privacy practices were
10 problematic.
11      Additionally, there is the issue of whether or not Oracle
12 is engaging in privacy-invasive conduct while telling the world
13 it isn't doing that.  And in the complaint, we allege that
14 information that came out after we had previously amended the
15 complaint showed that Oracle's representations, both in this
16 litigation and in its privacy policies that it doesn't engage
17 in political profiling, are incorrect, just factually
18 incorrect.  And this suggests that Oracle is trying to hide
19 this, because it understands that this conduct is harmful or
20 problematic and being called out.
21      **THE COURT:**  This is the sensitive interest segment
22 thing?
23      **MR. RUDOLPH:**  This is.  And this is their -- we made
24 these allegations in the complaint, and it was prior to any of
25 the information that was at issue and revealed to us in the

1  surreply briefing. But that information showed that Oracle,
2  despite representing, we don't make -- we don't create
3  political segments, we don't track and use that sort of
4  information, had actually been out there doing that. There was
5  some investigative reporting that found that these segments,
6  you know, these advertising segments from Oracle, were out
7  there in the wild, while Oracle was representing that it wasn't
8  doing this.
9       And then there's the highly sensitive information that
10 came to light after the briefing in this case closed that was
11 produced just sort of days after Oracle filed its reply brief.
12 And there, there was sort of unambiguous, you know, it's not
13 just -- these aren't just general averments about things Oracle
14 does. This was very specific to our plaintiffs, putting them
15 into very specific political categories and all sorts of other
16 information, specific health issues, their sexual activities,
17 their religious activities. These are all types of information
18 that Oracle claims to not engage in. And a -- the most
19 plausible inference is that Oracle recognizes that this conduct
20 is problematic, and that's why it's basically trying to hide
21 it.
22      So when you take all of these statements together, the
23 CEO's statements, statements to the press, statements by, we
24 agree it's an anonymous potentially former employee. If you
25 read the comments closely, it's hard to understand why somebody

1    would pretend to be a Oracle employee in that context.
2    Oracle's statement saying, essentially what we do is awful, but
3    it's only, you know, we're only going to say that when Google's
4    doing it.
5        If you take all of these together, it raises a plausible
6    inference that Oracle was aware that its privacy practices were
7    problematic, and that is -- that is the test that Your Honor
8    suggested was at issue in order for the exception to the
9    exception to apply.
10           **THE COURT:**  Why don't you talk about the intrusion
11   upon seclusion claim.
12           **MR. RUDOLPH:**  The Florida claims?
13           **THE COURT:**  Yeah.
14           **MR. RUDOLPH:**  Yeah.  Our new allegations make two
15   points clear.  And again, we are responding to Your Honor's
16   observation that plaintiffs had not plausibly alleged a --
17   their private space that Oracle had intruded into.  And our new
18   allegations call out marketing material and statements by
19   Oracle that go to tracking individuals in their homes.  It's
20   not just generally their Internet activity --
21           **THE COURT:**  But Ms. Cheung's point is one that I want
22   you to respond to, which is, this activity is -- it may be
23   someone is generating it from their home, but it's activity on
24   the Internet.  It's not private.  It's not private activity.
25   It's not encrypted.  It's not something like that.  So why does

1   it matter if you happen to be using your device at home?  It's
2   really the electronic world that you're occupying, isn't it?
3   And that's a public world.
4          **MR. RUDOLPH:**  Well, Oracle had previously argued and
5   prevailed on the argument that the locus of harm was where the
6   individual was, because they were accessing their Internet
7   activity in their state.  So that has to be one of two places.
8   I mean, it's either the place where they are physically in
9   their homes, which Oracle says, we track people physically in
10  their homes, or on their private electronic devices.  So
11  it's -- Oracle is engaging in con' --
12         **THE COURT:**  When you're talking about physical --
13  when you're in the home, it's almost, by definition, a private
14  space.
15         **MR. RUDOLPH:**  That's correct.
16         **THE COURT:**  The fact that you are then entering into
17  activity electronically in a public sphere, for that activity
18  it doesn't matter as much where it's being generated from.
19  You're conflating two different concepts, I think.  Because,
20  you know, if it's activity within -- within the private space
21  of a home, pretty easy to determine that that isn't something
22  that's, you know, the participant wants the public to
23  necessarily have access to.  But it becomes less -- it becomes
24  almost irrelevant if you're -- if what we're talking about is
25  your activity on the Internet.  You could be doing that from

1  Starbucks, it doesn't matter.
2              **MR. RUDOLPH:**  In the last round of motion to dismiss
3  briefing --
4              **THE COURT:**  Yeah.
5              **MR. RUDOLPH:**  -- Oracle argued and attempted to
6  dismiss the Florida wiretap, that the plaintiffs, Dr. Golbeck,
7  has no reasonable expectation of privacy in her Internet
8  activity.  And Your Honor found that, in fact, she does have a
9  reasonable expectation of privacy, at least some of her
10 online --
11             **THE COURT:**  It depends.  If you've got -- you can be
12 engaging in electronic activity that you're trying to keep
13 private through encryption, or closed networks or all sorts of
14 things.  Right?
15             **MR. RUDOLPH:**  Right.  Well, right.
16     And because the Florida wiretap claim proceeded, it's --
17 part of the nature of that claim is that some of the data that
18 Oracle is collecting from plaintiffs they have a reasonable
19 expectation of privacy in.  So it might not be all of it, but
20 at least some of it is.
21     And the point of the amendments were to more clearly
22 explain how Oracle intrudes into people's houses.
23             **THE COURT:**  Okay.
24             **MR. RUDOLPH:**  And with respect to the private
25 electronic devices, again, that's to clarify that this was

1  activity that was taking place on their devices.  Again, Oracle
2  prevailed on the argument that these -- these activities, these
3  interceptions take place on their devices.  It's Java script
4  code that's executed on the devices.  There is activity that
5  takes place physically on there.  Oracle is making a
6  distinction between sort of individual files that might be on
7  the device and their browsing activity, but it's all
8  information that's happening that is contained in this private
9  electronic device.
10            **THE COURT:**  Okay.  I don't think I need to hear
11  anymore.  So I'll take the matter under submission, and you'll
12  get an order.
13            **MR. RUDOLPH:**  Thank you, Your Honor.
14            **MS. CHEUNG:**  Thank you, Your Honor.
15       (Proceedings concluded at 2:55 p.m.)
16                           ---o0o---
17                     **CERTIFICATE OF REPORTER**
18       I certify that the foregoing is a correct transcript
19  from the record of proceedings in the above-entitled matter.
20  DATE:  Saturday, April 6, 2024
21
22
23  _____
24       Stephen W. Franklin, RMR, CRR, CPE
         Official Reporter, U.S. District Court
25