Michael W. Sobol (SBN 194857)
msobol@lchb.com
David T. Rudolph (SBN 233457)
drudolph@lchb.com
Jallé H. Dafa (SBN 290637)
jdafa@lchb.com
John D. Maher (SBN 316157)
jmaher@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
Nabila Abdallah (SBN 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Michael Katz-Lacabe, and Dr. Jennifer Golbeck, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ORACLE AMERICA, INC., a corporation organized under the laws of the State of Delaware,<br><br>Defendant. | Case No. 3:22-cv-04792-RS<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PLAINTIFF SERVICE AWARDS**<br><br>Judge: Hon. Richard Seeborg<br><br>Date: November 14, 2024<br>Time: 1:30 p.m.<br>Courtroom: 3<br><br>Date Action Filed: August 19, 2022<br>Trial Date: Not set<br><br>(Declaration of David T. Rudolph, Declaration of Michael Katz-Lacabe, and Declaration of Jennifer Golbeck, filed concurrently herewith) |

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** on November 14, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, CA 94102, Settlement Class Counsel[1] Lieff Cabraser Heimann & Bernstein, LLP ("Class Counsel") will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 23(h) for an order awarding:

    a.  Attorneys' fees to Class Counsel equal to 25% of the $115 million non-reversionary Settlement Fund, in the amount of $28,750,000;

    b.  Unreimbursed litigation expenses totaling $211,350.52 that Class Counsel reasonably and necessarily incurred in furtherance of the prosecution of this Action; and

    c.  Service awards of $10,000 for each of the two Settlement Class Representatives, totaling $20,000.

This Motion is brought pursuant to the Court's Order Granting Preliminary Approval of Class Action Settlement (Dkt. 135), paragraphs 8.1–8.5 of the Settlement Agreement, and Federal Rule of Civil Procedure 23(h). The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the accompanying Declaration of David T. Rudolph in Support of this motion and all exhibits attached thereto, the concurrently filed declarations of Settlement Class Representatives, the pleadings and records on file in this Action, and other such matters and arguments as the Court may consider.

### STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Rule 23(h), this Motion raises the following issues:

    1.  Whether the Court should award to Class Counsel reasonable attorneys' fees of 25% of the $115 million non-reversionary Settlement Fund to Class Counsel as attorneys' fees;

    2.  Whether the Court should award $211,350.52 in out-of-pocket expenses that Class Counsel reasonably and necessarily incurred in furtherance of the Action; and

---

[1] Capitalized terms in this notice and the supporting memorandum have the same meanings as in the Class Action Settlement Agreement (the "Agreement" or the "Settlement") (Dkt. 132-2).

3.  Whether the Court should award Service Awards of $10,000 to each of the two Settlement Class Representatives for their time and effort in pursuing this Action on behalf of the class.


Dated: August 28, 2024

/s/ Michael W. Sobol
Michael W. Sobol (SBN 194857)
msobol@lchb.com
David T. Rudolph (SBN 233457)
drudolph@lchb.com
Jallé H. Dafa (SBN 290637)
jdafa@lchb.com
John D. Maher (SBN 316157)
jmaher@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
Nabila Abdallah (SBN 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Plaintiffs and the Class*

1

## TABLE OF CONTENTS

2

Page

3  INTRODUCTION ............................................................................................................. 1

4  BACKGROUND ............................................................................................................... 2

   The Pre-Filing Investigation .......................................................................................... 2

5  Commencement of Suit and Challenges to the Pleadings............................................... 3

6  Extensive Discovery....................................................................................................... 3

7  Instrumental and Important Rulings............................................................................... 4

   Settlement Negotiations and Mediation ......................................................................... 5

8  The Settlement ............................................................................................................... 6

9  The Settlement Approval Process and Ongoing Work for the Class ............................... 7

10  ARGUMENT .................................................................................................................... 8

   I.     Class Counsel's Requested Fees are Fair and Reasonable.................................... 8

11         A.     The Relevant Factors Support Awarding Class Counsel Fees
12                Representing the Benchmark Twenty-Five Percent of the Common
                  Fund. .......................................................................................................... 10

13                1.    Class Counsel Obtained an Exceptional
                        Result for the Class. ........................................................................ 10

14                2.    Litigating These Novel Privacy Claims was
15                      Extremely Risky.............................................................................. 13

16                3.    The Settlement Resulted from Class
                        Counsel's Skill, Experience, and Zealous
                        Representation in This Complex Litigation. .................................... 14

17                4.    This Case was Risky to Litigate on
18                      Contingency. ................................................................................... 16

19                5.    Class Counsel's Requested Fee Percentage is
                        in Line with Similar Cases. ............................................................. 17

20         B.     A Lodestar Cross-Check Confirms the Reasonableness of the
                  Requested Fees............................................................................................ 18

21                1.    The Number of Hours Devoted to the Case
                        was Reasonable. .............................................................................. 18

22                2.    The Hourly Rates Are Reasonable. ................................................. 19

23                3.    The Multiplier is Justified Given the Results
                        Obtained, the Complexity of the Issues, and
24                      the Contingent Nature of the Representation. .................................. 21

25  II.    It is Appropriate to Reimburse Class Counsel's Reasonable Litigation
          Expenses........................................................................................................... 22

26  III.   The Requested Class Representative Service Awards are Reasonable and
          Well-Deserved................................................................................................... 23

27  CONCLUSION ................................................................................................................ 25

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Activision Sec. Litig.*,
  723 F. Supp. 1373 (N.D. Cal. 1989) ........................................................................ 9

*Alvarez v. Farmers Ins. Exch.*,
  No. 14-cv-00574-WHO, 2017 WL 2214585 (N.D. Cal. Jan. 18, 2017) ................................ 24

*In re Am. Apparel, Inc. S'holder Litig.*,
  No. CV 10–06352 MMM, 2014 WL 10212865 (C.D. Cal. July 28, 2014) ........................... 16

*Andrews v. Plains All Am. Pipeline L.P.*,
  No. CV15-4113 PSG, 2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) .................................. 18

*In re Anthem, Inc. Data Breach Litig.*,
  No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ...................... *passim*

*In re Apple Inc. Device Performance Litig.*,
  No. 18-md-02827-EJD, 2021 WL 1022866 (N.D. Cal. Mar. 17, 2021), *appeal
  dismissed,* No. 23-15416, 2023 WL 10447843 (9th Cir. Aug. 8, 2023) ............................ 9, 16

*In re Apple Inc. Device Performance Litig.*,
  No. 18-md-02827-EJD, 2023 WL 2090981 (N.D. Cal. Feb. 17, 2023), *appeal
  dismissed,* No. 23-15416, 2023 WL 10447843 (9th Cir. Aug. 8, 2023) .................... 13, 15, 17

*In re Arizona Theranos, Inc. Litig.*,
  No. 2:16-cv-02138-DGC (D. Ariz. Feb. 6, 2024), ECF No. 619 ........................................... 20

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ...................................................................................... 8, 9, 10

*Brice v. Gonzalez*,
  No. 23-15103, 2023 WL 3090669 (9th Cir. Mar. 31, 2023) ................................................ 17

*Brown, et al. v. Google LLC*,
  No. 4:20-cv-03664-YGR (N.D. Cal.), ECF No. 1106 ......................................................... 11

*Campbell, et al. v. Facebook, Inc.*,
  No. 4:13-cv-05996-PJH (N.D. Cal., Aug. 18, 2017), ECF No. 253 ..................................... 11

*In re Capacitors Antitrust Litig.*,
  No. 17-md-02801-JD, 2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) ................................. 18

*Corker v. Costco Wholesale Corp.*,
  No. 19-cv-00290-RSL, 2023 WL 6215108 (W.D. Wash. Sept. 25, 2023) ........................... 20

*Cottle v. Plaid Inc.*,
  No. 20-cv-03056-DMR, 2022 WL 2829882 (N.D. Cal. July 20, 2022) ............................... 21

*Covillo v. Specialtys Café*,
  No. C-11-00594 DMR, 2014 WL 954516 (N.D. Cal. Mar. 6, 2014) .................................... 23

*Czarnionka, et al. v. The Epoch Times Association, Inc.*,
  No. 1:22-cv-06348-AKH (S.D.N.Y. July 10, 2024), ECF No. 106 ...................................... 20

*Dyer v. Wells Fargo Bank, N.A.*,
  303 F.R.D. 326 (N.D. Cal. 2014) ..................................................................................... 21

*In re Facebook Biometric Info. Priv. Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021), *aff'd*, No. 21-15553, 2022 WL 822923
(9th Cir. Mar. 17, 2022) ............................................................................................. 22

*In re Facebook Internet Tracking Litig.*,
No. 12-md-02314-EJD, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022), *aff'd
sub nom. In re Facebook, Inc. Internet Tracking Litig.*, No. 22-16903, 2024
WL 700985 (9th Cir. Feb. 21, 2024).......................................................................... 22

*Fischel v. Equitable Life Assurance Soc'y*,
307 F.3d 997 (9th Cir. 2002)......................................................................................... 8

*Fowler v. Wells Fargo Bank, N.A.*,
No. 17-cv-02092-HSG, 2019 WL 330910 (N.D. Cal. Jan. 25, 2019) ....................... 20

*Fraley v. Facebook, Inc.*,
No. C 11-1726 RS, 2013 WL 4516806 (N.D. Cal. Aug. 26, 2013), *aff'd sub
nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016)......................................... 19

*In re Glumetza Antitrust Litig.*,
No. C 19-05822 WHA, 2022 WL 327707 (N.D. Cal. Feb. 3, 2022) ......................... 16

*In re Google Buzz Priv. Litig.*,
No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ........................... 11

*In re Google Inc. Street View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021)...................................................................................... 11

