Michael W. Sobol (SBN 194857)
msobol@lchb.com
David T. Rudolph (SBN 233457)
drudolph@lchb.com
Jallé H. Dafa (SBN 290637)
jdafa@lchb.com
John D. Maher (SBN 316157)
jmaher@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
Nabila Abdallah (SBN 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Michael Katz-Lacabe, and Dr. Jennifer Golbeck, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ORACLE AMERICA, INC., a corporation organized under the laws of the State of Delaware,<br><br>Defendant. | Case No. 3:22-cv-04792-RS<br><br>**DECLARATION OF DAVID T. RUDOLPH IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PLAINTIFF SERVICE AWARDS** |

I, David T. Rudolph declare:

1.      I am a partner at the law firm of Lieff Cabraser Heimann & Bernstein, LLP, counsel to Plaintiffs and Court-appointed Settlement Class Counsel ("Class Counsel"). Dkt. 135 ¶ 7. I am a member in good standing of the California State Bar. I have personal knowledge of the matters set forth herein, or am informed and believe them to be true, and if called to testify thereto, I could and would do so competently. I respectfully submit this Declaration in support of

Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards.

## I.   **INTRODUCTION**

2.   On behalf of the Plaintiffs and the Settlement Class, Class Counsel has reached a settlement with Oracle America Inc. ("Oracle") that provides a $115 million non-reversionary common fund to be distributed evenly among Settlement Class Members, as well as non-monetary relief addressing the alleged privacy violations. Over a two year pre-filing investigation, and nearly two years of hard-fought litigation, Class Counsel devoted over 13,000 hours prosecuting novel, high-risk privacy claims to protect important privacy rights, and obtaining an extraordinary Settlement. This case is not premised on a theory of negligence based on revelations in the press, breach of contract, or alleged mishandling of personal data contrary to the defendant's business purposes—it is a challenge to Oracle's regularly conducted business activity. This necessitated that Class Counsel pursue novel claims to protect the Settlement Class from the acquisition and stockpiling of personal data into individual dossiers for commercial exploitation.

## II.   **CLASS COUNSEL'S INVESTIGATION AND LITIGATION EFFORTS**

3.   Class Counsel performed extensive work and assumed substantial risk to get here. Given the novelty and complexity of this case, no other law firms endeavored to take on the risks this case represented. Thus, Class Counsel did not work with co-counsel as is typical, and absorbed all the risks alone. The substantial time and resources Class Counsel devoted to this case, and the work it expects it will continue to do to oversee the Settlement administration, is described below.

### A.   **The Pre-Filing Investigation**

4.   In early 2020, Class Counsel began a two-year investigation into Oracle's practices and potential legal claims to protect the Class's privacy rights. The investigation involved analyzing the sprawling public record, including complaints filed by consumer organizations and government regulators, academic articles, news reports, books, web pages, marketing materials, privacy policies, and disclosures. Because no other lawsuit or regulator

action involving the conduct at issue had been filed against Oracle in the United States, Class Counsel put substantial effort into crafting novel legal theories challenging Oracle's conduct consistent with the prevailing and evolving Ninth Circuit privacy jurisprudence.

5. Class Counsel worked with the prospective Plaintiffs to retrieve and analyze aspects of the personal data Oracle has assembled regarding them, known as "Offline Access Request Response Reports" ("OARRRs"). The process of formally requesting and obtaining the Plaintiffs' personal information from Oracle pursuant to their rights under the California Consumer Privacy Act served as the basis to filing this novel lawsuit.

6. Because of the highly novel nature of the claims asserted in this action, challenging Oracle's regularly conducted business activities as a data broker and ad tech purveyor, Class Counsel retained a consulting expert specializing in privacy theory to help refine the potential legal theories that would be asserted in this Action. Class Counsel also consulted two computer scientists who performed forensic research. This two-year investigation produced the facts and accompanying theories of liability that formed the basis of this litigation.

**B.  Commencement of Suit and Challenges to the Pleadings**

7. On August 19, 2022, Plaintiffs filed suit against Oracle alleging that its data brokering business violates internet users' right to privacy under the California Constitution as well as various state and federal privacy statutes. Dkt. 1. Oracle initiated three rounds of motions to dismiss that raised potentially dispositive issues including Plaintiffs' standing, reasonable expectation of privacy, choice of law, and the applicability of state and federal wiretap statutes to Oracle's interception of Plaintiffs' data. Dkts. 23, 63, 88. Class Counsel researched and drafted thorough oppositions to Oracle's motions and, in response to the Court's rulings, amended the complaint twice.

8. Each iteration of the complaint required extensive additional legal and factual research. For example, Plaintiffs' articulation of their common law claim for unjust enrichment after it had been initially dismissed by the Court required delving deeply into the origins of the doctrine within California law and its evolution through the Restatement. Plaintiffs' amended complaint closely tracked this re-theorization of the claim for unjust enrichment, and Plaintiffs

ultimately prevailed on that claim. In addition to prevailing on many of their claims in the first Amended Complaint, Plaintiffs also moved for leave to file a motion for partial reconsideration of the Court's choice of law analysis, which was denied. Dkts. 85, 86.