*In re Google Location Hist. Litig.*,
5:18-cv-05062-EJD (N.D. Cal., May 3, 2024), ECF No. 367 ................................... 11

*In re Google Location Hist. Litig.*,
No. 18-cv-05062-EJD, 2024 WL 1975462 (N.D. Cal. May 3, 2024)........................ 20

*Gutierrez v. Amplify Energy Corp.*,
No. 21-CV-01628-DOC, 2023 WL 6370233 (C.D. Cal. Sept. 14, 2023)............. 20, 21, 23

*Gutierrez v. Wells Fargo Bank, N.A.*,
No. C 07-05923 WHA, 2015 WL 2438274 (N.D. Cal. May 21, 2015)...................... 22

*Harris v. Marhoefer*,
24 F.3d 16 (9th Cir. 1994)........................................................................................... 22

*Harrison v. Bank of Am. Corp.*,
No. 19-cv-00316-LB, 2021 WL 5507175 (N.D. Cal. Nov. 24, 2021) ......................... 8

*Hopkins v. Stryker Sales Corp.*,
No. 11-CV-02786-LHK, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013)........................ 17

*Hosp. Auth. Of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
No. 15-cv-01100, 2020 WL 3053468 (M.D. Tenn. May 29, 2020)............................ 21

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
No. 19-md-02913-WHO, 2023 WL 11820531 (N.D. Cal. Dec. 18, 2023)............. 14, 24

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*,
No. CV 07-05107 SJO, 2013 WL 7985367 (C.D. Cal. Dec. 23, 2013) ....................... 8

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ................................................................................ 11

*In re Lidoderm Antitrust Litig.*,
No. 14-md-02521-WHO, 2018 WL 4620695 (N.D. Cal. Sept. 20, 2018) ...................... *passim*

*Lynwood Invs. CY Ltd. v. Konovalov*,
No. 20-cv-03778-MMC, 2023 WL 2918754 (N.D. Cal. Apr. 11, 2023) ............................ 21

*In re Media Vision Tech. Sec. Litig.*,
913 F. Supp. 1362 (N.D. Cal. 1996) ...................................................................... 22

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
768 F. App'x 651 (9th Cir. 2019) ......................................................................... 22

*In re Netflix Priv. Litig.*,
No. 11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ............................ 11

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................. 10

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ............................................................................... 23

*In re Optical Disk Drive Prods. Antitrust Litig.*,
959 F.3d 922 (9th Cir. 2020) ................................................................................. 9

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ................................................................................. 15

*In re Portal Software, Inc. Sec. Litig.*,
No. C-03-5138 VRW, 2007 WL 1991529 (N.D. Cal. June 30, 2007) .............................. 25

*Ramirez v. Trans Union, LLC*,
No. 12-cv-00632-JSC, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022) ............................ 20

*Roberts v. AT&T Mobility LLC*,
No. 15-cv-03418-EMC, 2021 WL 9564449 (N.D. Cal. Aug. 20, 2021) ............................ 21

*In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
No. 17-ml-2792-D, 2020 WL 9936692 (W.D. Okla. June 11, 2020), *aff'd*, 997
F.3d 1077 (10th Cir. 2021) .................................................................................. 21

*Senne v. Kansas City Royals Baseball Corp.*,
No. 14-cv-00608 JCS, 2023 WL 2699972 (N.D. Cal. Mar. 29, 2023), *aff'd sub
nom. Senne v. Concepcion*, No. 23-15632, 2023 WL 4824938 (9th Cir. June
28, 2023) ................................................................................................... 8, 18

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ............................................................................... 11

*Tait v. BSH Home Appliances Corp.*,
No. SACV 10-0711-DOC, 2015 WL 4537463 (C.D. Cal. July 27, 2015) ........................... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. MDL 07–md–1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ......................... 15

*Thomas v. MagnaChip Semiconductor Corp.*,
    No. 14-cv-01160-JST, 2018 WL 2234598 (N.D. Cal. May 15, 2018) ................................... 8

*In re TikTok, Inc., Consumer Priv. Litig.*,
    617 F. Supp. 3d 904 (N.D. Ill. 2022), *appeal dismissed sub nom. In re Tiktok*
    *Inc., Consumer Priv. Litig.*, No. 22-2682, 2022 WL 19079999 (7th Cir. Oct.
    12, 2022) ............................................................................................................ 14, 18

*Van Vranken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995) ................................................................................ 23

*Vela, et al. v. AMC Networks, Inc.*,
    No. 1:23-cv-02524-ALC (S.D.N.Y May 16, 2024), ECF No. 64 ......................................... 20

*Vianu v. AT&T Mobility LLC*,
    No. 19-cv-03602-LB, 2022 WL 16823044 (N.D. Cal. Nov. 8, 2022) .................................. 21

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................................. 18, 21

*In re Vizio, Inc., Consumer Priv. Litig.*,
    No. 16-ML-02693-JLS-KES, 2019 WL 12966638 (C.D. Cal. July 31, 2019),
    *judgment entered sub nom. In re VIZIO, Inc., Consumer Priv. Litig.*, No. 16-
    ml-02693-JLS, 2019 WL 3818854 (C.D. Cal. Aug. 14, 2019) ........................................... 12

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    MDL No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) .......................... 21

*Walsh v. Kindred Healthcare*,
    No. C 11–00050 JSW, 2013 WL 6623224 (N.D. Cal. Dec. 16, 2013) .................................. 13

*In re Zoom Video Commc'ns, Inc. Priv. Litig.*,
    No. 20-cv-02155-LB, 2022 WL 1593389 (N.D. Cal. Apr. 21, 2022), *appeal*
    *dismissed sub nom. Brice v. Rodgers*, No. 22-15764, 2023 WL 3568176 (9th
    Cir. Jan. 5, 2023) .............................................................................................. 17, 22

**Statutes**

28 U.S.C § 1292(b) ...................................................................................................... 3, 16

**INTRODUCTION**

In recognition of the substantial work performed for the Class in this case and the strong result achieved, Class Counsel respectfully move the Court to award attorneys' fees representing 25% of the Settlement Fund, the established benchmark within the Ninth Circuit. This request, amounting to $28.75 million, represents a multiplier of 2.91, which is well within the 1.0–4.0 multiplier range awarded in most settlements with similar sized common funds. In the Ninth Circuit, where a settlement creates a common fund, the District Court has the discretion to award attorneys' fees using either the percentage of the common fund method or the lodestar method. Class Counsel respectfully submit that under either method, the requested fee amount is fair and reasonable.

On behalf of the Plaintiffs and the Settlement Class, Class Counsel has reached a settlement with Oracle America Inc. ("Oracle") that provides a $115 million non-reversionary common fund to be distributed evenly among Settlement Class Members, as well as non-monetary relief addressing the alleged privacy violations. Additionally, this settlement contributed instrumentally to Oracle's cessation of its ad tech business—an event that has been described as sending shockwaves throughout the industry.

Over a two year pre-filing investigation, and nearly two years of hard-fought litigation, Class Counsel devoted over 13,000 hours prosecuting novel, high-risk privacy claims to protect important privacy rights, and obtaining an extraordinary Settlement. This case is not premised on breach of contract or other promises, or the negligent mishandling of personal data contrary to the defendant's business purposes—it is a challenge to Oracle's regularly conducted business activity. Atypically for privacy cases, Oracle's alleged unlawful activities were not directed at its customers, "users," or others in privity with it, but upon the general population. This necessitated that Class Counsel pursue novel claims to protect the Settlement Class from the acquisition and stockpiling of personal data into individual dossiers for commercial exploitation. The risk inherent in this litigation is demonstrated by the fact that no other plaintiffs or plaintiffs' counsel took on these challenges by filing a similar case. This makes the Settlement without precedent and all the more remarkable.

NOTICE OF MTN. AND MTN. FOR ATTYS' FEES, REIMBURSEMENT
OF EXPENSES, AND PLTF SERVICE AWA4RDS
CASE NO. 3:22-CV-04792-RS

Class Counsel also seek reimbursement of their reasonably and necessarily incurred expenses, including expert costs, totaling $211,350.52, and Service Awards of $10,000 for the two Settlement Class Representatives. The Class Representatives remained committed to their duties to the Class throughout the litigation, even though their sensitive personal information increasingly became the subject of litigation and part of the case record.

For the reasons set forth herein, Plaintiffs and Class Counsel respectfully request that the Court approve the requested fee award, expense reimbursement, and Service Awards in light of the quality of the Settlement, the skill required to achieve it, the significant risks assumed, and the contingent nature of Class Counsel's representation in this novel and risk-laden litigation.

## BACKGROUND

Class Counsel began work on this novel privacy action over four years ago. *See* Declaration of David T. Rudolph in Support of Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards ("Rudolph Decl.") ¶¶ 4–6. Since then, Class Counsel has devoted substantial resources to investigate, litigate, and resolve claims challenging Oracle's privacy-invasive practices. *See id.* ¶ 3. Plaintiffs allege Oracle's covert collection and aggregation of Plaintiffs' personal data effected comprehensive surveillance of Plaintiffs' personal lives, abrogating their privacy and autonomy. *See generally* Dkt. 87, Second Amended Complaint ("SAC"). Representing Plaintiffs that sought to hold Oracle accountable for this conduct required that Class Counsel undertake a novel and high-risk theory of liability, requiring expertise and commitment to overcome the myriad of challenges that it presented.

### The Pre-Filing Investigation

In early 2020, Plaintiffs began a two-year investigation into Oracle's practices and potential legal claims to protect the Class's privacy rights. Rudolph Decl. ¶¶ 4–6. Plaintiffs analyzed the sprawling public record, including complaints filed by consumer organizations and government regulators, academic articles, news reports, books, web pages, marketing materials, privacy policies and disclosures. Class Counsel consulted experts: a privacy law scholar and two computer scientists who performed forensic research. *Id.* ¶ 6. Class Counsel worked with the prospective Plaintiffs to retrieve and analyze their "Offline Access Request Response Reports"

("OARRRs"), which have been central to this litigation. *Id.* ¶ 5.