9.     Plaintiffs Second Amended Complaint required substantial further research in support of Plaintiffs' re-pleading of the crime-tort exception to the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.* ("ECPA"). For instance, Plaintiffs analyzed Oracle's extant public statements regarding privacy issues, and delved deeply into forensic analysis of Oracle's sale of political and health segments despite its statements to the public that it did not engage in such conduct.

10.     Four days after Oracle filed its reply brief in support of its third motion to dismiss (ECF No. 92), Oracle produced spreadsheets reflecting certain data in its records that Oracle represented may have been associated with Plaintiffs. Dkt. 98-2. These spreadsheets were relevant to the motion to dismiss. Dkt. 98-2 § II.A. The Court granted Plaintiffs' request to file a surreply to bring these spreadsheets to the Court's attention, and Oracle responded. Dkts. 94, 95, 98-2, 100-1.

11.     Following Oracle's third motion to dismiss, the Court allowed seven of the nine claims alleged in Plaintiffs Second Amended Complaint to proceed.[1]

12.     While the Court was not persuaded by Plaintiffs' amendments to their ECPA claim, following the Court's dismissal with prejudice of that claim, Plaintiffs filed a motion under 28 U.S.C § 1292(b), which Oracle opposed. Dkts. 120, 122.

---

[1] The claims that survived Oracle's motions to dismiss were as follows: (1) Invasion of Privacy Under the California Constitution (on behalf of the proposed California Class), (2) Intrusion Upon Seclusion Under California Common Law (on behalf of the proposed California Class), (3) Violation of the California Invasion of Privacy Act (on behalf of the proposed CIPA Sub-Class), (4) Violation of the Florida Security of Communications Act (on behalf of the proposed FSCA Class), (5) Unjust Enrichment under California Common Law (on behalf of the proposed California Class), (6) Unjust Enrichment under Florida Law (on behalf of the proposed Florida Class), and (7) Declaratory Judgment that Oracle Wrongfully Accessed, Collected, Stored, Disclosed, Sold, and Otherwise Improperly Used Plaintiffs' Private Data and Injunctive Relief (on behalf of all proposed Classes). *See* Dkts. 87, 114.

### C.   **Extensive Discovery**

13.     During the multiple challenges to the pleadings, Class Counsel pressed for discovery while defending against Oracle's aggressive discovery demands to Plaintiffs. The Parties engaged in frequent, vigorously adversarial meet and confer conferences from early on in the litigation. For example, one business day after Oracle's counsel entered its appearance, Plaintiffs sent Oracle drafts of the protective order and ESI protocol and initiated the Rule 26(f) conference. From the beginning, the Parties disputed the terms of the ESI protocol and protective order, as well as the parameters of the proposed forensic inspection protocol to search Plaintiffs' imaged devices for their internet activity.

14.     Plaintiffs served—and Oracle responded to—four sets of substantive document requests, comprised of 73 individual requests, along with two sets of interrogatories.

15.     Plaintiffs also took the deposition of an Oracle employee. This deposition led to the discovery of key document repositories from which Oracle subsequently produced documents. Given the slow pace of document productions throughout the course of the litigation, Plaintiffs had not yet conducted further depositions, however, by the time of settlement, Oracle had produced sufficient documents to conduct substantive depositions and Plaintiffs were preparing to depose many more Oracle employees.

16.     The Parties contested the scope, relevance, and pace of discovery, leading to frequently contentious video meet and confer conferences and the exchange of dozens of discovery dispute letters and correspondence. Plaintiffs sent several motion to compel letter brief drafts to Oracle's counsel. The Parties each filed one motion to compel with Magistrate Judge Westmore, which helped advance the pace of discovery. Dkts. 102, 110.

17.     Oracle frequently would not agree to provide responsive discovery until threatened by a motion to compel, requiring Class Counsel to expend a substantial amount of time preparing motions to compel that were ultimately not filed with Court. Oracle's initial production of documents came slowly, and Class Counsel, after many attempts at meet and conferring, eventually drafted and sent to Oracle numerous motion to compel letter briefs for presentation to the Court. Ultimately, but belatedly, Oracle agreed to many of Plaintiffs' requests only after

Plaintiffs began the motion to compel process but before the motion to compel letter briefs were filed; however, obtaining the substantial discovery Oracle eventually produced was the product of near-constant discovery disputes throughout the course of the case. A non-exhaustive list of examples includes the following:

    a.    <u>February 14, 2023</u>: After five months of Oracle declining to enter into a stipulated ESI Protocol to allow discovery to proceed, Plaintiffs informed Oracle that Plaintiffs would file a motion seeking entry of Plaintiffs' draft ESI Protocol. On March 15, 2023, Oracle finally agreed to the ESI Protocol.

    b.    <u>May 26, 2023</u>: Plaintiffs informed Oracle they would move to compel regarding its failure to provide substantive answers to Plaintiffs' First Set of Interrogatories served months earlier on March 30, 2022. On May 31, 2023, Oracle provided additional information.

    c.    <u>July 14, 2023</u>: Plaintiffs sent Oracle their portion of two joint letter briefs regarding Oracle's failure to produce documents responsive to Plaintiffs' First Set of Requests for Production ("RFPs") served 7 months earlier, and its inadequate responses to Plaintiffs' First Set of Interrogatories. On July 17, 2023, the following business day, Oracle finally produced additional documents.