## Commencement of Suit and Challenges to the Pleadings

On August 19, 2022, Plaintiffs filed suit against Oracle alleging that its data brokering business violates internet users' right to privacy under the California Constitution as well as various state and federal privacy statutes. Dkt. 1. Oracle initiated three rounds of motions to dismiss that raised potentially dispositive issues including Plaintiffs' standing, the reasonable expectation of privacy, choice of law, and applicability of state and federal wiretapping statutes to Oracle's interception of Plaintiffs' data. Rudolph Decl. ¶ 7; Dkts. 23, 63, 88. Class Counsel researched and drafted thorough oppositions to Oracle's motions and, in response to the Court's rulings, amended the complaint twice. Rudolph Decl. ¶ 7. Each iteration of the complaint required extensive additional legal and factual research. *Id.* ¶ 8. Following the Court's dismissal with prejudice of their Electronic Communications Privacy Act ("ECPA") claim, Plaintiffs filed a motion under 28 U.S.C § 1292(b), which Oracle opposed. Dkts. 120, 122; Rudolph Decl. ¶ 12.

## Extensive Discovery

While defending the multiple challenges to the pleadings, Class Counsel pressed for discovery from Oracle while also countering Oracle's aggressive discovery demands to Plaintiffs. Plaintiffs served—and Oracle responded to—four sets of substantive document requests, comprised of 73 individual requests, along with two sets of interrogatories. Rudolph Decl. ¶ 14. Plaintiffs also took the deposition of an Oracle employee. *Id.* ¶ 15. The Parties contested the scope, relevance, and pace of discovery, leading to frequently contentious video meet and confer conferences and the exchange of dozens of discovery dispute letters and correspondence. *Id.* ¶ 16. Plaintiffs sent several motion to compel letter brief drafts to Oracle's counsel. *Id.* The Parties each filed a motion to compel with Magistrate Judge Westmore, which helped advance the pace of discovery. Dkts. 102, 110.

Oracle ultimately produced over 160,000 pages of documents and ESI, in addition to over 283 video files, spanning approximately 173 hours, of internal discussions regarding the technical operation of Oracle's collection and use of data. Rudolph Decl. ¶ 20. To analyze the materials that Oracle produced, Class Counsel had to grasp complex ad tech software technologies and

- 3 -

1   processes. Plaintiffs retained consulting experts to help conduct an accurate analysis of highly

2   technical information and lines of computer code. *Id.* Plaintiffs obtained key information about

3   Oracle's business practices and policies, strategic decisions, agreements, clients, the extent of

4   data Oracle had received, and the inferred data resulting from its data processing. *Id.* ¶ 21.

5   　　　Plaintiffs responded to Oracle's 26 document requests to Plaintiff Johnny Ryan,[2] 27

6   requests to Plaintiff Michael Katz-Lacabe, and 28 requests to Plaintiff Jennifer Golbeck and

7   conducted thorough searches for documents and responsive ESI. *Id.* ¶ 22. This required engaging

8   a forensics consultant who imaged Plaintiffs' personal laptops and cell phones, a process that

9   required extensive safeguards before Plaintiffs could agree to it. *Id.* Each Plaintiff produced

10  responsive documents and provided detailed responses to Oracle's interrogatories, including

11  supplemental responses at Oracle's request. Plaintiffs also provided detailed responses to Oracle's

12  requests for admission. *Id.*

13  <u>**Instrumental and Important Rulings**</u>

14  　　　Class Counsel obtained several key rulings that drove this litigation to its successful

15  resolution. First, Plaintiffs overcame Oracle's challenge to standing, a ruling that set the tone for

16  many of Plaintiffs' causes of action because it established that Plaintiffs had adequately pled

17  harm, causation, and redressability. Oracle's first motion to dismiss contended that Plaintiffs

18  lacked standing, in part, because they could not show that Oracle's harm was "fairly traceable" to

19  Plaintiffs' conduct. *See generally* Dkt. 23 § IV.A. In essence, Oracle argued that because it did

20  not retrieve data directly from Plaintiffs, but instead obtained data through Plaintiffs' visits to

21  third party websites, the causal link was broken. *Id.* The Court disagreed, ruling that Plaintiffs had

22  standing to sue Oracle: "Plaintiffs allege that Oracle's products, implemented by numerous

23  websites, lead to the collection of vast amounts of data which, when 'synchronized' altogether,

24  lead to personal identification and purported invasions of privacy. *That is, in fact, the very*

25  *outcome that Oracle wishes—and markets to its customers.*" Dkt. 49 at 10 (emphasis added).

26  Class Counsel prevailed on this novel issue, which could have been fatal to Plaintiffs' case.

27
28  ---
    [2] Dr. Johnny Ryan, a resident of Ireland, served as a named plaintiff for the Worldwide Class that
    Plaintiffs pled in their initial complaint. Dkt. 1. Following the Court's ruling on Oracle's first
    motion to dismiss, he filed a notice of voluntary dismissal. Dkt. 56.

Second, Class Counsel's ultimate success in sealing portions of Plaintiffs' OARRRs (the report Oracle provides concerning aspects of the personal data it stores) was another critical juncture in the litigation. While in most cases a sealing motion would be merely administrative, here Plaintiffs' motion involved a core theory of the case—that the mere amalgamation of detailed data about Plaintiffs had serious privacy implications. Despite initially not opposing sealing, Oracle must have realized the implications of Plaintiffs' motion to seal, and opposed it. Dkt. 76. After the Court partially rejected Plaintiffs' motion to seal (Dkt. 68), Plaintiffs submitted declarations in support of the subsequent motions to seal portions of their OARRRs. Dkts. 71-1, 71-9. After *three rounds* of motions to seal, the Court granted Plaintiffs' motion to seal most of the OARRRs, holding them to be "detailed dossier[s] of information about an individual that, by virtue of [their] comprehensiveness, implicate[] privacy concerns." Dkt. 77 at 17.

Finally, Plaintiffs preserved numerous important causes of action that left Oracle open to significant exposure, even after Oracle's second attempt to dismiss them. Oracle's second motion to dismiss was a frontal attack on seven of the nine causes of actions alleged in Plaintiffs First Amended Complaint (*see* Dkt. 63), which Plaintiffs largely overcame (*see* Dkt. 77). Plaintiffs' remaining claims preserved avenues to redress the core of Oracle's conduct that the initial complaint sought to challenge, including claims under the California Invasion of Privacy Act (CIPA) and the Florida Security of Communications Act (FSCA), as well as claims for unjust enrichment under both California and Florida law, and claims for declaratory and injunctive relief, in addition to Plaintiffs' core claims of intrusion upon seclusion and invasion of privacy under California law. Dkt. 77.

**Settlement Negotiations and Mediation**

After some initial settlement discussions in the Autumn of 2023, Plaintiffs presented Oracle with a demand for settlement on November 14, 2023. Oracle responded three months later with an invitation to explore settlement and, thereafter, the Parties agreed to mediate with Professor Eric D. Green and Fouad Kurdi of Resolutions, LLC. Rudolph Decl. ¶ 27. Prior to the in-person mediation session, the Parties prepared detailed mediation briefs outlining their positions on the strengths and weaknesses of the case and exchanged a further demand and

1    response. On April 24, 2024, the Parties engaged in an extended day of in-person mediation. *Id.*

2    By the close of the mediation session, the Parties had exchanged only draft term sheets. *Id.* ¶ 28.

3    During the next two weeks, the Parties continued negotiations through emails and phone calls

4    with the mediators. *Id.* On May 8, 2024, they executed a binding settlement term sheet outlining

5    the basic terms of a settlement. *Id.* Over the next ten weeks, the Parties negotiated a long-form

6    settlement agreement, including the precise terms and implementation of non-monetary relief. *Id.*

7    ¶ 29. These arm's length negotiations resulted in the Settlement Agreement, which was executed

8    on July 8, 2024. *Id.*; Dkt. 132-1.

9                                    **The Settlement**

10          The Settlement provides valuable monetary and non-monetary relief to the Class:

11          *First*, Oracle will pay $115 million to create a non-reversionary cash Settlement Fund for

12   the benefit of Settlement Class Members, who will receive a *pro rata* payment from the Net

13   Settlement Fund (*i.e.*, after the deduction of settlement-related costs, including the costs of Notice

14   and Settlement administration, any Court-awarded attorneys' fees and expenses, and Class

15   Representative Service Awards) upon submitting a valid claim. Dkt. 132-2, Settlement

16   Agreement ("SA") ¶¶ H, O, W, 3.2.5, 3.2.15. No portion of the Settlement Fund will revert to

17   Oracle. *Id.* ¶¶ T, 3.2.1.

18          *Second*, Oracle must implement meaningful business practices designed to address the

19   alleged privacy violations and protect Plaintiffs' privacy moving forward. There are two aspects

20   of this non-monetary relief. One, Oracle has agreed that it will not capture (a) user-generated

21   electronic information within referrer URLs (*i.e.*, the URL of the previously-visited page)

22   associated with a website user or (b) any text entered by a user in an online web form other than

23   through Oracle's own websites. As such, Oracle has agreed it will not engage in the alleged

24   conduct which is central to Plaintiffs' wiretap claims. SA ¶ 3.5; *see* Dkt. 77 at 9 (limiting

25   electronic "content" for Plaintiffs' CIPA claim to referrer URLs and data entered into forms).