    d.    <u>November 2, 2023</u>: Plaintiffs informed Oracle that they would move to compel regarding its failure to produce documents in response to more than ten of Plaintiffs' Second Set of RFPs. On November 9, Oracle agreed to produce responsive materials.

    e.    <u>December 20, 2023</u>: Plaintiffs informed Oracle that they would move to compel regarding its failure to produce documents in response to RFP 55. On January 16, 2024, Oracle agreed to produce all non-privileged documents.

    f.    <u>February 12, 2024</u>: Plaintiffs sent Oracle their portion of a letter brief concerning Oracle's failure to produce Plaintiffs' data. On February 16, 2024, Oracle responded that it would produce responsive material "today."

       g.     <u>February 28, 2024</u>: Plaintiffs informed Oracle they would likely move to compel the use of Plaintiffs' proposed search terms due to Oracle's failure to timely propose search terms. On March 1, 2024, Oracle provided a search term proposal.

18.     While Oracle challenged the scope and relevance of virtually every single one of Plaintiffs' discovery requests throughout the course of the litigation, a particularly contentious area concerned Oracle's possession of personal data related to Plaintiffs. At the outset of the litigation, on November 22, 2022, Plaintiffs served their First Set of RFPs on Oracle, including RFP No. 2, requesting Plaintiffs' personal data in Oracle's possession. Oracle objected. The Parties met and conferred. Oracle initially stated that it was "unable to tie all data collected over time with an individual," and that Plaintiffs' OARRRs "include all the personal data associated with Plaintiffs in Oracle's possession when the reports were requested." Plaintiffs did not accept this representation as correct or accurate, given the OARRRs were necessarily generated using Plaintiffs' personal data housed in Oracle's databases. However, for months, Oracle stood on its position that the OARRRs were its sole source of personal data for Plaintiffs.

19.     In December 2023—after Plaintiffs repeatedly questioned Oracle's position throughout the meet and confer process—Oracle conceded it possessed personal data beyond that in the OARRRs. Even then, however, Oracle would not commit to a production, questioning whether it could present Plaintiffs' personal data in human readable format, and asserting that it would continue to investigate the situation. Consequently, Plaintiffs sent Oracle their portion of a motion to compel on February 12, 2024. On February 16, 2024, just four days later, Oracle produced documents showing that Oracle was storing tens of thousands of lines of personal data about the named Plaintiffs, including so-called "audiences." *See* Dkt. 94. Plaintiffs' personal data is the critical evidence in this case, which was only produced after Class Counsel spent a year doggedly pursuing it. Shortly after Oracle produced this evidence, Class Counsel, as part of the briefing on Oracle's third motion to dismiss, brought this data to the Court's attention. Dkt. 99. (The Parties began discussing the logistics of the ultimately successful mediation shortly thereafter.)

20.     Oracle ultimately produced over 160,000 pages of documents and ESI, in addition to over 283 video files, spanning approximately 173 hours of internal discussions regarding the technical operation of Oracle's collection and use of data. To analyze the materials that Oracle produced, Class Counsel had to grasp complex ad tech software technologies and processes. Plaintiffs retained consulting experts to help conduct an accurate analysis of highly technical information and lines of computer code.

21.     Class Counsel thoroughly analyzed the materials that Oracle produced. Class Counsel established a core team of four staff attorneys reviewing this discovery who produced over a dozen in-depth memoranda covering a broad array of discovery subjects, from the deployment and operation of the BlueKai Core Tag tracking mechanism, the sources of data for and operation of the Oracle ID Graph, Oracle's internal adherence to privacy policies, and analyses of specific Oracle employees' role in the conduct at issue in preparation for depositions. This extensive work provided a comprehensive understanding of Oracle's role in the conduct at issue in this case. Through this process, Plaintiffs were able to discern key information about Oracle's business practices and policies during the relevant period, strategic decisions, agreements, clients, the extent of data Oracle had received, and the inferred data resulting from its data processing.

22.     Class Counsel also responded to defensive discovery. Plaintiffs responded to Oracle's document requests (26 requests to Plaintiff Johnny Ryan, 27 requests to Plaintiff Michael Katz-Lacabe, and 28 requests to Plaintiff Jennifer Golbeck) and conducted thorough searches for documents and responsive ESI. This required engaging a forensics consultant who imaged Plaintiffs' personal laptops and cell phones, a process that required extensive safeguards before Plaintiffs could agree to it. Each Plaintiff produced responsive documents and provided detailed responses to Oracle's interrogatories, including supplemental responses at Oracle's request. Plaintiffs also provided detailed responses to Oracle's requests for admission.