26   Two, Oracle has agreed to implement an audit program to reasonably review customer

27   compliance with contractual consumer privacy obligations. SA ¶ 3.5. Oracle has agreed to

28   comply with these provisions for as long as it offers the products and services described in the

SAC. *Id.*

This non-monetary relief is coupled with Oracle's announcement—just over thirty days after committing to the business practice changes in the Parties' binding term sheet—that it would be exiting the ad tech business altogether.[3] Specifically, Oracle announced it will shut down the business units responsible for virtually all of the conduct that is at issue in this case[4] and will automatically delete its customers' data "once [its] obligations are met," and will "end relationships with data providers."[5] While Oracle's CEO cited falling revenues for its decision, media reports stated that "there is a near-universal view that [this decision] also reflects the impact of . . . strengthening privacy rules around the world."[6] Plaintiffs believe the filing of this lawsuit contributed to its decision.[7]

## The Settlement Approval Process and Ongoing Work for the Class

On July 18, 2024, Plaintiffs filed a motion for preliminary approval of the Settlement, supported by declarations of counsel and the Settlement Administrator, Angeion Group, LLC ("Angeion" or "Settlement Administrator"). Prior to selecting Angeion, Class Counsel obtained and carefully negotiated multiple rounds of bids from three well-established, experienced, and

---

[3] Tim Cross, *Oracle Quietly Exits the Advertising Business*, VideoWeek (June 12, 2024), https://videoweek.com/2024/06/12/oracle-quietly-exits-the-advertising-business/ [https://perma.cc/7ECF-FXXB].

[4] *Oracle Advertising End-of-Life Frequently Asked Questions*, Oracle (June 17, 2024), https://www.oracle.com/contracts/docs/oracle-advertising-end-of-life-faqs.pdf?download=false [https://perma.cc/WFL3-ARU8]; *see also* Catherine Perloff, *Exclusive: Oracle will end all of its ad products by Sept. 30*, Adweek (June 17, 2024), https://www.adweek.com/programmatic/exclusive-oracle-will-end-all-of-its-ad-products-by-sept-30/ [https://perma.cc/GR5N-V4PC].

[5] *Oracle Advertising End-of-Life Frequently Asked Questions*, Oracle at 3 (June 17, 2024), *supra* n. 4.

[6] Andrew Birmingham and Nadia Cameron, *$1.7bn wipeout: Oracle's adtech exit follows 'gross miscalculation' as industry 'also rans' squeezed out by privacy pincer, outgunned by bigger tech* Mi3 (June 17, 2024), https://www.mi-3.com.au/17-06-2024/oracles-ad-tech-retreat-suggests-gross-miscalculation-also-speaks-volumes-about-state [https://perma.cc/H27Q-E7LV].

[7] *Supra* n. 3 (noting this lawsuit "put extra pressure" on Oracle to close its ad business); Stephanie Liu, Mo Allibhai, and Xiaofeng Wang, *Oracle Exits the Advertising Business*, Forrester (June 19, 2024), https://www.forrester.com/blogs/oracle-exits-the-advertising-business/ [https://perma.cc/35CB-QYU2]. ("In Oracle's case, consumer privacy awareness manifested as a class-action lawsuit alleging that Oracle built 'digital dossiers' on millions of people without their consent. While a judge dismissed some of the claims in the original lawsuit, it is still proceeding through the legal system and remains unresolved."); *supra* n. 6 (noting that given "the legal baggage of [this] class action lawsuit," made it necessary for Oracle to "convince the market its solutions are viable").

1    highly regarded class action notice and administration firms. Rudolph Decl. ¶ 34.

2           On August 9, 2024, the Court granted preliminary approval of the Settlement,

3    provisionally certified the Settlement Class, approved the Notice Plan, and appointed Settlement

4    Class Counsel, Settlement Class Representatives, and Angeion as the Settlement Administrator.

5    Dkt. 135. Class Counsel then worked closely with Angeion to supervise its implementation of the

6    Settlement's notice program. *See, e.g.*, www.KatzPrivacySettlement.com.

7                                           **ARGUMENT**

8           For the achievement of this Settlement and the work that went into it, Class Counsel

9    respectfully submit that an award of attorneys' fees representing 25% of the common fund, *i.e.*,

10   $28.75 million, and a 2.91 multiplier on their lodestar, is fair and reasonable. Class Counsel also

11   request reimbursement of expenses totaling $211,350.52, which were necessary to litigate this

12   action, and the award of $10,000 Service Awards to compensate Mr. Katz-Lacabe and Dr.

13   Golbeck for their contributions to the common benefit.

14   **I.     Class Counsel's Requested Fees are Fair and Reasonable.**

15          Here, the Court has the discretion to determine the reasonableness of a request for

16   attorneys' fees using either the common fund method or the lodestar method. *In re Bluetooth*

17   *Headset Prods. Liab. Litig.*, 654 F.3d 935, 944–45 (9th Cir. 2011). Class Counsel respectfully

18   submit that whether the Court bases its award on the percentage of the common fund method,

19   with an accompanying lodestar crosscheck, or purely on the lodestar method, Class Counsel's

20   requested fee is reasonable.

21          Where the "benefit to the class is easily quantified in common-fund settlements," like this

22   one, district courts often "award attorneys a percentage of the common fund in lieu of the often

23   more time-consuming task of calculating the lodestar." [8] *Thomas v. MagnaChip Semiconductor*

---

24   [8] *See, e.g.*, *Senne v. Kansas City Royals Baseball Corp.*, No. 14-cv-00608 JCS, 2023 WL
     2699972, at *19 (N.D. Cal. Mar. 29, 2023), *aff'd sub nom. Senne v. Concepcion*, No. 23-15632,
25   2023 WL 4824938 (9th Cir. June 28, 2023) ("The Court concludes that it is appropriate to use the
     percentage-of-fund method when calculating attorneys' fees in this case because Plaintiffs have
26   created a common fund that is ascertainable.") (citation omitted); *In re Korean Air Lines Co., Ltd.*
     *Antitrust Litig.*, No. CV 07-05107 SJO (AGRx), 2013 WL 7985367, at *1 (C.D. Cal. Dec. 23,
27   2013) ("The use of the percentage-of-the-fund method in common-fund cases is the prevailing
     practice in the Ninth Circuit for awarding attorneys' fees and permits the Court to focus on a
28   showing that a fund conferring benefits on a class was created through the efforts of plaintiffs'
     counsel.") (citations omitted). *See also, e.g.*, *Harrison v. Bank of Am. Corp.*, No. 19-cv-00316-

*Corp.*, No. 14-cv-01160-JST, 2018 WL 2234598, at *3 (N.D. Cal. May 15, 2018) (citing *In re Bluetooth Headset Prods.*, 654 F.3d at 942). The percentage-of-the-fund method "align[s] the lawyers' interests with achieving the highest award for the class members, and reduc[es] the burden on the courts that a complex lodestar calculation requires." *Tait v. BSH Home Appliances Corp.*, No. SACV 10-0711-DOC (ANx), 2015 WL 4537463, at *11 (C.D. Cal. July 27, 2015) (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1374–77 (N.D. Cal. 1989)); *accord In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) ("By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result." (citation omitted)).

In so-called megafund cases, *i.e.*, settlements in excess of $100 million, the Ninth Circuit has repeatedly rejected a "sliding-scale" requiring fee percentages to decline as the size of the fund increases. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 933 (9th Cir. 2020) ("[W]e have already declined to adopt a bright-line rule requiring the use of sliding-scale fee awards for class counsel in megafund cases, and we are bound by circuit precedent.") (citation omitted); *see also In re Apple Inc. Device Performance Litig.*, No. 18-md-02827-EJD, 2021 WL 1022866, at *6 (N.D. Cal. Mar. 17, 2021), *appeal dismissed,* No. 23-15416, 2023 WL 10447843 (9th Cir. Aug. 8, 2023) (starting with 25% benchmark in $310 million settlement). Additionally, as confirmed by the lodestar cross-check, the requested fee award would not constitute a "windfall." The requested fee would constitute a lodestar multiplier of 2.91 which is comfortably within the 1.0–4.0 range awarded in "the vast majority" of "common fund cases with settlements ranging from $50-200 million." *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2018 WL 4620695, at *3 (N.D. Cal. Sept. 20, 2018) (citation omitted). This multiplier will decrease as Class Counsel continues to commit resources to final approval and administration of the Settlement.[9]

---

LB, 2021 WL 5507175, at *8 (N.D. Cal. Nov. 24, 2021) ("When counsel recovers a common fund that confers a 'substantial benefit' on a class of beneficiaries, counsel is 'entitled to recover their attorney's fees from the fund.'") (quoting *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1006 (9th Cir. 2002)).

[9] Class Counsel conservatively estimates that it will incur at least 200 hours of attorney time and

1

2

**A.**    <u>**The Relevant Factors Support Awarding Class Counsel Fees Representing the Benchmark Twenty-Five Percent of the Common Fund.**</u>

3    Under the percentage method, courts "typically calculate 25% of the fund as the

4    'benchmark' for a reasonable fee award, providing adequate explanation in the record of any

5    'special circumstances' justifying a departure." *In re Bluetooth Headset Prods.*, 654 F.3d at 942

6    (citations omitted). In evaluating the benchmark percentage, courts are to consider factors

7    established by the Ninth Circuit, including: "(1) the results achieved; (2) the risk of litigation; (3)

8    the skill required and the quality of work; (4) the contingent nature of the fee and the financial

9    burden carried by the plaintiffs; and (5) awards made in similar cases." *In re Omnivision Techs.,*

10    *Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008). As detailed below, each of the relevant factors

11    strongly supports Class Counsel's 25% fee request.

12    **1.**    <u>**Class Counsel Obtained an Exceptional Result for the Class.**</u>

13    "The overall result and benefit to the class from the litigation is the most critical factor in

14    granting a fee award." *In re Omnivsion Techs.*, 559 F. Supp. 2d at 1046 (citation omitted).