**D.     Instrumental and Important Rulings**

23.     Class Counsel obtained several key rulings that drove this litigation to its successful resolution.

24.     First, Plaintiffs overcame Oracle's challenges to standing, a ruling that set the tone for many of Plaintiffs' causes of action because it established that Plaintiffs had adequately pled harm, causation, and redressability. Oracle's first motion to dismiss contended that Plaintiffs lacked standing, in part, because they could not show that Oracle's harm was "fairly traceable" to Plaintiffs' conduct. *See generally* Dkt. 23 § IV.A. In essence, Oracle argued that because it did not retrieve data directly from Plaintiffs, but instead obtained data via Plaintiffs' visits to third party websites, the causal link was broken. *Id.* The Court disagreed, ruling that Plaintiffs had standing to sue Oracle: "Plaintiffs allege that Oracle's products, implemented by numerous websites, lead to the collection of vast amounts of data which, when 'synchronized' altogether, lead to personal identification and purported invasions of privacy. *That is, in fact, the very outcome that Oracle wishes—and markets to its customers.*" Dkt. 49 at 10 (emphasis added).

25.     Second, Class Counsel's ultimate success in sealing portions of the Plaintiffs' OARRRs (the report Oracle provides concerning aspects of the personal data it stores) was another critical juncture in the litigation. While in most cases a sealing motion would be merely administrative, here Plaintiffs' motion involved a core theory of the case—that the mere amalgamation of detailed data about Plaintiffs had serious privacy implications. Despite initially not opposing sealing, Oracle ultimately must have realized the implications of Plaintiffs' motion to seal, and changed course to oppose it. Dkt. 76. After the Court partially rejected Plaintiffs' motion to seal (Dkt. 68), Plaintiffs submitted declarations in support of the subsequent motions to seal portions of their OARRRs. Dkts. 71-1, 71-9. After *three rounds* of motions to seal, the Court ultimately granted Plaintiffs' motion to seal the vast majority of the OARRRs, holding them to be "detailed dossier[s] of information about an individual that, by virtue of [their] comprehensiveness, implicate[] privacy concerns." Dkt. 77 at 17.

26.     Finally, Plaintiffs' preserved numerous important causes of action that left Oracle open to significant liability. Oracle's second motion to dismiss was a frontal attack on seven of the nine causes of actions alleged in Plaintiffs First Amended Complaint (*see* Dkt. 63), which Plaintiffs largely overcame (*see* Dkt. 77). Plaintiffs preserved important claims, several of which provided for statutory damages, including claims under the California Invasion of Privacy Act

(CIPA) and the Florida Security of Communications Act (FSCA), as well as claims for unjust enrichment under both California and Florida law, and claims for declaratory and injunctive relief, in addition to Plaintiffs' core claims of intrusion upon seclusion and invasion of privacy under California law. Dkt. 77.

**E.      Settlement Negotiations and Mediation**

27.      After some initial settlement discussions in the Autumn of 2023, Plaintiffs presented Oracle with a demand for settlement on November 14, 2023. Oracle responded three months later with an invitation to explore settlement and, thereafter, the Parties agreed to mediate with Professor Eric D. Green and Fouad Kurdi of Resolutions, LLC. Prior to the in-person mediation session, the Parties prepared detailed mediation briefs outlining their positions on the strengths and weaknesses of the case and exchanged a further demand and response. On April 24, 2024, the Parties engaged in an extended day of in-person mediation.

28.      By the close of the mediation session, the Parties had exchanged only draft term sheets. During the next two weeks, the Parties continued negotiations through emails and phone calls with the mediators. On May 8, 2024, they executed a binding settlement term sheet outlining the basic terms of a settlement.

29.      Over the next ten weeks, the Parties negotiated a long-form settlement agreement. These arm's length negotiations resulted in the Settlement Agreement, which was executed on July 8, 2024. Dkt. 132-1.

**F.      The Settlement**

30.      The Settlement secures a non-reversionary Settlement Fund of $115 million, which appears to be the third-largest privacy class action settlement not involving a data breach to date. *See* Dkt. 132-1 (surveying fifteen comparable non-data breach privacy class action settlements). The Settlement also secures meaningful business practice commitments from Oracle to, for as long as it continues to offer the products and services described in the operative complaint, (1) not capture user-generated electronic information within referrer URLs (*i.e.*, the URL of the previously-visited page) associated with a website user or any text entered by a user in an online

web form other than through Oracle's own websites; and (2) implement an audit program to reasonably review customer compliance with its contractual consumer privacy obligations.

31.     From the Settlement Fund, the proposed Settlement delivers substantial cash payment to any Settlement Class Member who submits a valid claim. At the close of the claims period, the Settlement Fund (after deducting Court-approved attorneys' fees, expenses, service awards, and notice and administration costs) will be divided evenly on a per-capita basis among all Settlement Class Members for which a valid claim form is received.

32.     Assuming the Court awards the requested attorneys' fees and costs, and subtracting the anticipated settlement administration costs, Plaintiffs anticipate distributing approximately $81.2 million to the estimated 220 million Settlement Class Members. With a projected claims rate of 1.5–2.5%, as estimated in the Declaration of Steven Weisbrot accompanying Plaintiffs' Motion for Preliminary Approval,[2] each Settlement Class Member who files a valid claim would be allocated approximately $15 to $25.

33.     If any funds remain in the Settlement Fund after all valid, completed, and timely claims are paid, the Parties anticipate a redistribution of the remaining funds to Settlement Class Members unless and until it is economically infeasible to do so. Finally, subject to Court approval, the Parties have initially identified as a potential *cy pres* beneficiary the Privacy Rights Clearinghouse (PRC) to promote its privacy protection efforts. This ensures that all of the money secured by the Settlement will inure to the benefit of the Settlement Class and the privacy interests advanced in this litigation. These funds will never revert to Oracle.