15    The results achieved in this litigation are superb. Class Counsel secured a $115 million

16    monetary fund, which appears to be the third-largest privacy class action settlement not involving

17    a data breach to date. Rudolph Decl. ¶ 30; *see* Dkt. 132-1 (surveying fifteen comparable non-data

18    breach privacy class action settlements). Assuming the Court awards the requested attorneys' fees

19    and costs, and subtracting the anticipated settlement administration costs, Plaintiffs anticipate

20    distributing approximately $81.2 million to estimated 220 million Settlement Class members. *See*

21    Dkt. 132-1 ¶ 18. With a projected claims rate of 1.5–2.5%, each valid claimant would be

22    allocated approximately $15 to $25. *Id.*

23    Delivering tangible monetary payments to individuals subjected to Oracle's practices is an

24    impressive feat for a Class of roughly 220 million people, where the Class Members had no out-

25    of-pocket damages. In privacy class actions, it is particularly difficult for class counsel to deliver

26

27    50 hours of paralegal time prior to the final approval hearing. Rudolph Decl. ¶ 45. Additionally, 100 hours of attorney time and 100 hours of paralegal time will be required to administer the

28    Settlement. *Id.* Multiplying these hours by the billing rates of those likely to perform the work amounts in an additional $295,000 in lodestar, decreasing the multiplier to 2.83. *Id.*

compensation for the violations that class members suffer. Numerosity is rarely even a question in privacy cases, where data breaches or invasive privacy practices regularly touch tens if not hundreds of millions of people. For this reason, many multi-million dollar privacy settlements are still often only large enough to be distributed *cy pres*. *See, e.g.*, Order Granting Final Settlement Approval at 3, *In re Google Location Hist. Litig.*, 5:18-cv-05062-EJD (N.D. Cal., May 3, 2024), ECF No. 367 ($62 million settlement distributed as *cy pres*); *In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1109 (9th Cir. 2021) ($13 million settlement distributed as *cy pres*). Similarly, with such large class sizes, it is often only possible to obtain injunctive relief for the class. *See, e.g.*, Motion for an Award of Att'y' Fees at 20–28, *Brown, et al. v. Google LLC*, No. 4:20-cv-03664-YGR (N.D. Cal. April 23, 2024), ECF No. 1106; Order Granting Pls.' Unopposed Mot. for an Award of Att'ys' Fees at 2, *Campbell, et al. v. Facebook, Inc.*, No. 4:13-cv-05996-PJH (N.D. Cal., Aug. 18, 2017), ECF No. 253.[10] The direct compensation to the Class here is an exceptional result.

On the strength of this monetary result alone, the Court would be well within its discretion to award the benchmark 25% fee. However, "the $115 million fund does not represent the entire value to the Class because the Settlement also offers nonmonetary benefits." *In re Anthem*, 2018 WL 3960068, at *11 (awarding 27% of a $115 million fund, in part, because "even if this nonmonetary relief does not form part of the percentage fund, the Court may consider its value as 'a "relevant circumstance" in determining what percentage of the common fund class counsel should receive as attorneys' fees.'") (citing *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003)). Class Members and the public at-large will substantially benefit from the non-monetary relief that this litigation has achieved both directly and indirectly.

Under the Settlement, Oracle must implement practices designed to address the alleged privacy violations. First, Oracle has agreed that it will not capture (a) user-generated electronic

---

[10] *See also Lane v. Facebook, Inc.*, 696 F.3d 811, 819–20 (9th Cir. 2012) ($9.5 million settlement distributed as *cy pres* in case with statutory damages available); *In re Netflix Priv. Litig.*, No. 11-CV-00379 EJD, 2013 WL 1120801, at *3 (N.D. Cal. Mar. 18, 2013) ($9 million settlement distributed as *cy pres* in case involving alleged unauthorized storage of personal information, where statutory damages were available); *In re Google Buzz Priv. Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *4 (N.D. Cal. June 2, 2011) (settlement creating $8.5 million *cy pres* fund to resolve privacy claims of class estimated in the tens of millions).

1    information within referrer URLs (*i.e.*, the URL of the previously-visited page) associated with a

2    website user, or (b) any text entered by a user in an online web form other than through Oracle's

3    own websites. SA ¶ 3.5. Second, Oracle has agreed to implement an audit program to reasonably

4    review customer compliance with contractual consumer privacy obligations. SA ¶ 3.5. Oracle has

5    agreed to comply with these provisions for as long as it offers the products and services described

6    in the SAC. *Id.*

7         Significantly, this lawsuit also forced Oracle to confront its privacy-invasive business

8    model. First, as alleged in the amended pleadings, Oracle ceased operation of its "AddThis"

9    tracking mechanism after the initial pleadings alleged that Oracle's collection of data through

10   AddThis violated Plaintiffs' privacy rights.[11] *See* Dkt. 87 ¶ 56. Second, just over thirty days after

11   committing to the business practice changes in the Parties' May 8, 2024 binding term sheet,

12   Oracle's CEO announced that it was exiting the ad tech business altogether.[12] In part due to this

13   lawsuit, Oracle apparently recognized that its ad tech business was premised on allegedly

14   unlawful activity and therefore not worthwhile to continue.[13] Oracle's ad tech closure will dispose

15   of the business units responsible for virtually all of the conduct that is at issue in this case.

16        Courts agree that "[i]njunctive relief is especially valuable in privacy cases, such as this

17   one, where the harm of having one's personal information surreptitiously collected is . . . difficult

18   to monetarily quantify." *In re Vizio, Inc., Consumer Priv. Litig.*, No. 16-ML-02693-JLS-KES,

19   2019 WL 12966638, at *6–7 (C.D. Cal. July 31, 2019), *judgment entered sub nom. In re VIZIO,*

20   *Inc., Consumer Priv. Litig.*, No. 16-ml-02693-JLS (KESx), 2019 WL 3818854 (C.D. Cal. Aug.

21   14, 2019) (concluding "that the combined monetary and injunctive results achieved weigh in

22   favor of an upward departure from the 25% benchmark."). The significant non-monetary relief

23

---

24   [11] Allison Schiff, *Oracle To Shut Down AddThis – Completely This Time*, AdExchanger (May 25, 2023), https://www.adexchanger.com/data-exchanges/oracle-to-shut-down-addthis-completely-

25   this-time/ [https://perma.cc/6LWB-X75U].

26   [12] *See supra* n. 3.

27   [13] *See id.* (noting this lawsuit "put extra pressure" on Oracle to close its ad business); *supra* n. 7 ("In Oracle's case, consumer privacy awareness manifested as a class-action lawsuit alleging that Oracle built 'digital dossiers' on millions of people without their consent. While a judge

28   dismissed some of the claims in the original lawsuit, it is still proceeding through the legal system and remains unresolved.").

that Class Counsel achieved through this litigation is difficult and imprecise, if not impossible, to quantify in dollar terms. At minimum, however, these meaningful non-monetary achievements underscore the reasonableness of the fee request and may factor into the Court's fee analysis calculus. *See In re Anthem*, 2018 WL 3960068, at *11; *Walsh v. Kindred Healthcare*, No. C 11–00050 JSW, 2013 WL 6623224, at *3 (N.D. Cal. Dec. 16, 2013) (approving fee request of 30% of the common fund, finding that the request was effectively reduced by the "substantial injunctive relief" obtained through the settlement). Class Counsel's contribution to ending the alleged misconduct has provided an enormous value beyond the $115 million Settlement Fund. The exceptional monetary and non-monetary relief provided to the Class provide strong support for Class Counsel's fee request.

## 2.   Litigating These Novel Privacy Claims was Extremely Risky.

From the beginning, this case entailed unique risks. While Plaintiffs' claims are based on long-standing Constitutional, common law, and statutory rights, the application of those rights to parties not in privity with the alleged offender, but rather based in part on the mere aggregation of data, is completely novel. *See In re Apple Inc. Device Performance Litig.*, No. 18-md-02827-EJD, 2023 WL 2090981, at *14 (N.D. Cal. Feb. 17, 2023), *appeal dismissed,* No. 23-15416, 2023 WL 10447843 (9th Cir. Aug. 8, 2023) (substantial risks found where plaintiffs "faced risks attendant to prosecuting a case with relatively unique subject matter involving application of statutory computer intrusion and common law trespass to chattels to iPhone devices").

This case required a bespoke, in-depth investigation conducted by Class Counsel on behalf of the Plaintiffs. Class Counsel took on the substantial burden of investigating, documenting, and innovatively challenging *an entire business model* of one of the largest and most powerful corporations in the world. Class Counsel carefully developed novel legal theories, with the assistance of consulting experts, and identified viable claims to support them, tracking the development of Ninth Circuit and district court privacy rights jurisprudence in real-time, and crafting Plaintiffs' claims around that developing law. Ambitiously, in their initial complaint, Plaintiffs sought to represent five potential classes, including a Worldwide Class. Dkt. 1. All this to say that Class Counsel knew from the outset that this case was a risky endeavor.

1    In bringing this case, Class Counsel fundamentally challenged the legality of Oracle's ad

2    tech practices, and therefore understood that Oracle would be forced to stage a vigorous legal

3    defense throughout, given that a loss could jeopardize the solvency of its ad tech business. During

4    its three rounds of motions to dismiss, Oracle raised potentially dispositive issues including

5    Plaintiffs' standing, reasonable expectation of privacy, choice of law, and the applicability of

6    state and federal wiretap statutes to Oracle's interception of Plaintiffs' data. Rudolph Decl. 7; *see*

7    *generally* Dkts. 23, 63, 88.