### G.     The Settlement Approval Process and Ongoing Work for the Class

34.     On July 18, 2024, Plaintiffs filed a motion for preliminary approval of the Settlement, supported by declarations of counsel and the Settlement Administrator, Angeion Group, LLC ("Angeion" or "Settlement Administrator"). Prior to selecting Angeion, Class Counsel obtained and carefully negotiated multiple rounds of bids from other well-established, experienced, and highly regarded class action notice and administration firms.

---

[2] *See* Dkt. 132-5 ¶¶ 48-50 (Declaration of Steve Weisbrot).

35.     On August 9, 2024, the Court granted preliminary approval of the Settlement, provisionally certified the Settlement Class, approved the Notice Plan, and appointed Settlement Class Counsel, Settlement Class Representatives, and Angeion as the Settlement Administrator. Dkt. 135. Class Counsel then worked closely with Angeion to supervise its implementation of the Settlement's notice program. *See, e.g.*, www.KatzPrivacySettlement.com.

## III.     ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICES AWARDS

### A.     Class Counsel's Lodestar

36.     Class Counsel's efforts in this case, including over 13,000 hours of work[3] in the face of vigorous opposition from Oracle, have resulted in a Settlement with an excellent monetary recovery and meaningful injunctive relief designed to address the practices on which Plaintiffs' claims are based to prevent violations in the future. As explained further below, the time that Class Counsel devoted to this case amounts to a lodestar of approximately $9,866,699.

37.     Class Counsel prosecuted this case on a purely contingent basis and agreed to advance all necessary expenses, to the exclusion of other fee-generating work, knowing that Class Counsel would receive a fee and be reimbursed for expenses only if it obtained meaningful relief on a class-wide basis. Class Counsel will have advanced all necessary professional time and expenses for over four years before being eligible to receive any compensation.

38.     No other plaintiffs' counsel took on the significant risk of prosecuting these novel, cutting-edge claims against Oracle. This left Class Counsel to alone assume the risk of challenging Oracle—a well-resourced defendant that would have continued to vigorously defend its business practices had the litigation gone forward.

39.     Class Counsel efficiently managed its staffing in an effort to keep its lodestar as low as possible. Because staffing in this case was uncharacteristically within a single law firm, Class Counsel was able to staff a lean team for litigation of this magnitude. Keeping the team small promoted clear communication channels, eliminated the potential for duplication of work,

---

[3] These hours are calculated from inception to August 8, 2024—the day before the Court granted preliminary approval. *See* Dkt. 135.

and efficiently streamlined work flows such as legal research and drafting. In addition, Class

Counsel are local to the Bay Area so there was a minimum of travel time and related expenses.

40. Class Counsel have substantial expertise in complex consumer and privacy class

actions. The quality of their representation is first and foremost reflected in the work they

performed throughout the case and, ultimately, in obtaining an outstanding Settlement for the

Class. Further detail about Class Counsel's qualifications is set forth in Section III.A.2., below.[4]

41. As described above in Section II, Class Counsel performed a significant amount of

work on behalf of the Class, including an extensive two-year factual investigation alongside

expert consultants; developing legal theories of liability; researching and drafting three

complaints; defending against three motions to dismiss; engaging in hard-fought discovery;

analyzing over 160,000 pages of responsive documents and ESI, as well as over 283 videos

spanning approximately 173 hours; and participating in vigorous mediation and settlement

negotiations.

42. From the inception of this case, Class Counsel maintained contemporaneous time

records. As shown in **Exhibit A**, Class Counsel devoted approximately 13,100 hours to this

litigation, accumulating a lodestar of approximately $9,866,699 from inception to August 8,

2024—the day before the Court granted preliminary approval. *See* Dkt. 135. Class Counsel

wrote-off over one hundred hours of reported time in the exercise of billing discretion. This

reported lodestar data omits time spent by attorneys and staff who, after initial auditing, billed

fewer than 20 hours on the case.

43. By the time of final approval hearing on November 14, 2024, Class Counsel's

reasonable lodestar will have increased due to the time spent briefing and arguing final approval,

potentially responding to objections, and overseeing the Class Notice program and distribution of

the Settlement Fund. If there are objections and subsequent appeals, those commitments and

responsibilities may extend for several more years.

---

[4] Lieff Cabraser's firm resume is also available at:
https://www.lieffcabraser.com/pdf/Lieff_Cabraser_Firm_Resume.pdf.

44.     Class Counsel request an award which represents 25% of the $115 million common fund, or $28.75 million. The requested fee award of $28.75 million represents a multiplier of 2.91 with substantial further work remaining.

45.     Class Counsel conservatively estimates that it will incur at least 200 hours of attorney time and 50 hours of paralegal time prior to the final approval hearing. Additionally, 100 hours of attorney time and 100 hours of paralegal time will likely be required to administer the Settlement. Multiplying these hours by the billing rates of those likely to perform the work amounts to an additional $295,000 in lodestar, decreasing the multiplier to 2.83.