8    Had the case not settled, Plaintiffs would continue to face substantial pretrial risks, such as

9    whether the Court would grant class certification or enter summary judgment against them. *See In*

10   *re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 941 (N.D. Ill. 2022), *appeal*

11   *dismissed sub nom. In re Tiktok Inc., Consumer Priv. Litig.*, No. 22-2682, 2022 WL 19079999

12   (7th Cir. Oct. 12, 2022) ("Data privacy law is a relatively undeveloped and technically complex

13   body of law, which creates uncertainty and, therefore, additional risk for Class Counsel."). Trial

14   of course presented substantial risks including whether the Court would allow the presentation of

15   Plaintiffs' damages models and whether a jury would award the damages sought. Courts

16   acknowledge that navigating risks like these merits higher fee awards. *See, e.g.*, *In re JUUL Labs,*

17   *Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 19-md-02913-WHO, 2023 WL 11820531, at

18   *2 (N.D. Cal. Dec. 18, 2023) ("upward departure to 30%" justified where "the plaintiffs faced

19   significant legal (*e.g.*, potential preemption of claims, defendants' weighty attacks on plaintiffs'

20   theories of economic loss and common proof of damages) and practical risks (*e.g.*, potential

21   insolvency of [the defendant], regulatory directives remained in flux throughout)").

22   Class Counsel's work to investigate, expose, and confront alleged wrongdoing that may

23   have otherwise remained unchallenged—and may have continued unabated in the absence of this

24   lawsuit—merits the requested fee award.

25                          **3.      The Settlement Resulted from Class Counsel's Skill,
                                    Experience, and Zealous Representation in This Complex**
26                          **Litigation.**

27   Courts recognize that higher fee percentages are warranted where class counsel achieve a

28   positive result in a complex case. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir.

1   1995) (33% fee "justified because of the complexity of the issues and the risks"); *In re TFT-LCD*

2   *(Flat Panel) Antitrust Litig.*, No. MDL 07–md–1827 SI, 2011 WL 7575003, at *1 (N.D. Cal. Dec.

3   27, 2011) (awarding attorneys' fees of 30% of the $405 million settlement in a case "involving

4   complex and difficult issues of fact and law"). This case required exceptional skill and experience

5   to prosecute. Class Counsel had to carry out a two year investigation to acquire a sufficient

6   understanding of the complex and frequently opaque ad tech industry and the related technology

7   that facilitate the collection, aggregation, and sale of class member data. Rudolph Decl. ¶¶ 4–6.

8          Once Plaintiffs filed the case, discovery required understanding complex, highly technical

9   information. Class Counsel worked hand-in-hand with its consulting technical experts to ensure

10  meaningful and accurate analysis of these documents. *Id*. ¶¶ 20, 21. With this key information

11  about Oracle's business practices, Class Counsel was able to engage in informed settlement

12  negotiations to maximize the financial recovery and robust non-monetary provisions tailored to

13  remediating the alleged wrongful business practices. *Id.*

14         Overcoming three rounds of motions to dismiss most claims, including a constitutional

15  privacy claim, took expertly crafted legal arguments drawing from a wealth of experience. *In re*

16  *Apple Device*, 2023 WL 2090981, at *14 (awarding 26% of the $310 million settlement finding

17  that "withst[anding] two motions to dismiss is some testament to Class Counsel's skill.") (cleaned

18  up). While aware that this was uncharted territory, Class Counsel were steadfast in their

19  arguments. *See In re Anthem*, 2018 WL 3960068, at *12 (awarding 27% of the $115 million

20  settlement where "class certification was not guaranteed, in part because Plaintiffs had a scarcity

21  of precedent to draw on"). For example, Plaintiffs doggedly pursued their interpretation of the

22  ECPA's crime-tort exception throughout the course of the litigation: after the Court dismissed

23  Plaintiffs' ECPA claim for a third time, with prejudice (Dkt. 114), Plaintiffs filed a motion under

24  28 U.S.C § 1292(b) for interlocutory review; the case settled shortly thereafter. Dkt. 120;

25  Rudolph Decl. ¶ 12.

26         Without their competence, creativity, expertise, and tenacity, Class Counsel would not

27  have been able to successfully litigate against a company with virtually limitless financial and

28  legal resources, represented by a prominent litigation firm. "In addition to the difficulty of the

1   legal and factual issues raised, the court should also consider the quality of opposing counsel as a

2   measure of the skill required to litigate the case successfully." *In re Am. Apparel, Inc. S'holder*

3   *Litig.*, No. CV 10–06352 MMM (JCGx), 2014 WL 10212865, at *22 (C.D. Cal. July 28, 2014)

4   (citations omitted); *see also In re Apple*, 2021 WL 1022866, at *6 ("Class Counsel faced a

5   company with significant financial and legal resources," that "was represented in this case by two

6   national, highly respected law firms, . . . which weighs in favor of a fee award.") (citation

7   omitted). The experience and skill that Class Counsel applied to this litigation weighs in favor of

8   the requested fee award.

9                      **4.      This Case was Risky to Litigate on Contingency.**

10          Given the novelty and complexity of this case, no other law firms endeavored to take on

11  the risk this case represented, and as such Class Counsel did not engage in the otherwise frequent

12  practice of working with co-counsel. Rudolph Decl. ¶¶ 3, 38. This practice is especially common

13  in privacy class actions, which are still relatively novel and risky—in fact, *not one* of the fifteen

14  cases with comparable settlements cited by Plaintiffs in their Preliminary Approval motion

15  involved only a single firm, demonstrating the unusual risk Class Counsel assumed by litigating

16  this case alone. *See* Dkt. 132-3. The fact that no "copycat" suits were filed is further evidence that

17  other firms viewed this case as too risky to prosecute. This case benefitted greatly from keeping

18  the litigation entirely in-house—including time efficiencies and consistently high-quality work.

19  Yet without co-counsel to spread the risk, Class Counsel assumed significant exposure. *Cf. In re*

20  *Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2022 WL 327707, at *11 (N.D. Cal. Feb. 3,

21  2022) ("Despite the fact that counsel undertook this litigation on a purely contingent basis, the

22  risk of non-payment was spread out over seven different law firms, ensuring that no one firm

23  would take too big a hit upon an adverse ruling."). Class Counsel prosecuted this case on a purely

24  contingent basis and agreed to advance all necessary expenses, to the exclusion of other fee-

25  generating work, knowing that Class Counsel would receive a fee and be reimbursed for expenses

26  only if it obtained meaningful relief on a class-wide basis. Rudolph Decl. ¶ 37; *see Hopkins v.*

27  *Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *3 (N.D. Cal. Feb. 6, 2013)

28  (finding higher fee award justified where "[t]his case was conducted on an entirely contingent fee

1    basis against a well-represented Defendant").

2              **5.        Class Counsel's Requested Fee Percentage is in Line with
                            Similar Cases.**

3

4         The requested 25% fee award is in line with the range of awards in this Circuit, especially

5    when compared to fees awarded in cases with similar settlements, litigation history, and

6    complexity. For example, in *In re Anthem*, the parties settled after three years of litigation for

7    $115 million plus non-monetary relief "aimed at combatting the precise harm" suffered by the

8    settlement class. 2018 WL 3960068, at *2, *5, *11. The court awarded class counsel a 27% fee

9    after considering the "substantial" and "expedient resolution of the case," the "novel legal issues

10   about the scope of certain state privacy statutes and about the viability of certain damages

11   theories," and the "significant factual investigation prior to bringing these actions." *Id.* at *11–13,
     *15.

12

13        *In re Anthem, Inc. Data Breach Litigation* is not an outlier. Courts generally award fees at

14   or above the federal benchmark under similar circumstances. *See In re Apple Device*, 2023 WL

15   2090981, at *13–14 (awarding 26% of $310 million settlement after three years of litigation at the

16   pleading stages resulting in estimated payments to claimants of roughly $25 per device); *In re*

17   *Zoom Video Commc'ns, Inc. Priv. Litig.*, No. 20-cv-02155-LB, 2022 WL 1593389, at *11 (N.D.

18   Cal. Apr. 21, 2022), *appeal dismissed sub nom. Brice v. Rodgers*, No. 22-15764, 2023 WL

19   3568176 (9th Cir. Jan. 5, 2023) and *Brice v. Gonzalez*, No. 23-15103, 2023 WL 3090669 (9th

20   Cir. Mar. 31, 2023) (awarding 25% of $85 million settlement, resulting in a 3.28 multiplier,

21   where, after two years of litigation, counsel obtained "excellent benefits for the class, both

22   monetary and injunctive (in an area of law in which purely injunctive relief is common), and there

23   were significant risks involved with the litigation"); *In re Lidoderm*, 2018 WL 4620695, at *1

24   (awarding 33% of $105 million after four years of risky litigation); *In re TikTok*, 617 F. Supp. 3d

25   at 942 (awarding 33% of $92 million settlement after three years of litigation, recognizing that

26   "[t]he need to provide financial incentives for zealous and effective representation of consumers

27   in legally and technologically complex data privacy cases such as this—especially in the age of

28   pervasive social media—weighs in favor of granting the request").

1

2

### B.   A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fees.

While the Court may conduct a lodestar cross-check on the reasonableness of a fee award

based on a percentage of the recovery, "a cross-check is not required so long as the court achieves

a reasonable result using the method it selects." *Senne v. Kansas City Royals*, 2023 WL 2699972,

at *18 (citations omitted).[14] Nonetheless, a lodestar crosscheck here further supports Class

Counsel's requested fee.[15]

### 1.   The Number of Hours Devoted to the Case was Reasonable.

As reflected above (*supra* Part I.A.3. and Background), the team performed a substantial

amount of work to develop and prosecute this case. This work included: (i) diligently

investigating the facts and legal claims in consultation with experts; (ii) withstanding three

motions to dismiss; (iii) litigating crucial motions to seal; (iv) seeking interlocutory appeal to

preserve Plaintiffs' ECPA claim; (v) engaging in comprehensive discovery, cooperatively

resolving numerous of discovery disputes with Oracle's counsel, and litigating two disputes via

submission of joint letter briefs to Magistrate Judge Kandis Westmore; (vi) conducting extensive

research and working with experts in preparation to move for class certification;[16] (vii) engaging

in mediation and subsequent negotiations with Oracle; and (viii) fulfilling responsibilities under

the Settlement, such as seeking and obtaining preliminary approval of the Settlement, drafting

clear and concise notices, and designing and implementing a detailed and comprehensive notice

program. *See* Rudolph Decl. ¶¶ 7–35.