### 1.     Billing Rates

46.     The hourly rates used to determine the lodestar represent Class Counsel's current, customary professional rates effective for the year 2024. The billing rates of the team members who contributed to this case range from $1,015–$1,380 for partners, $530–$720 for associates, $525 for non-partner-track attorneys, and $510–$535 for paralegals and other support staff.

47.     Class Counsel's billing rates, reflected in **Exhibit A** attached hereto, are based upon a combination of the title and the specific years of experience for each employee, as well as periodic analyses of internal costs, rates used by plaintiff's firms performing comparable work, and rates of defense firms in our cases. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals) may have different rates based on a variety of factors, including years of practice and the rates of similarly experienced peers at Class Counsel and/or other plaintiff or defense firms.

48.     Class Counsel's hourly rates are consistent with market rates nationally and in the Bay Area and its then-current billing rates have been accepted by courts in other contingent complex litigation and class actions. *See, e.g.*, *Vela, et al. v. AMC Networks, Inc.*, No. 1:23-cv-02524-ALC, at *6 (S.D.N.Y May 16, 2024), ECF No. 64 (approving Class Counsel's current, 2024 billing rates); *Czarnionka, et al. v. The Epoch Times Association, Inc.*, No. 1:22-cv-06348-AKH, at *6 (S.D.N.Y. July 10, 2024), ECF No. 106 (same); *In re Google Location Hist. Litig.*, No. 5:18-CV-05062-EJD, 2024 WL 1975462, at *15 (N.D. Cal. May 3, 2024) (finding Class Counsel's 2023 rates ranging from $550–$1,300 for partners, $420–$720 for associates, and $535

for paralegals and other support staff "fall within the range of those approved in other similar cases") (citations omitted); Final Order & Judgment at 9, *In re Arizona Theranos, Inc. Litig.*, No. 2:16-cv-2138-DGC (D. Ariz. Feb. 6, 2024), ECF No. 619 (approving Class Counsel's 2023 rates); *Corker v. Costco Wholesale Corp.*, No. 19-cv-00290-RSL, 2023 WL 6215108, at *1 (W.D. Wash. Sept. 25, 2023) ("Counsel's hourly rates, while steep, are not unreasonable given the nature of this litigation."); *Gutierrez v. Amplify Energy Corp.*, No. 21-CV_01628-DOC (JDEx), 2023 WL 6370233, at *7 (C.D. Cal. Sept. 14, 2023) (surveying Northern District orders awarding attorneys' fees, finding that Class Counsel's hourly "rates are consistent with market rates in their area"); *Ramirez v. Trans Union, LLC*, No. 12-cv-00632-JSC, 2022 WL 17722395, at *9 (N.D. Cal. Dec. 15, 2022) (finding that Class Counsel's rates, at the time, "from $1,325 to $560 for partners and associates, and $485-$455 for 'litigation support' and paralegals" were "generally in line with rates prevailing in this community for similar services") (citations omitted); *Vianu v. AT&T Mobility LLC*, No. 19-cv-03602-LB, 2022 WL 16823044, at *11 (N.D. Cal. Nov. 8, 2022) (finding Class Counsel's "billing rates are normal and customary for timekeepers with similar qualifications and experience in the relevant market") (citations omitted); *see also Cottle v. Plaid Inc.*, No. 20-cv-03056-DMR, 2022 WL 2829882, at *11 (N.D. Cal. July 20, 2022) (approving rates); *Pulmonary Assocs. of Charleston PLLC, et al. v. Greenway Health, LLC, et al.*, No. 19-00167, at *5–8 (N.D. Ga., Dec. 2, 2021) (approving rates); *Roberts v. AT&T Mobility LLC*, No. 15-cv-03418-EMC, 2021 WL 9564449, at *4 (N.D. Cal. Aug. 20, 2021); *In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 17-ml-2792-D, 2020 WL 9936692, at *7 (W.D. Okla. June 11, 2020) *aff'd*, 997 F.3d 1077 (10th Cir. 2021) ("Class Counsel's billing rates are reasonable for their respective geographic areas in comparable cases."); *Hosp. Auth. Of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, No. 15-cv-01100, 2020 WL 3053468, at *1 (M.D. Tenn. May 29, 2020) (approving Class Counsel's rates); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (finding that Class Counsel's rates were "more than reasonable given the complexities of this case and the extraordinary result achieved for the Class").

## 2.     **Attorneys, Paralegals, and Other Specialized Staff**

49.     Class Counsel's team consisted of just two partners, with substantial work carried out by four associates (initially only one, with three more joining over the subsequent year and a half as the litigation progressed) and five staff-attorneys. Below is additional detail regarding these key team members and their contributions to the litigation.