Class Counsel litigated this case efficiently. *See id.* By uncharacteristically assuming one-

hundred percent of the risk, Class Counsel was incentivized to keep the lodestar as low as

---

[14] "Arguably, a lodestar cross-check is not required" when "the [c]ourt has been extensively involved in supervising [the] litigation and has observed first-hand the monumental effort [c]lass [c]ounsel has put into the case.") *Id.* at *20. *Cf. Andrews v. Plains All Am. Pipeline L.P.*, No. CV15-4113 PSG (JEMx), 2022 WL 4453864, at *4 (C.D. Cal. Sept. 20, 2022) (foregoing a cross check where the *Vizcaino* factors were met).

[15] "[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002); *see also In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018) (cross-check does not require "mathematical precision [or] bean-counting").

[16] Plaintiffs' motion for class certification was originally due by December 15, 2023. Dkt. 34.

1    possible. *Id.* ¶ 39. Staffing this case entirely in-house allowed Class Counsel to staff a lean team

2    for litigation of this magnitude. *Id.* The core team was managed by just two partners, with

3    substantial work carried out by four associates (initially only one, with three more joining over

4    the subsequent year and a half as the litigation progressed) and five staff-attorneys. *Id.* ¶¶ 49–56.

5    Keeping the team small also promoted clear communication channels, eliminated the potential for

6    duplication of work, and diminished the number of hands touching each brief. *Id.* ¶ 39. These

7    efficiencies resulted in a reasonable lodestar. *See Fraley v. Facebook, Inc.*, No. C 11-1726 RS,

8    2013 WL 4516806, at *3 (N.D. Cal. Aug. 26, 2013), *aff'd sub nom*. *Fraley v. Batman*, 638 F.

9    App'x 594 (9th Cir. 2016) ("Delegation, however, does not inevitably lead to overall savings, and

10   counsel here appears to have avoided some of the excesses that can result from overstaffing.").

11          From the inception of this case, Class Counsel maintained contemporaneous time records.

12   Rudolph Decl. ¶ 42. Class Counsel devoted more than 13,100 hours to this litigation,

13   accumulating a lodestar of approximately $9,866,699 from inception to August 9, 2024—the date

14   the Court granted preliminary approval. *Id.* Ex. A; *see* Dkt. 135. All time spent by attorneys and

15   staff who worked fewer than 20 hours on the case and all time devoted to this fee application has

16   been omitted from the lodestar calculation. Rudolph Decl. ¶ 42. These numbers also do not

17   include substantial time that Class Counsel will continue to devote to this case—seeking approval

18   of, and implementing, the Settlement. *Id.* ¶¶ 42–43, 45. Based on prior experience, Class

19   Counsel's responsibilities moving forward will likely involve responding to inquiries from Class

20   Members and overseeing distribution of the Settlement Fund. *Id.* ¶ 45. Class Counsel may also

21   expend time responding to objections to the Settlement. *Id.* ¶ 43. If there are objections and

22   subsequent appeals, those commitments and responsibilities may extend for several more years.

23   *Id.*

24          Accordingly, the time that Class Counsel dedicated to litigating this complex case and

25   reaching this remarkable resolution were necessary and eminently reasonable.

26                          **2.      The Hourly Rates Are Reasonable.**

27          The reasonable hourly rate is "the rate prevailing in the community for similar work

28   performed by attorneys of comparable skill, experience, and reputation." *Fowler v. Wells Fargo*

1  *Bank, N.A.*, No. 17-cv-02092-HSG, 2019 WL 330910, at *6 (N.D. Cal. Jan. 25, 2019) (citation

2  omitted). Lieff Cabraser's hourly rates are consistent with market rates in the Bay Area and its

3  then-current billing rates have been accepted by courts in other contingent complex litigation and

4  class actions. *See, e.g.*, *Vela, et al. v. AMC Networks, Inc.*, No. 1:23-cv-02524-ALC, at *6

5  (S.D.N.Y May 16, 2024), ECF No. 64 (approving Class Counsel's 2024 billing rates);

6  *Czarnionka, et al. v. The Epoch Times Association, Inc.*, No. 1:22-cv-06348-AKH, at *6

7  (S.D.N.Y. July 10, 2024), ECF No. 106 (same); *In re Google Location Hist. Litig.*, No. 18-cv-

8  05062-EJD, 2024 WL 1975462, at *15 (N.D. Cal. May 3, 2024) (finding Class Counsel's rates

9  ranging from $550–$1,300 for partners, $420–$720 for associates, and $535 for paralegals and

10  other support staff "fall within the range of those approved in other similar cases . . . ") (citations

11  omitted); Final Order & Judgment at 9, *In re Arizona Theranos, Inc. Litig.*, No. 2:16-cv-02138-

12  DGC (D. Ariz. Feb. 6, 2024), ECF No. 619 (approving Class Counsel's 2023 rates); *Corker v.*

13  *Costco Wholesale Corp.*, No. 19-cv-00290-RSL, 2023 WL 6215108, at *1 (W.D. Wash. Sept. 25,

14  2023) ("Counsel's hourly rates, while steep, are not unreasonable given the nature of this

15  litigation[.]"); *Gutierrez v. Amplify Energy Corp.*, No. 21-CV-01628-DOC (JDEx), 2023 WL

16  6370233, at *7 (C.D. Cal. Sept. 14, 2023) (surveying Northern District orders awarding attorneys'

17  fees, finding that Class Counsel's hourly "rates are consistent with market rates in their area");

18  *Ramirez v. Trans Union, LLC*, No. 12-cv-00632-JSC, 2022 WL 17722395, at *9 (N.D. Cal. Dec.

19  15, 2022) (finding that Class Counsel's rates, at the time, "from $1,325 to $560 for partners and

20  associates, and $485-$455 for 'litigation support' and paralegals" were "generally in line with

21  rates prevailing in this community for similar services . . . ") (citations omitted); *Vianu v. AT&T*

22  *Mobility LLC*, No. 19-cv-03602-LB, 2022 WL 16823044, at *11 (N.D. Cal. Nov. 8, 2022)

23  (finding Class Counsel's "billing rates are normal and customary for timekeepers with similar

24  qualifications and experience in the relevant market") (citations omitted).[17] The historical rates of

25

---

26  [17] *See also Cottle v. Plaid Inc.*, No. 20-cv-03056-DMR, 2022 WL 2829882, at *11 (N.D. Cal.
July 20, 2022) (approving Lieff Cabraser's rates); *Roberts v. AT&T Mobility LLC*, No. 15-cv-
03418-EMC, 2021 WL 9564449, at *4 (N.D. Cal. Aug. 20, 2021); *In re Samsung Top-Load*

27  *Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 17-ml-2792-D, 2020 WL 9936692,
at *7 (W.D. Okla. June 11, 2020), *aff'd*, 997 F.3d 1077 (10th Cir. 2021) ("Class Counsel's billing

28  rates are reasonable for their respective geographic areas in comparable cases."); *Hosp. Auth. Of
Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, No. 15-cv-01100, 2020 WL 3053468, at *1

1  the team members who contributed to this case range from $1,015–$1,380 for partners, $530–

2  $720 for associates, $525 for non-partner-track attorneys, and $510–$535 for paralegals and other

3  support staff. Rudolph Decl. ¶ 45; Ex. A. These rates are also comparable to Oracle's counsel's

4  billing rates. *See Lynwood Invs. CY Ltd. v. Konovalov*, No. 20-cv-03778-MMC, 2023 WL

5  2918754, at *6 (N.D. Cal. Apr. 11, 2023) (awarding fee based on hourly rates of between $980

6  and $1,293.75 for partners at Morrison & Foerster). Considering the prevailing rates in this

7  District, the qualification and experience of counsel,[18] and the rates charged by Oracle's counsel,

8  Class Counsel's billing rates are reasonable.

9       **3.       The Multiplier is Justified Given the Results Obtained, the
10                  Complexity of the Issues, and the Contingent Nature of the
                    Representation.**

11      In this Circuit, multipliers ranging from 1.0 to 4.0 are considered "presumptively

12  acceptable." *Gutierrez*, 2023 WL 6370233, at *6 (quoting *Dyer v. Wells Fargo Bank, N.A.*, 303

13  F.R.D. 326, 334 (N.D. Cal. 2014)). This range holds true in "vast majority" of "common fund

14  cases with settlements ranging from $50-200 million." *In re Lidoderm*, 2018 WL 4620695, at *3

15  (citing *Vizcaino*, 290 F.3d at 1052-54).

16      Here, the requested award of fees of $28.75 million represents a multiplier of 2.91.

17  Rudolph Decl. ¶ 43. This multiplier fits squarely within the range of multipliers that Courts in the

18  Ninth Circuit regularly approve on settlements of this size or greater. *See, e.g.*, *In re Facebook*

19  *Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 633 (N.D. Cal. 2021), *aff'd*, No. 21-15553, 2022

20  WL 822923 (9th Cir. Mar. 17, 2022) (awarding 4.71 multiplier in $650 million settlement); *In re*

21  *Facebook Internet Tracking Litig.*, No. 12-md-02314-EJD, 2022 WL 16902426, at *12 (N.D. Cal.