50.     Michael Sobol has been a partner at Lieff Cabraser for 25 years. Mr. Sobol is a 1989 graduate of Boston University School of Law. Mr. Sobol has been appointed class counsel in numerous consumer and privacy class actions, has served as chair of the firm's Consumer Protection practice group from 2002 to 2022, and since its inception in 2016 has served as chair of the firm's Data Privacy and Cybersecurity practice group. Mr. Sobol regularly speaks on panels and at conferences related to consumer and privacy law. In this case, Mr. Sobol maintained a high level of involvement, managing all aspects of the litigation, lending leadership and guidance based upon his decades of relevant experience. In that role, Mr. Sobol, alongside David T. Rudolph, their colleagues, and the Plaintiffs, engaged in the extended pre-filing investigation, helping to develop the case strategy and claims. He also provided strategic input regarding all court-filed documents, helped to draft the substance of Plaintiffs' multiple pleadings, discovery requests, briefs and other motion papers, and case management filings. Mr. Sobol identified consulting experts for retention, conferred with them, and generally oversaw their contribution to the case development. Mr. Sobol regularly consulted with team members regarding the progress of litigation, including the development of the discovery strategy and process. Mr. Sobol led the negotiations and mediation that resulted in the extraordinary settlement in this case. This included the development of materials and briefing for the same, as well as the ensuing documentation for the approval of the settlement. Finally, Mr. Sobol generally helped manage the case and its staffing.

51.     David Rudolph is a partner at Lieff Cabraser. Mr. Rudolph is a 2004 graduate of University of California, Berkeley School of Law and joined Lieff Cabraser in 2012. Mr. Rudolph is also Adjunct Professor of Law at University of California College of the Law, San Francisco, where he teaches privacy law, and is a Certified Information Privacy Professional (CIPP/US). He

is a member of the Executive Committee of the Cybersecurity and Privacy Law Section of the Bar Association of San Francisco, and regularly speaks on panels and at conferences related to privacy law. Prior to joining Lieff Cabraser, Mr. Rudolph was an associate at Quinn Emanuel Urquhart & Sullivan, and also served as a law clerk for the Honorable Saundra Brown Armstrong, U.S. District Court, and Northern District of California. Mr. Rudolph was primarily responsible for the supervision of the day-to-day litigation of this case, including conducting Class Counsel's extensive pre-filing investigation of the case with the Plaintiffs. Mr. Rudolph was instrumental in every aspect of prosecuting this case, often handling much of the substantive work, including drafting the initial complaint and the subsequent amended complaints, conducting legal research for and drafting the oppositions to Oracle's three motions to dismiss—work which spanned most of the nearly two years of active litigation in this Action. Mr. Rudolph assisted in identifying, retaining and conferring with consulting experts and their contribution to the case development. Mr. Rudolph also prepared for and took the early deposition of an Oracle employee. Mr. Rudolph oversaw all of Class Counsel's offensive and defensive discovery efforts, lead almost all of the many discovery meet and confer video conferences, argued all motions for which there were hearings, and is overseeing the Settlement Administrator's notice and claims administration process.

52.     Jallé Dafa was an associate at Lieff Cabraser from 2020 to 2023 and became a partner at Lieff Cabraser in 2024. Ms. Dafa received her J.D. from the University of California, Berkeley School of Law in 2011. Prior to her work at Lieff Cabraser, Ms. Dafa clerked for Judge Mary M. Schroeder of the United States Court of Appeals for the Ninth Circuit and Judge Jacqueline S. Corley of the United States District Court for the Northern District of California. Ms. Dafa became involved in this Action in February 2021. As such, her tasks in this case have included: drafting correspondence with opposing counsel regarding discovery; participating in meet and confer and discovery negotiation efforts with opposing counsel; and assisting with drafting briefs to the Court.

53.     John Maher is an associate at Lieff Cabraser. Mr. Maher is a 2016 graduate of University of California, Berkeley School of Law. Following law school, Mr. Maher clerked for

Judge Lucy H. Koh of the Northern District of California, and Chief Judge Diane P. Wood of the Seventh Circuit. Mr. Maher was involved in this action from September 2023 to present. His tasks in this case have included: researching and drafting iterations of the complaint, assisting in the execution and evolution of Plaintiffs' discovery strategy; assisting in the supervision of review and analysis of Oracle's document productions; conducting factual and legal research and drafting memoranda; corresponding with opposing counsel regarding discovery; assisting with the drafting of briefs and other Court submissions; and participating in and leading meet and confer and discovery negotiation efforts with opposing counsel.

54.     Amelia Haselkorn is an associate at Lieff Cabraser. Ms. Haselkorn received her J.D. from the University of California, Irvine, School of Law in 2021. Ms. Haselkorn was involved in this action from December 2023 to present. As such, her tasks in this case have included: assisting in the execution and evolution of Plaintiffs' discovery strategy; assisting in the supervision of review and analysis of Oracle's document productions; conducting factual and legal research and drafting memoranda; and assisting with the drafting of briefs and other Court submissions.

55.     Nabila Abdallah is an associate at Lieff Cabraser. Ms. Abdallah received her J.D. from the University of California, Berkeley, School of Law in 2022. Ms. Abdallah became involved in this Action shortly after it was filed in August 2022. Her tasks in this case have included: drafting and assisting with drafting briefs to the Court, drafting and responding to discovery requests, extensive legal research on numerous issues, and attending and participating in discovery meet and confers.