22  Nov. 10, 2022), *aff'd sub nom. In re Facebook, Inc. Internet Tracking Litig.*, No. 22-16903, 2024

23  WL 700985 (9th Cir. Feb. 21, 2024) (awarding 3.28 multiplier in $90 million settlement); *In re*

24

25  (M.D. Tenn. May 29, 2020) (approving Lieff Cabraser's rates); *In re Volkswagen "Clean Diesel"*
26  *Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 1047834, at *5
    (N.D. Cal. Mar. 17, 2017) (finding that Lieff Cabraser's rates were "more than reasonable given
27  the complexities of this case and the extraordinary result achieved for the Class").

    [18] *See* Rudolph Decl. ¶¶ 50–56 (detailing each attorneys' level of experience); *see also* Lieff
28  Cabraser firm resume, available at:
    https://www.lieffcabraser.com/pdf/Lieff_Cabraser_Firm_Resume.pdf.

1  *Zoom Video Commc'ns*, 2022 WL 1593389, at *11 (finding "modest multiplier" of 3.17

2  reasonable in $85 million settlement where litigation had been pending for two years); *In re Nat'l*

3  *Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653 (9th

4  Cir. 2019) (approving 3.66 multiplier in $200 million settlement); *Gutierrez v. Wells Fargo Bank,*

5  *N.A.*, No. C 07-05923 WHA, 2015 WL 2438274, at *7 (N.D. Cal. May 21, 2015) (following $203

6  million settlement, the court applied a 5.5 multiplier to lead counsel's lodestar based on "the fine

7  results achieved on behalf of the class, the risk of nonpayment [lead counsel] accepted, the

8  superior quality of their efforts, and the delay in payment"). Here, the lodestar cross-check

9  confirms that the requested award for fees is appropriate, especially taking into account Class

10  Counsel's efficiency in litigating and expediency in resolving this case.

11  **II.      It is Appropriate to Reimburse Class Counsel's Reasonable Litigation Expenses.**

12      "Reasonable costs and expenses incurred by an attorney who creates or preserves a

13  common fund are reimbursed proportionately by those class members who benefit[.]" *In re Media*

14  *Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) (citations omitted). Class

15  Counsel have incurred $211,350.52 in unreimbursed litigation expenses, including costs advanced

16  in connection with consulting experts, mediation, legal research, filing fees, document hosting

17  services, copying and mailing, and other customary litigation expenses. Rudolph Decl. ¶ 58

18  (detailing the litigation expenses that Class Counsel incurred by category). Courts frequently find

19  that such expenses, which "would normally be charged to a fee paying client," recoverable.

20  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citations omitted); *see, e.g.*, *In re Lidoderm*,

21  2018 WL 4620695, at *4 (awarding 33% of $105 million). Especially given the risk of the

22  litigation, Class Counsel expended only that which was reasonably necessary for the continued

23  prosecution and resolution of this litigation. Rudolph Decl. ¶ 59; *see Gutierrez*, 2023 WL

24  6370233, at *7 ("While this highly technical case was expensive to prosecute, '[c]ounsel had a

25  strong incentive to keep expenses at a reasonable level due to the high risk of no recovery when

26  the fee is contingent.'") (citation omitted).

27      The success of this litigation depended in part on the high-quality of work provided by the

28  consulting experts that Class Counsel retained. Rudolph Decl. ¶ 60. From the beginning, these

- 22 -

experts helped investigate Oracle's alleged conduct by performing confirmatory research and analysis of Oracle's publicly-available technical documentation. *Id.* Once Plaintiffs started receiving documents, Class Counsel relied on these experts to translate highly technical documents, including lines of code that Oracle produced. *Id.* Thus, unsurprisingly, given the complex and highly technical nature of this case, the vast majority of expenses went to expert work. *Id.* The other substantial expense was hiring two experienced and well-regarded mediators to help facilitate a discussions of a potential resolution. *Id.* ¶ 61. These expenses were advanced by Class Counsel on a contingent basis to finance this litigation. *Id.* ¶ 63. Accordingly, it is appropriate for the Court to reimburse the requested litigation expenses.

### III.   The Requested Class Representative Service Awards are Reasonable and Well-Deserved.

Service awards are "intended to compensate class representatives for work undertaken on behalf of a class" and "are fairly typical in class action cases." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (cleaned up). Courts have discretion to approve service awards based on the amount of time and effort spent, the duration of the litigation, and the personal benefit (or lack thereof) as a result of the litigation. *See, e.g.*, *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995). Here, Class Counsel requests that the Court award $10,000 to each of the two Named Plaintiffs, for a total of $20,000 or .017 percent of the Settlement Fund.[19]

Both Mr. Katz-Lacabe and Dr. Golbeck stepped forward to represent and protect the interests of the Settlement Class. They have each submitted declarations further explaining the

---

[19] While a $5,000 service award is "presumptively reasonable," courts may increase the amount in light of the time and effort dedicated to the litigation and the risks associated with representing the class. *Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (awarding $8,000); *cf. Gutierrez*, 2023 WL 6370233, at *8 ("Service awards of $7,500 or larger are often awarded in this Circuit;" awarding service awards amounting to .3% of the gross settlement, which is "well within the range the Ninth Circuit has found reasonable"); *see also In re JUUL Labs*, 2023 WL 11820531, at *5 (awarding $7,000 to $10,000 to representatives who "joined the litigation in its earliest stages, completed an intrusive ESI collection interview and/or forensic collection of their documents, including cell phones and social media accounts."); *In re Lidoderm*, 2018 WL 4620695, at *4 (awarding $10,000 to each of the nine class representatives, for a total of $10,000 or 0.86% of the settlement); *Alvarez v. Farmers Ins. Exch.*, No. 14-cv-00574-WHO, 2017 WL 2214585, at *1 (N.D. Cal. Jan. 18, 2017) (approving nine $10,000 service awards that in the aggregate were 1.8% of the settlement value).

1  considerable time spent and personal sacrifices made to prosecute this Action. *See* concurrently

2  filed Declarations of Michael Katz-Lacabe and Dr. Jennifer Golbeck ("Katz-Lacabe Decl." and

3  "Golbeck Decl."). Here, each Plaintiff made exceptional contributions on behalf of the Settlement

4  Class, absent personal benefit, and in fact, undertaking considerable risk. The Settlement recovery

5  would not have been possible without their efforts. Rudolph Decl. ¶ 65.

6       Not only did Plaintiffs put their names and reputations on the line, but despite being

7  zealous privacy advocates, they risked disclosure of their own personal information and data in

8  the public record for the Class's benefit. Katz-Lacabe Decl. ¶ 8; Golbeck Decl. ¶ 8. At the outset

9  of this case, Mr. Katz-Lacabe and Dr. Golbeck assisted in the investigation and reviewed and

10  approved the initial complaint, working with Class Counsel to obtain their OARRRs from Oracle.

11  Katz-Lacabe Decl. ¶ 5; Golbeck Decl. ¶ 5. These OARRRs contain extensive personal

12  information about each Plaintiff. *See* Dkts. 71-1, 71-9. Even so, both Plaintiffs attached their

13  OARRRs to the subsequent complaints filed to bolster the Settlement Class's claims, risking the

14  possibility that the Court would not permit them to remain under seal. Katz-Lacabe Decl. ¶ 8;

15  Golbeck Decl. ¶ 8. After the Court partially rejected Plaintiffs' motion to seal their OARRRs

16  (Dkt. 68), Plaintiffs submitted declarations in support of the subsequent motions to seal portions

17  of their OARRRs. Dkts. 71-1, 71-9. In her declaration, Dr. Golbeck described and included

18  samples of online harassment she regularly faces as an outspoken female privacy advocate, which

19  she feared could have been exacerbated by publication of the OARRRs. Dkt. 71-1 ¶ 7–8, Ex. A.

20       Further risking their privacy, Mr. Katz-Lacabe and Dr. Golbeck also each agreed to turn

21  over the contents of their personal devices to a neutral forensic expert to be searched, imaged, and

22  produced to Oracle, in the interest of the litigation. Katz-Lacabe Decl. ¶ 5; Golbeck Decl. ¶ 5.

23  Throughout the litigation, both Plaintiffs kept in close contact with counsel to actively monitor

24  the progress of the litigation and approved the Settlement. *Id.* Given these contributions and

25  sacrifices, awarding $10,000 in Service Awards would not improperly grant preferential treatment

26  to Plaintiffs. *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 1991529, at

27  *6 (N.D. Cal. June 30, 2007).

28

1

## <u>CONCLUSION</u>

2        For the reasons discussed above, Class Counsel respectfully requests that the Court grant

3    this motion in its entirety, and award (1) attorneys' fees in the amount of $28,750,000; (2)

4    reimbursement of litigation expenses of $211,350.52; and (3) Service Awards of $10,000 to each

5    of the two Plaintiffs.

6    Dated: August 28, 2024                    Respectfully submitted,

7
                                        */s/ Michael W. Sobol*
8                                       Michael W. Sobol (SBN 194857)
                                        msobol@lchb.com
9                                       David T. Rudolph (SBN 233457)
                                        drudolph@lchb.com
10                                      Jallé H. Dafa (SBN 290637)
                                        jdafa@lchb.com
11                                      John D. Maher (SBN 316157)
                                        jmaher@lchb.com
12                                      Amelia A. Haselkorn (SBN 339633)
                                        ahaselkorn@lchb.com
13                                      Nabila Abdallah (SBN 347764)
                                        nabdallah@lchb.com
        LIEFF CABRASER HEIMANN & BERNSTEIN,
14      LLP
                                        275 Battery Street, 29th Floor
15                                      San Francisco, CA  94111-3339
                                        Telephone:  415.956.1000
                                        Facsimile:  415.956.1008
16
                                        *Attorneys for Plaintiffs and the Class*
17

18

19

20

21

22

23

24

25

26

27

28