56.     In addition to the core litigation team, five staff attorneys at Lieff Cabraser assisted with the analysis of discovery between August 2023 and July 2024. Roger Geissler received his J.D. from University of California, College of the Law, San Francisco in 2012. James Leggett received his J.D. from Santa Clara University School of Law, Santa Clara in 2012. Cameron Saunders received her J.D. from Golden Gate University, School of Law in 2006 and her L.L.M in taxation in 2008. Jerry Shindelbower received his J.D. from Golden Gate University School of Law, San Francisco, California in 2011. Ryan Sturtevant received his J.D. from University of

California College of Law, San Francisco in 2005. Lieff Cabraser staff attorneys are full-time salaried employees of the firm receiving a full array of benefits. Their legal work concentrates on the factual analysis of a case, but they are not presumptively on partner track. Lieff Cabraser's staff attorneys focus their practice primarily on discovery activities, with an emphasis on technology-assisted efficiencies, deposition preparation, and other document analysis. Each of these five staff attorneys performed these roles in connection with the analysis of discovery in this Action at various times throughout this period.

57.     The primary paralegal at Lieff Cabraser in this Action is Miriam Gordon, who became involved in the Action in March 2022, before the first complaint was filed. Ms. Gordon's tasks in this case included: organizing case documents, assisting with filings and checking the factual and legal materials cited in pleadings and briefs, conducting research and investigation, speaking with Class Members, assisting with the service of case documents, managing Lieff Cabraser's case file, preparing hearing preparation and other materials for court proceedings, and coordinating with the firm's Litigation Support Department, discussed below, concerning document discovery and review.

58.     Lieff Cabraser maintained and managed the substantial document database for this action in house, through its Litigation Support department. The team of litigation support staff (including Anthony Grant, Margie Calangian, Fawad Rahimi, and Muna Texier who have 24, 16, 7, and 2 years of experience in litigation support, respectively) managed all aspects of Oracle's document productions and the collection, preservation, and production of our clients' files. They assisted with a variety of other projects as well, including: technical aspects of the ESI protocol; preparing especially complex saved searches to assist in the document review efforts; and various troubleshooting requests inherent to any large case.

### B.     Unreimbursed Costs and Litigation Expenses

59.     Class Counsel have incurred $211,350.52 in unreimbursed litigation expenses from inception to August 8, 2024,[5] in connection with the prosecution of this Action. These

---

[5] Class Counsel does not request reimbursement for expenses incurred after the date the Court granted preliminary approval of the Settlement. *See* Dkt. 135.

1  include costs advanced in connection with customary litigation expenses, such as consulting

2  experts, mediation, legal research, filing fees, document hosting services, copying and mailing,

3  and other customary litigation expenses. Expenses were calculated from the firm's books and

4  records and represent an accurate recordation of costs and expenses. Especially given the risk of

5  the litigation, Class Counsel expended only that which was reasonably necessary for the

6  continued prosecution and resolution of this litigation.

7        60.    The success of this litigation depended in part on the high-quality of work

8  provided by the consulting experts that Class Counsel retained. The consulting experts conferred

9  with Class Counsel on the case strategy and development of the claims and pleadings. Once

10  Plaintiffs started receiving documents, Class Counsel relied on these experts to translate highly

11  technical documents, including lines of code that Oracle produced. Both experts spent dozens of

12  hours reviewing Oracle's technical document and productions, drafting in-depth and

13  comprehensive analyses of Oracle's alleged wiretapping and personal information profiling data

14  systems. These experts also performed substantial work in preparation for class certification,

15  including analyses of class certification-related issues and providing outlines of their initial

16  reports in support of class certification. Thus, unsurprisingly, given the complex and highly

17  technical nature of this case, the vast majority of expenses went to expert work.

18        61.    The additional substantial expense was hiring two experienced and well-regarded

19  mediators to help facilitate discussions of a potential resolution. The skill and experience of these

20  mediators (Professor Eric D. Green and Fouad Kurdi of Resolutions, LLC) were instrumental in

21  assisting with the ultimate success of the mediation efforts.

22        62.    Especially given the risk of this litigation, Class Counsel made every effort to

23  minimize expenses—expending only that which was reasonably necessary to prosecute and

24  resolve this litigation.

25        63.    These expenses were advanced by Class Counsel on a contingent basis to finance

26  this litigation. A report of the expenses Class Counsel incurred in connection with this Action are

27  detailed in **Exhibit B** attached hereto.

28

C.      Service Award Payments to Plaintiffs

64.      The Court has appointed Plaintiffs Michael Katz-Lacabe and Jennifer Golbeck as Settlement Class Representatives for the Settlement Class. Dkt. 135 ¶ 7.

65.      Class Counsel respectfully requests service awards of $10,000 for each of the two Plaintiffs to compensate their efforts and sacrifices in service to the Class. Mr. Katz-Lacabe and Dr. Golbeck made exceptional contributions on behalf of the Settlement Class, absent personal benefit, and in fact, undertaking considerable risk.

66.      Mr. Katz-Lacabe and Dr. Golbeck should each be recognized for their active participation and contributions throughout this litigation, which are further described in their declarations. True and correct copies of Mr. Katz-Lacabe and Dr. Golbeck's declarations are submitted alongside Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards.

I declare under penalty of perjury that the foregoing is true and correct. Executed in San Francisco, California, this 28th day of August, 2024.


*/s/ David T. Rudolph*
David T. Rudolph

**ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I attest that all signatories above have concurred in the filing of this document.

Dated: August 28, 2024            By:   */s/ Michael W. Sobol*
                                            Michael. W. Sobol