Michael W. Sobol (SBN 194857)
msobol@lchb.com
David T. Rudolph (SBN 233457)
drudolph@lchb.com
Jallé H. Dafa (SBN 290637)
jdafa@lchb.com
John D. Maher (SBN 316157)
jmaher@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
Nabila Abdallah (SBN 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Attorneys for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Michael Katz-Lacabe, and Dr. Jennifer Golbeck, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ORACLE AMERICA, INC., a corporation organized under the laws of the State of Delaware,<br><br>Defendant. | Case No. 3:22-cv-04792-RS<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. Richard Seeborg<br><br>Date: November 14, 2024<br>Time: 1:30 p.m.<br>Courtroom: 3<br><br>Date Action Filed: August 19, 2022<br>Trial Date: Not set<br><br>(Declarations of David T. Rudolph and Steven Weisbrot filed concurrently herewith) |

## NOTICE OF MOTION AND MOTION

### TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** on November 14, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, CA 94102, Plaintiffs Michael Katz-Lacabe and Dr. Jennifer Golbeck ("Plaintiffs") will, and hereby do, move the Court for entry of an order pursuant to Rules 23(e) and (g) of the Federal Rules of Civil Procedure:

    a.  Granting final approval of the proposed Settlement as fair, reasonable, and adequate;

    b.  Confirming certification of the Settlement Class as defined as "all natural persons residing in the United States whose personal information, or data derived from their personal information, was acquired, captured, or otherwise collected by Oracle Advertising technologies or made available for use or sale by or through ID Graph, Data Marketplace, or any other Oracle Advertising product or service from August 19, 2018 to the date of final judgment in the Action;"

    c.  Confirming the Court's prior appointment of Class Representatives and Class Counsel;

    d.  Finding that Notice to the Class was directed and completed in a reasonable manner, and confirming the Court's prior appointment of Settlement Administrator;

    e.  Overruling the twenty-eight objections received, Dkts. 137/148, Dkt. 139, Dkt. 140, Dkt. 141, Dkt. 143, Dkt. 146, Dkt. 147, Dkt. 150, Dkt. 152, Dkt. 154, Dkt. 155, Dkt. 156, Dkt. 157, Dkt. 158, Dkt. 159, Dkt. 160, Dkt. 161, Dkt. 162, Dkt. 163, Dkt. 164, Dkt. 165, Dkt. 166, Dkt. 167, Dkt. 168, Dkt. 171, Dkt. 172, and Dkt. 173.

    f.  Granting the Motion for Attorneys' Fees, Reimbursement of Expenses and Plaintiff Service Awards (filed separately on August 28, 2024, *see* Dkt. 136); and

    g.  Entering final judgment as to Oracle in this action, filed concurrently herewith.

This Motion is supported by the following memorandum of points and authorities, the Declaration of David T. Rudolph in Support of Final Approval of Class Action Settlement and the exhibits attached thereto; the Declaration of Steven Weisbrot of Angeion Group, LLC re Implementation of the Notice Plan and the exhibits attached thereto regarding the settlement notice; the argument of counsel; all papers and records on file in this matter; and such other matters as the Court may consider. Plaintiffs' responses to all of the objections filed are incorporated herein by category.

1

## STATEMENT OF ISSUES TO BE DECIDED

2

Pursuant to Rule 23, this Motion raises the following issues:

3

4

1. Whether the Settlement Agreement entered between the parties is fair, reasonable, and adequate and should be approved under Rule 23(e) and controlling Ninth Circuit authority;

5

6

2. Whether the Settlement Class as defined in the Agreement should be certified under Rule 23(b)(3);

7

3. Whether Notice to the Class was directed and completed in a reasonable manner;

8

4. Whether the objections to the Settlement should be overruled;

9

10

5. Whether the appointment of Michael Katz-Lacabe and Jennifer Golbeck as Class Representatives should be affirmed;

11

6. Whether the appointment of Michael Sobol and David Rudolph of Lieff Cabraser Heimann & Bernstein LLP as Settlement Class Counsel should be affirmed;

12

13

7. Whether the appointment of Angeion Group, LLC as Settlement Administrator should be affirmed;

14

15

8. Whether, independently from the approval of the Settlement, to grant the Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards (Dkt. 136); and

16

17

9. Whether final judgment should be entered against Oracle.

18

Dated: October 31, 2024

*/s/ Michael W. Sobol*
Michael W. Sobol (SBN 194857)
msobol@lchb.com

19

David T. Rudolph (SBN 233457)
drudolph@lchb.com

20

Jallé H. Dafa (SBN 290637)
jdafa@lchb.com

21

John D. Maher (SBN 316157)
jmaher@lchb.com

22

Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com

23

Nabila Abdallah (SBN 347764)
nabdallah@lchb.com

24

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor

25

San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

26

*Attorneys for Plaintiffs and the Class*

27

28

1

## TABLE OF CONTENTS

2

Page

3   I.      INTRODUCTION ................................................................................................. 1

4   II.     BACKGROUND ................................................................................................... 1

        A.      Summary of Settlement............................................................................... 2
5
        B.      The Class Notice Plan ................................................................................. 2
6
        C.      Claims and Settlement Administration ....................................................... 3
7
        D.      Oracle's Exit from the Ad Tech Industry .................................................... 4

8   III.    ARGUMENT ......................................................................................................... 4

        A.      Class Members' Response to the Settlement Merits Final Approval. ......... 5
9
        B.      Consideration of Rule 23(e) Factors Merits Final Approval. ..................... 6
10
                1.      Rule 23(e)(2)(A):  The Class Representatives and
11                             Class Counsel Have Vigorously Represented the
                               Class............................................................................................. 6
12
                2.      Rule 23(e)(2)(B):  The Settlement is the Result of
13                             Arm's Length Negotiations........................................................... 6

                3.      Rule 23(e)(2)(C):  The Settlement Provides
14                             Meaningful Relief to the Class..................................................... 7

                        a.      Rule 23(e)(2)(C)(i):  Costs, risks, and delay from trial and
15                                    appeal ................................................................................ 7

16                      b.      Rule 23(e)(2)(C)(ii):  The effectiveness of distribution to the
                               class ................................................................................... 8
17
                        a.      Rule 23(e)(2)(C)(iii):  Terms of proposed attorneys' fees
18                                    and expenses..................................................................... 8

                        b.      Rule 23(e)(2)(C)(iv):  Agreements to be identified under
19                             Rule 23(e)(3) ..................................................................... 9

                        c.      Rule 23(e)(2)(D):  The Settlement treats all Class Members
20                                    equitably............................................................................ 9

        C.      Class Member Objections Should Be Overruled. ........................................ 9
21
                1.      Objections to the Sufficiency of the Settlement Fund ............................. 10
22
                2.      Objections to the Class Definition ............................................................ 14

23              3.      Objection to the Allocation of the Settlement Fund.................................. 15

24              4.      Objections to Adequacy of the Class Representatives
                               and Class Counsel ...................................................................... 15
25
                5.      Objections to Notice ................................................................................. 16
26
                6.      Objections to the Claims Process.............................................................. 17

27              7.      Objections Regarding Insufficient Information ........................................ 18

                8.      Objection to the Claim and Exclusion Forms ........................................... 18

28              9.      Objection to Settlement Administrator's Expenses .................................. 19

**TABLE OF CONTENTS**
(continued)

Page

10.  Objections to the Sufficiency of Non-Monetary Relief .......................................................................................... 19

11.  Inapplicable Objections ......................................................................... 20

D.  The Settlement Class Should Be Certified. ........................................................... 21

E.  The Court Should Grant the Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards. ....................................... 22

IV.  CONCLUSION ................................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page**

*Acosta v. Trans Union, LLC*,
    240 F.R.D. 564 (C.D. Cal.), *superseded*, 243 F.R.D. 377 (C.D. Cal. 2007)..................... 13, 14

*Allen v. Bedolla*,
    787 F.3d 1218 (9th Cir. 2015)............................................................................................. 10

*In re Anthem, Inc. Data Breach Litig.*,
    15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ............................. 19, 24

*In re Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018) ........................................................................................ 5, 11

*In re Apple iPhone/iPod Warranty Litig*,
    40 F. Supp. 3d 1176 (N.D. Cal. 2014) .............................................................................. 23, 25

*In re Apple iPhone/iPod Warranty Litig.*,
    No. CV-10-01610, 2014 WL 12640497 (N.D. Cal. May 8, 2014) ........................................ 17

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011)............................................................................................... 24

*Brooks, et al. v. Thomas Reuters Corporation*,
    No. 3:21-cv-01418-EMC-KAW ............................................................................................ 14

*Browne v. American Honda Motor Co., Inc.*,
    No. CV 09-06750 MM (DTBx), 2010 WL 9499072, at *15 (C.D. Cal. July 29,
    2010) ..................................................................................................................................... 9

*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020)............................................................................................. 5

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004)............................................................................................. 6, 10

*City of Burlington v. Dague*,
    505 U.S. 557 (1992) ............................................................................................................. 24

*Cottle v. Plaid Inc.*,
    No. 20-CV-03056-DMR, 2022 WL 2829882 (N.D. Cal. July 20, 2022) ............................. 5

*Cruz v. Sky Chefs*,
    No. C-12-02705 DMR, 2014 WL 7247065 (N.D. Cal. Dec. 19, 2014).................................. 10

*Dyer v. Wells Fargo Bank, N.A.*,
    303 F.R.D. 326 (N.D. Cal. 2014) ........................................................................................ 25

*In re Facebook Biometric Info. Priv. Litig.*,
    522 F. Supp. 3d 617 (N.D. Cal. 2021), *aff'd*, No. 21-15553, 2022 WL 822923
    (9th Cir. Mar. 17, 2022) ............................................................................... 10, 11, 13, 25

*In re Facebook Internet Tracking Litig.*,
    No. 5:12-MD-02314-EJD, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022),
    *aff'd sub nom. In re Facebook, Inc. Internet Tracking Litig.*, No. 22-16903,
    2024 WL 700985 (9th Cir. Feb. 21, 2024).......................................................................... 13

*In re Google LLC St. View Elec. Commc'ns Litig.*,
   611 F. Supp. 3d 872 (N.D. Cal. 2020), *aff'd sub nom. In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102 (9th Cir. 2021)................................................. 12

*In re Google Location Hist. Litig.*,
   No. 5:18-CV-05062-EJD, 2024 WL 1975462 (N.D. Cal. May 3, 2024)......................... 17, 25

*In re Google Referrer Header Priv. Litig.*,
   No. 5:10-CV-04809-EJD, 2023 WL 6812545 (N.D. Cal. Oct. 16, 2023) .............................. 14

*Grey Fox, LLC v. Plains All-Am. Pipeline, L.P.*,
   No. CV 16-03157 PSG, 2024 WL 4267431 (C.D. Cal. Sept. 17, 2024) ............................... 25

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)............................................................................................. 4

*In re Initial Pub. Offering Sec. Litig.*,
   721 F. Supp. 2d 210 (S.D.N.Y. 2010)............................................................................... 13

*Jabbari v. Farmer*,
   965 F.3d 1001 (9th Cir. 2020)........................................................................................... 15

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012)........................................................................................ 7, 15

*In re Lidoderm Antitrust Litig.*,
   2018 WL 4620695 (N.D. Cal. 2018)................................................................................. 25

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-02420 YGR (DMR), 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).......................... 14

*Medeiros v. HSBC Card Servs., Inc.*,
   No. CV 15-09093 JVSA (AFMx), 2017 WL 11632870 (C.D. Cal. Oct. 23, 2017) ................................................................................................................................ 12

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................ 23

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015).............................................................................................. 14

*Perkins v. Linkedin Corp.*,
   No. 13-CV-04303-LHK, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016)................. 9, 12, 14, 19

*Rodriguez v. West Publishing Corp.*,
   563 F.3d 948, 965 (9th Cir. 2009)..................................................................................... 11

*Sugarman v. Ducati N. Am., Inc.*,
   No. 5:10-CV-05246-JF, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012).................................. 6

*In re TikTok, Inc., Consumer Privacy Litig.*,
   617 F. Supp. 3d 904 (N.D. Ill. 2022) .................................................................................. 5

*In re Transpacific Passenger Air Transportation Antitrust Litig.*,
   No. C 07-05634 CRB, 2015 WL 3396829 (N.D. Cal. May 26, 2015), *aff'd*, 701 F. App'x 554 (9th Cir. 2017) .......................................................................................... 15

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002)....................................................................................... 24

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab.
    Litig.*,
    MDL No. 2672 CRB (JSC), 2017 WL 2212780 (N.D. Cal. May 17, 2017) ........................... 5

*In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*,
    MDL No. 1735, No. 2:06-cv-00225-PMP-PAL, 2010 WL 786513 (D. Nev.
    Mar. 8, 2010).................................................................................................................... 13

*In re Yahoo! Inc. Consumer Data Security Breach Litig.*,
    No. 16-md-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020).................................. 5

*In re Zoom Video Commn's, Inc. Privacy Litig.*,
    No. 3:20-cv-02155-LB, 2022 WL 1593389 (N.D. Cal. Apr. 21, 2022) .................................. 5

**Court Rules**

Fed. R. Civ. P. 23(h) ................................................................................................................ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  INTRODUCTION

Pursuant to the Court's Preliminary Approval Order, the Settlement Administrator has successfully implemented the Class notice and Claims programs. Class notice has been effective, reaching approximately 214,000,000 people, *i.e.*, 97% of the Class, with an average notice frequency of 3.18 times per Class Member. The Claims program has resulted in over 3.2 million submitted claims, falling squarely within the estimated claims response rate reported to the Court at Preliminary Approval. The objections filed are a minute fraction of the class, *i.e.*, twenty-eight total objections, as are the 481 requested opt-outs, which pale in comparison to the 3.2 million claims received. The objections share Plaintiffs' deep concern for the practices giving rise to this lawsuit, and thus primarily assert a wish for greater monetary compensation. Respectfully, however, the objections fail to account for the risks, as noted by the Court at Preliminary Approval, inherent in the further litigation of these untested, novel claims. Based on the current estimate of valid claims, Class Members will recover approximately $25 each. This is meaningful compensation for non-out-of-pocket losses, especially in light of the legal and factual risks associated with litigating this case. Accordingly, the Court should grant final approval of the Settlement.

The fee request abides by the Ninth Circuit's benchmark of 25% of the common fund and falls comfortably within the range of multipliers on lodestar that are typically awarded in settlements with similarly sized funds. Based on the extraordinary results achieved for the Class, and all relevant factors under guiding Ninth Circuit precedent, the requested fee is reasonable. Respectfully, the objections to the fee request would effectively have the Court replace Ninth Circuit jurisprudence with objector's individual value judgments. The Court should also grant Class Counsel's request for attorneys' fees, expenses, and Class Representative service awards.

## II.  BACKGROUND

On August 9, 2024, the Court granted Preliminary Approval. The appointed Settlement Administrator has implemented the Court-ordered Notice and Claims programs.

### A.     Summary of Settlement

A summary of the Settlement terms was provided at Preliminary Approval. Dkt. 132 at Background § III. The Settlement requires Oracle to establish a $115 million non-reversionary Settlement Fund to pay Class Member claims, costs of Class notice and administration, Class Counsel's attorneys' fees and expenses, and Class Representative Service Awards. The Settlement also provides non-monetary relief which addresses the conduct at issue, as described in Section III.C., *infra*. SA ¶ 3.5. The Settlement Class will release any claims against Oracle and the Released Parties that are based on, or arise from, one or more of the same factual predicates or theories of liability as alleged in the operative complaint (Dkt. 87). SA ¶¶ 10.2, 10.3.

Class Counsel has moved for an award of 25% of the Settlement as attorneys' fees, which yields a modest lodestar multiplier of 2.91, reimbursement of expenses reasonably incurred in this litigation, and service awards of $10,000 for each of the Settlement Class Representatives. *See* Dkt. 136. The Settlement is not conditioned upon the Court's approval of service awards, attorneys' fees, or expenses, and Oracle was entitled to oppose the request for attorneys' fees and expenses. SA ¶¶ 8.1, 8.3, 8.5.

### B.     The Class Notice Plan

The Settlement Administrator successfully executed the Notice Plan approved by the Court. *See* Dkt. 135; Declaration of Steven Weisbrot of Angeion Group, LLC ("Weisbrot Decl.") ¶¶ 6–42. On August 29, 2024, the Settlement Administrator commenced the primary notice method via the media campaign and the supplemental email notice. *Id.* ¶¶ 12–24. Within the 49-day Notice Period, the media campaign, consisting of state-of-the-art internet notice, a paid search campaign, engagement on social media, and press releases, was completed. *Id.* ¶¶ 12–16. The media campaign resulted in the delivery of over 679 million impressions, exceeded expectations by reaching an estimated 83.3% of the target population of 256.4 million, translating to 97% of the estimated Settlement Class of 220 million. *Id.* ¶ 7. During the notice period, the supplemental email notice campaign was also fully effectuated. *Id.* ¶¶ 17–24. After de-duplicating approximately 840 million email addresses, all of the nearly 456 million unique emails were sent between August 29 and September 28, 2024. *Id.* ¶ 20. "Non-deliverable" emails were given

1  multiple further attempts, and a secondary "reminder" email campaign went to the successfully

2  delivered addresses until the end of the Notice Period. *Id*. ¶¶ 23–24.

3      A Settlement Website allowed those receiving direct notice, or learning about the

4  Settlement from the press, to obtain further information. Weisbrot Decl. ¶¶ 30–33; *see also*

5  www.katzprivacysettlement.com. It housed copies of the Detailed Notice, Claim Form, Exclusion

6  Form, a frequently asked questions page, a "contact us" page, and key litigation documents such

7  as the Second Amended Complaint, the Court's three orders on Oracle's motions to dismiss, and

8  all filings related to the Settlement. *Id.* ¶¶ 30, 32. To date, there have been more than 14 million

9  unique visits to the Settlement Website. *Id.* ¶ 33.

10      In addition, due to the prominence of this case, there was a large volume of naturally

11 occurring media coverage of the Settlement, further notifying the Class. *Id.* ¶ 28 & Ex. G. *USA*

12 *Today*, MSN, and other news outlets ran full articles on their websites reporting on the Settlement

13 and the Settlement Class, often relaying instructions on how to submit claims. *Id.*

14                    **C.    Claims and Settlement Administration**

15      As of October 28, the Settlement Administrator received and responded to more than

16 28,000 emails, the interactive voice response system received more than 40,000 calls, more than

17 91,000 visitors to the Settlement Website engaged with the chat feature, and the Settlement

18 Administrator had sent a copy of the Detailed Notice and/or Claim Form to each of the 1,816

19 individuals who requested one or both. The Settlement Administrator spent dozens of hours

20 interfacing with individuals responding to the Settlement during the Notice Period. *Id.* ¶ 31, 35–

21 36. In addition, Class Counsel's office fielded questions (via email, telephone, and mail) from

22 approximately 521 individuals, responding to every communication, often with multiple follow-

23 ups. Rudolph Decl. ¶ 4. Most communications sought assurance that the notice received was not a

24 scam and/or asked for help completing the Claim Form. *Id.* (Some doubt about inclusion in the

25 Class was precipitated by that fact that Oracle is not in privity with Class Members, and thus they

26 have no direct experience with them. *Id.* ¶ 5.)

27

28

1

### D.   Oracle's Exit from the Ad Tech Industry

2        On September 30, 2024, Oracle ended all Oracle Advertising products.[1] *See also* Dkt. 87,

3   SAC. In effect, Oracle announced it would shut down the business units responsible for virtually

4   all of the conduct that is at issue in this case and will automatically delete its customers' data

5   "once [its] obligations are met," and will "end relationships with data providers."[2] As one

6   commentator put it, "the legal baggage of [this] class action lawsuit," made it necessary for

7   Oracle to "convince the market its solutions are viable."[3]

8   ## III.   ARGUMENT

9        At preliminary approval, the Court found ample support to find that the proposed

10  Settlement is "fair, reasonable, and adequate" pursuant to Rule 23(e), that the proposed

11  Settlement Class may be certified under Rules 23(a) and (b), and thus granted preliminary

12  approval of the Settlement, consistent with the Federal Rules, prevailing case law, and the

13  Northern District's Procedural Guidance for Class Action Settlements. *See* Preliminary Approval

14  Order, Dkt. 135 ¶ 6; *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019, 1022, 1025 (9th

15  Cir. 1998). Nothing has changed since then that would disrupt these findings.

16

17

---

18  [1] Specifically the complained-of products, including Oracle Cloud Data Management Platform (comprising the BlueKai business, including the BlueKai "Core Tag" tracking mechanism and
19  associated cookies and pixels, Datalogix, and the Data Marketplace); Digital Audiences (including OnRamp, the primary Oracle service utilizing Oracle's ID Graph); and Cross-Device
20  tracking. *See Oracle Advertising,* https://www.oracle.com/advertising/ ("Oracle has decided to exit the Advertising business and will no longer be providing Oracle Advertising services and
21  solutions"). *See also Oracle Advertising End-of-Life Frequently Asked Questions*, Oracle (June 17, 2024), https://www.oracle.com/contracts/docs/oracle-advertising-end-of-life-
22  faqs.pdf?download=false.

23  [2] Tim Cross, *Oracle Quietly Exits the Advertising Business*, VideoWeek (June 12, 2004), https://videoweek.com/2024/06/12/oracle-quietly-exits-the-advertising-business/ (noting this
24  lawsuit "put extra pressure" on Oracle to close its ad business); Stephanie Liu, Mo Allibhai, and Xiaofeng Wang, *Oracle Exits the Advertising Business*, Forrester (June 19, 2024),
25  https://www.forrester.com/blogs/oracle-exits-the-advertising-business/ ("In Oracle's case, consumer privacy awareness manifested as a class-action lawsuit alleging that Oracle built
26  'digital dossiers' on millions of people without their consent. While a judge dismissed some of the claims in the original lawsuit, it is still proceeding through the legal system and remains
27  unresolved.").

     [3] Andrew Birmingham and Nadia Cameron, *$1.7bn wipeout*, Mi3 (June 17, 2024),
28  https://www.mi-3.com.au/index.php/17-06-2024/oracles-ad-tech-retreat-suggests-gross-miscalculation-also-speaks-volumes-about-state.

1

**A.**     **Class Members' Response to the Settlement Merits Final Approval.**

2         The Class's response demonstrates overwhelming support for the Settlement. Participation

3   in the claims process was positive and fell squarely within the range anticipated and reported to

4   the Court at preliminary approval. As of October 28, 2024, 3,234,120 claims have been

5   submitted, which, based on the estimated class size of 220 million members, yields a claims rate

6   of 1.47%. Weisbrot Decl. ¶ 37.[4] The claims rate aligns with the Settlement Administrator's

7   estimate at preliminary approval and is in line with those in other privacy settlements. *See* Dkt.

8   132 at 14 (predicting a claims rate between 1.5% and 2.5%); Dkt. 132-3, Chart of Selected

9   Comparable Case Outcomes (listing claims rates as low as .08%); *see also, e.g.*, *Cottle v. Plaid*

10  *Inc.*, No. 20-CV-03056-DMR, 2022 WL 2829882, at *5 (N.D. Cal. July 20, 2022) (approving

11  settlement with a 1.28% claims rate); *In re Zoom Video Commn's, Inc. Privacy Litig.*, No. 3:20-

12  cv-02155-LB, 2022 WL 1593389, at *4 (N.D. Cal. Apr. 21, 2022) (approving a settlement with a

13  claims rate of about 1%); *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 921

14  (N.D. Ill. 2022) (approving a settlement with a 1.4% claims rate); *In re Yahoo! Inc. Consumer*

15  *Data Security Breach Litig.*, No. 16-md-02752-LHK, 2020 WL 4212811, at *20 (N.D. Cal. July

16  22, 2020) (approving settlement with 0.6% claims rate); *In re Anthem, Inc. Data Breach Litig.*,

17  327 F.R.D. 299, 329 (N.D. Cal. 2018) (approving a settlement with a 1.8% claims rate).

18        In contrast, a relatively small number (and percentage) of Class Members opted-out or

19  objected to the Settlement. Four hundred eighty-one Class Members have opted out of the

20  Settlement, or just 0.015% of those who responded to the Settlement. Weisbrot Decl. ¶ 43. *See,*

21  *e.g.*, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, MDL

22  No. 2672 CRB (JSC), 2017 WL 2212780, at *10 (N.D. Cal. May 17, 2017) (approving a

23  settlement with a 0.11% opt out rate). Only twenty-six Class Members, or 0.0008% of Class

24  Members who responded, filed an objection to the Settlement. Weisbrot Decl. ¶ 44 (two objectors

25  filed two objections each). The overwhelming support for the Settlement supports granting final

26  _____

[4] These numbers are subject to the Settlement Administrator's further review for potential invalid
27  claims. Weisbrot Decl. ¶ 40. To ensure that Class Members who intended to submit a claim had
ample opportunity to do so, as is best practice, the Settlement Administrator provided ten days of
28  leniency following the Claims Deadlines where it continued to accept claims and assisted Class
Members who reached out for help. *See, e.g.*, Weisbrot Decl. ¶¶ 57, 59.

1    approval. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (a positive

2    "reaction of the class members to the proposed settlement" indicates its fairness); *Sugarman v.*

3    *Ducati N. Am., Inc.*, No. 5:10-CV-05246-JF, 2012 WL 113361, at *3 (N.D. Cal. Jan. 12, 2012)

4    (objections from 42 of 38,774 class members—more than 0.1 percent—is a "positive response");

5    *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming district court's

6    approval of settlement where forty-five of 90,000 class members objected to the settlement

7    (.05%), and 500 class members opted out (.56%)). The substance of each these twenty-eight

8    objections is addressed in Section III.C.

9                    **B.      Consideration of Rule 23(e) Factors Merits Final Approval.**

10          The proposed Settlement readily satisfies these criteria of Fed. R. Civ. P. 23(e).

11                    **1.      Rule 23(e)(2)(A):  The Class Representatives and Class Counsel
                               Have Vigorously Represented the Class.**

12

13          At Preliminarily Approval, the Court found that the Class Representatives and Class

14   Counsel have adequately represented the class, stating that "these attorneys are competent and

15   capable of exercising the responsibilities of Class Counsel and that Settlement Class

16   Representatives will adequately protect the interests of the Settlement Class." Dkt. 135 ¶ 7. The

17   successful implementation of the Settlement to date, as described herein, confirms this previous

     finding of the Court.

18

19                    **2.      Rule 23(e)(2)(B):  The Settlement is the Result of Arm's Length
                               Negotiations.**

20          The Settlement "is the result of informed, arm's-length negotiations between experienced

21   class action attorneys and made with the assistance of the mediation services of Professor Eric D.

22   Green, Esq. and Fouad Kurdi, Esq." Dkt. 135 ¶ 3. The Settlement is informed by extensive

23   discovery and expert analysis that allowed Plaintiffs to make a thorough evaluation of not only

24   the strengths and weaknesses of their claims, but also the fairness, reasonableness, and adequacy

25   of the Settlement. Dkt. 132 at 20–21. Class Members have had a reasonable opportunity to file

26   claims, opt-out, and object. Weisbrot Decl. ¶ 69. Further, Class Counsel's application for an

27   award of attorneys' fees is to be considered independently from the approval of the Settlement,

28   and neither Class Counsel nor the Class Representatives can terminate the Settlement based on

1   the Court's ruling on attorneys' fees or Service Awards. *See* Dkt. 135 ¶ 29; SA ¶¶ 8.3, 8.5. As

2   such, the Settlement also meets the "higher standard of fairness" applicable to settlements reached

3   before class certification. *Lane*, 696 F.3d at 819 (citation omitted).

### 3.   Rule 23(e)(2)(C):   The Settlement Provides Meaningful Relief to the Class.

The relief to the Class is meaningful. On monetary relief, the Settlement provides the third

largest common fund of any non-data breach privacy settlement, and the highest common fund

amount of any privacy case where no direct relationship exists between defendant and the class.

*See* Dkt. 132–3 (surveying fifteen comparable non-data breach privacy class action settlements);

Dkt 132 at 19 (the only two privacy class action settlements larger than this one not involving a

data breach involved Facebook). The Settlement Fund of $115 million will not revert to Oracle

and will enable the distribution of a meaningful $25 in compensation to every valid claimant. On

non-monetary relief, the prohibitory injunction addresses the practices at the heart of Plaintiffs'

allegations: for as long as Oracle continues to offer the products and services described in the

operative complaint, it (i) will not capture certain complained-of electronic communications and

(ii) will implement an audit program to review its customers' compliance with contractual

consumer privacy obligations. SA ¶ 3.5; *see* Dkt. 77 at 9 (limiting electronic "content" for

Plaintiffs' CIPA claim to referrer URLs and data entered into forms). As Oracle shuts down its ad

tech business, the Settlement ensures that if Oracle returns to this area of commerce, its practices

will be subject to the injunctive relief standards.

### a.   Rule 23(e)(2)(C)(i):   Costs, risks, and delay from trial and appeal

This is a novel case, predicated on the innovative application of legal theories and privacy

rights against a defendant with substantial resources to mount a vigorous defense. Success at class

certification, summary judgment, trial, and on appeal is far from certain. While the Court

maintained certain claims at the pleading stage, it made clear that "some [had] barely [survived]."

Dkt. 49 at 23. Trial presented not only the usual risks, but also Oracle's cessation of its

advertising business may add difficulty to obtain testimony from key witnesses.

**b.      Rule 23(e)(2)(C)(ii):  The effectiveness of distribution to the class**

The Settlement provides that each Class Member who submits a valid claim form will receive a pro rata distribution from the Net Settlement Fund.[5] *See* SA ¶¶ 3.1; Dkt. 135 ¶ 18. A highly effective distribution of the Net Settlement Fund will be achieved by a combination of the state-of-the-art Notice Plan, a simple and easily accessible claims process, and an intensive responsiveness to Class Members' inquiries and concerns. As detailed in Section II.B, *supra*, the Notice Plan successfully reached 83.3% of the target audience of 256.4 million via the media plan, in addition to direct email. Weisbrot Decl. ¶¶ 47. Class Members were able to submit a simple online claim form through the Settlement Website or by regular mail. *See* SA ¶ 7.2.1.

To assist with the distribution, the Settlement Administrator maintained an active call center that received approximately 40,000 calls. Weisbrot Decl. ¶ 35. It also responded to over 28,000 email inquiries. *Id.* ¶ 36. On the Settlement website, which received over 14 million unique visits, over 91 thousand Class Members engaged with the chat feature. *Id.* ¶¶ 31–33. Additionally, Class Counsel has directly responded to questions about the Settlement and claim form process received via email, phone, and mail from 521 individuals, and sent the claim form, opt-out form, detailed notice, and the operative complaint to approximately 104 individuals. Declaration of David T. Rudolph in Support of Final Settlement Approval ("Rudolph Decl.") ¶ 4. While claim validation continues, approximately 3.2 million claims have been received, representing 1.47% of the estimated Class—as set forth in Section III.A, *supra*, this evidences a successful distribution and is well within the response rate typically warranting approval of a class Settlement.

**a.      Rule 23(e)(2)(C)(iii):  Terms of proposed attorneys' fees and expenses**

As detailed in Plaintiffs' Motion for Attorneys' Fees and Expenses (Dkt. 136) and as summarized in Section III.E, below, Class Counsel's fee request is within the usual range of fee awards that are approved in the Ninth Circuit and the request is merited. Class Counsel will not

---

[5] The Net Settlement Fund is "the Settlement Fund, less any Attorneys' Fee and Expense Payment, Service Awards, Settlement Administrator expenses, and taxes." SA ¶ H.

1   be paid any fees until after the Court has granted final approval of the Settlement, and there are no

2   issues with timing that might raise concern. *See* SA ¶¶ 3.2.13, 8.3.

3               **b.      Rule 23(e)(2)(C)(iv):  Agreements to be identified under**
                          **Rule 23(e)(3)**
4

5       Plaintiffs and Class Counsel have not entered into any agreements that must be identified

6   under Rule 23(e)(3).

7               **c.      Rule 23(e)(2)(D):  The Settlement treats all Class**
                          **Members equitably**

8       The Settlement provides equal access to the Net Settlement Fund and each claimant will

9   receive the same pro rata share of the Settlement Fund. All Class Members will benefit from the

10  non-monetary relief. *See* SA ¶ 3.5.

11              **C.      Class Member Objections Should Be Overruled.**

12      Plaintiffs take seriously the objections of the Class Members, have scrutinized each of

13  them thoroughly, and address each objection in the pages that follow. The gravamen of the

14  objections seem propelled by deep concern and outrage over Oracle's alleged conduct that this

15  litigation brought to light. *See, e.g.*, Dkt. 146 ("The class deserves a jury trial because that would

16  make public the sordid details of Oracle's extensive and intrusive surveillance activities."); Dkt.

17  152 (expressing shock at the detailed level of information contained in her OARRR); Dkt. 164

18  ("The kind of mass surveillance Oracle and its partners have engaged in is unprecedented and

19  dangerous."); Dkt. 163 (Oracle "remains in business despite its apparent and purported illegal

20  activities."). This leads most objectors to the conclusion that the consideration for the Settlement

21  is insufficient, and that Oracle should pay much, much more to compensate the Class. There is no

22  question that the allegations, taken as true, merit significant relief, but Plaintiffs respectfully

23  disagree about the sufficiency of the Settlement. Rather, Plaintiffs are steadfast that the

24  Settlement is an outstanding achievement that fairly resolves the claims, particularly in light of

25  the risks and delay of further litigation. "That certain Class Members evaluate the risks

26  differently, or would prefer to go to trial despite those risks, does not prevent the Court from

27  granting final approval to the Settlement." *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK,

28  2016 WL 613255, at *6 (N.D. Cal. Feb. 16, 2016) (citing *Browne v. American Honda Motor Co.*,

1    *Inc.*, No. CV 09-06750 MM (DTBx), 2010 WL 9499072, at *15 (C.D. Cal. July 29, 2010)); *Allen*

2    *v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("[I]t is the nature of a settlement, as a highly

3    negotiated compromise . . . that it may be unavoidable that some class members will always be

4    happier with a given result than others.") (internal quotation marks omitted).

5         To date, twenty-eight objections to the Settlement have been filed with the Court: Dkts.

6    137/148, Dkt. 139, Dkt. 140, Dkt. 141, Dkt. 143, Dkts. 146/173, Dkt. 147, Dkt. 150, Dkt. 152,

7    Dkt. 154, Dkt. 155, Dkt. 156, Dkt. 157, Dkt. 158, Dkt. 159, Dkt. 160, Dkt. 161, Dkt. 162, Dkt.

8    163, Dkt. 164, Dkt. 165, Dkt. 166, Dkt. 167, Dkt. 168, Dkt. 171, and Dkt. 172. These twenty-

9    eight objections represent only 0.0009% of the approximately 3.2 million Class Members who

10   responded, or approximately 1 out of every 114,000 responding Class Members. The Court

11   should "appropriately infer that [this] class action settlement is fair, adequate, and reasonable"

12   where, as here "few class members [have] object[ed] to it." *Cruz v. Sky Chefs*, No. C-12-02705

13   DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014); *see Churchill Village*, 361 F.3d at 577

14   (affirming settlement approval with an objection rate of 0.05%—many times larger than the

15   objection rate here).

16        Even though objections are few in number, to the extent the basis for each objection can

17   be discerned, Plaintiffs respectfully address them by subject matter:[6]

18                    **1.    Objections to the Sufficiency of the Settlement Fund**

19        Most objections (seventeen of twenty-eight) express that the $115 million monetary relief

20   is too low: Dkt Nos. 137 and 148 (submitted by the same person), 139, 140, 141, 146, 147, 150,

21   152, 156–159, 163, 164,[7] 166, and 172. Respectfully, these objections do not adequately account

22   for the risks and delays involved in further litigation, making "no effort to tie [their comments] to

23   the disputes that would actually go to trial." *In re Facebook Biometric Info. Priv. Litig*., 522 F.

24   Supp. 3d 617, 627 (N.D. Cal. 2021), *aff'd,* No. 21-15553, 2022 WL 822923 (9th Cir. Mar. 17,

25

26   ─────────────────────
     [6] Objections to Class Counsel's fee request are treated separately in Section I.E.

27   [7] Anthony Trupia who submitted this objection pro se professes that he has "been a regular actor
     in the courts for one reason only: I want my legal civil rights, and the legal civil rights of my
28   fellow citizens, to be real." Dkt. 164 at 3. However, in correspondence with counsel for the
     parties, Mr. Trupia sought a private payout. *See* Exhibits 1 and 2 attached to the Rudolph Decl.

2022); *see also* Dkt. 146 at 2 (conceding that "a jury trial could add years to the resolution of this issue and that the technical details may be too complex for jurors to adequately understand."). These objections also undervalue the benefits of immediate injunctive relief and fail to "sufficiently account for the fact that the Settlement is likely to send a strong message to [the] Defendant[]," as demonstrated, in Class Counsel's view, by Oracle's exit from the ad tech industry. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 322 (N.D. Cal. 2018).

In contrast, Plaintiffs adhered to the Northern District's Procedural Guidance for Class Action Settlements, and engaged in an analysis of each claim. As the Court then found, at Preliminary Approval, further litigation entails numerous risks, uncertainties, complexities, and delay, whereas the Settlement secures a timely and certain cash recovery for the Class, paired with injunctive relief. *See* § III.B.3.a, *supra*; Dkt. 132 at 11–13. *See In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d at 626 ("Our circuit has acknowledged that judging the adequacy of the payout to the class under [the Rule 23(e)(2)(C)] factors is 'an amalgam of delicate balancing, gross approximations and rough justice[.]'") (quoting *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)).

In addition to uncertainty regarding liability, whether Class Members would establish a right to classwide compensation is highly uncertain. A classable compensatory damage theory would not likely include out-of-pocket expenses. Alternative theories of compensatory damages, such as "presumed" damages are less susceptible to a fixed calculation, and therefore, carry a significant level of uncertainty. Moreover, given the recency of Internet-era data privacy cases, alternative damages theories are somewhat untested. Although Plaintiffs vigorously assert that nominal damages should not, in any way, be the limit of compensation to the Class, Plaintiffs nonetheless ran the risk that nominal damages would be the limit of compensatory damages. Indeed, rather than a mere $1 in nominal damages, under the Settlement, valid claimants will receive approximately $25, and in that sense the Settlement resolves uncertainty over classwide damages very much in the Class's favor.

Uncertainty also exists with regard to Plaintiffs' recovery of statutory damages. For one, the Court dismissed the ECPA claim with prejudice, leaving Plaintiffs with only the right to

1  appeal. Second, the ECPA's statutory damages are discretionary, even with a finding of liability.

2  *See In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 888 (N.D. Cal.

3  2020), *aff'd sub nom. In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102 (9th Cir.

4  2021) ("It was uncertain . . . whether, even if Plaintiffs won, the Court would exercise its

5  discretion under the ECPA by awarding full statutory damages per class member, or no statutory

6  damages at all."). Further, courts recognize that CIPA's high statutory damages, awarded on a

7  "per violation" basis, may face a "significant risk of diminished recovery" should it be found

8  constitutionally excessive. *Medeiros v. HSBC Card Servs., Inc.*, No. CV 15-09093 JVSA

9  (AFMx), 2017 WL 11632870, at *5 (C.D. Cal. Oct. 23, 2017) (collecting cases approving

10  settlements of CIPA claims with average distributions ranging from $.75 to $6.98).

11        The objections assert more money is needed, but fail to resolve the uncertainty of recovery

12  with any realistic or rational metric defining what an adequate settlement *would be*. *See, e.g.*, Dkt.

13  150 at 4–5 (suggesting $10 billion would be the *minimum* adequate settlement in this case); Dkt.

14  Dkt. 141 (asserting each Class Member should "receive up to $10,000, [as] that is the ceiling of

15  what the settlement considers as the value of my personal information"); Dkt. 148. Indeed, many

16  of these objections mistakenly evaluate this Settlement on terms applicable to a different type of

17  privacy case, *i.e.*, a data breach. *See, e.g.*, Dkt. 140 (indicating privacy violations should be

18  "measured in terms of long-term security risks, potential misuse of data, or increased

19  vulnerability to fraud" and raising "identity theft risks"); Dkt. 158 (requesting lifetime data

20  protection and credit monitoring services); Dkt. 141 (asserting that his "personal information has

21  far greater value than the class action intimates"); *see also* Dkt. No. 156 (seeking data removal).

22  Unlike data breach cases, here damages are not measured in terms of security risks. *See* SAC § 1;

23  *see Perkins*, 2016 WL 613255, at *5 (rejecting objection because the "lawsuit did not raise

24  concerns about the sale of data or possible data breaches").

25        One objection, Dkt. 150 (made by the only objector represented by counsel), is

26  particularly baseless.[8] This objection proposes $10 billion as the *floor* for a settlement, relying on

27

28
---
[8] Attorney John Pentz and his co-counsel Kendrick Jan represent objector Sarah Feldman, who has been identified in other litigation as Mr. Pentz's sister-in-law, Dkt. 150. *See In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 3:18-md-02843-VC (N.D. Cal.), Dkt.

the same argument (*i.e.*, class size times an arbitrary discount on statutory damages) brought by the same objector represented by the same counsel, that courts have rejected repeatedly, including in decisions affirmed by the Ninth Circuit. *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, No. 3:18-MD-02843-VC, 2023 WL 8443230, at *3 (N.D. Cal. Oct. 10, 2023) (the same objections "do not account at all for the risks presented by the [statutory privacy] claims, other than the due-process risks, [and therefore] are without merit and are overruled"); *In re Facebook Internet Tracking Litig.*, No. 5:12-MD-02314-EJD, 2022 WL 16902426, at *8 (N.D. Cal. Nov. 10, 2022), *aff'd sub nom. In re Facebook, Inc. Internet Tracking Litig.*, No. 22-16903, 2024 WL 700985 (9th Cir. Feb. 21, 2024) (district court properly rejected the $1.24 trillion in statutory damages proposed by objectors as an unreasonable baseline that would violate due process); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. at 627 ("[S]imply pointing out . . . the theoretical possibility of billions of dollars . . . is not illuminating. The objectors . . . randomly pick various percentages of success at trial as purported measures of adequacy."). As in those cases, the objectors here make no effort to assess the risks of class certification, summary judgment, or trial for CIPA claims that this Court found "barely" survived dismissal.[9] Dkt. 49 at 23.

One objection complains that the prospective value of his claim was not specified. *See* Dkt. 137 at 4, n. 5. Notice need not "provide an exact forecast of how much each class member

---

1161, fn. 4. Mr. Pentz has also represented her in unsuccessful objections previously. Courts have described Mr. Pentz as a "serial objector" and have found his objections to be filed in "bad faith." *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp. 2d 210, 214-215 (S.D.N.Y. 2010) (finding "evidence of bad faith or vexatious conduct"); *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, MDL No. 1735, No. 2:06-cv-00225-PMP-PAL, 2010 WL 786513, at *1-2 (D. Nev. Mar. 8, 2010) (noting that Pentz has "a documented history" dropping his objections "when [he and his clients] were compensated by the settling class or [their] counsel"); Robert Klonoff, Class Actions Objectors: The Good, the Bad, and the Ugly, 89 Fordham L. Rev. 475, 490 n. 86, 499 (2020) (discussing Mr. Pentz's history, and citing cases).

[9] The *Acosta* case cited by this objector offers no support for the objector's arguments. There, the court denied *preliminary approval*, not simply as a function of the settlement value, but rather was based on an "unacceptable volume and degree of deficiencies" in the settlement, including "inherent structural deficiencies" plaguing the distribution of benefits and the court's observation that the entire "process by which the parties reached [the] proposed settlement was flawed." *See Acosta v. Trans Union, LLC*, 240 F.R.D. 564 (C.D. Cal.), *superseded*, 243 F.R.D. 377 (C.D. Cal. 2007)). Moreover, the proposed settlement at issue lacked concrete monetary consideration, leading the court to "estimate [] the Settlement's cash value" at "less than $1 million." *Id.* at 578.

would receive." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015); *see* Dkt. 132-1 ¶ 18; Dkt. 136 at 10. In fact, the estimated amount of the individual claims reported in Class Counsel's declaration on the Settlement Website, of $15–$25, turned out to be reasonably accurate, as the estimated the final claim value is approximately $25. Weisbrot Decl. ¶ 37 (approximately 3.2 million claims filed).

The valid claimants in this Settlement will receive approximately $25 each. Courts routinely find similar distributions in comparable privacy cases meaningful. *Brooks, et al. v. Thomas Reuters Corporation*, No. 3:21-cv-01418-EMC-KAW, Dkts. 250 at 5, 259 (N.D. Cal. Oct. 11, 2024) (finding on preliminary approval estimated class distributions of $19.43 to $48.78 to be adequate); *In re Google Referrer Header Priv. Litig.*, No. 5:10-CV-04809-EJD, 2023 WL 6812545, at *2, *5 (N.D. Cal. Oct. 16, 2023) (finding average class distributions of $7.16 were adequate); *Perkins*, 2016 WL 613255, at *5 (finding distributions of $10 were a "meaningful cash recovery").

### 2.      Objections to the Class Definition

One objection challenges the viability of a nationwide Settlement Class given that "the ECPA claim[] appear[s] to have been dismissed by this Court." *See* Dkt. 137 at 5. However, the ultimate fate of the ECPA claim is not yet determined as Plaintiffs have sought an interlocutory appeal of the Court's dismissal of that claim. *See* Dkts. 120, 122. Accordingly, Plaintiffs' ECPA claim was not foreclosed at the time of Settlement and thus, to obtain global peace, Oracle had no choice but to settle with the proposed nationwide Class. In such circumstances, Ninth Circuit precedent supports certifying proposed nationwide settlement classes. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420 YGR (DMR), 2020 WL 7264559, at *13 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (prior orders denying class certification and its choice-of-law analysis excluding class members from non-repealer states did not foreclose their participation in the settlement because those orders were "subject to further litigation and appeal had the case not settled"); *In re Transpacific Passenger Air Transportation Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *3 (N.D. Cal. May 26, 2015), *aff'd*, 701 F. App'x 554 (9th Cir. 2017) (including a group of plaintiffs in settlement

class despite excluding their claims in a prior motion to dismiss because, *inter alia*, Plaintiffs "noted at the [final approval] motion hearing that they could still appeal that ruling"); *see also Jabbari v. Farmer*, 965 F.3d 1001, 1008 (9th Cir. 2020) (approving nationwide settlement class involving state claims where federal statutory claim was "important enough bind the class together").

One objector residing internationally requests that the Class definition be broadened beyond 2018 and beyond residency in the United States. Dkt. 171. This objector is obviously not a Class Member, but in any event, the Court made clear that the pleaded claims would not extend internationally. *See* Dkt. 49 at 18–22.

### 3. Objection to the Allocation of the Settlement Fund

An objection challenges the Settlement's *pro rata* allocation based on the naked assertion that "California class members [with claims under CIPA] possess significantly more valuable claims." Dkt. 150 at 8–9. The Ninth Circuit has rejected this exact argument, holding:

> Objectors are no doubt correct that the [statutory] claims of some class members might prove valuable if successful at trial, but that does not cast doubt on the district court's conclusion as to the fairness and adequacy of the overall settlement amount to the class *as a whole*. It is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages—that is why due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to pursue their claims separately, as were the class members in this case.

*Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012). This argument especially holds true here, where the Court found that Plaintiffs' CIPA claim "[had] barely [survived]," Dkt. 49 at 23, and Plaintiffs assert an even more valuable ECPA claim[10] on behalf of *all* class members.

### 4. Objections to Adequacy of the Class Representatives and Class Counsel

Two objections challenge the adequacy of the Class Representatives and/or Class Counsel. Dkts. 137, 164.[11] To the extent these objections reflect general dissatisfaction with the

---

[10] The ECPA provides for $10,000 in statutory damages, while CIPA provides for $5,000.

[11] This latter objection baselessly asserts that Class Counsel was "clearly in collusion" with Oracle's counsel. Dkt. 164 at 8. There are several objective indications that this Settlement was reached at arm's length. *See* § III.B.2, *supra*.

1    amount of the Settlement Fund and Class Counsel's fee request, they are addressed elsewhere.

2    Section III.E, *infra*. One objection mistakenly asserts that "only California claims exist" and "a

3    Florida resident with no cognizable claim under California law can[not] represent the interests of

4    class members here." *See* Dkt. 137 at 8.[12] However, the Florida claims survived several motions

5    to dismiss, and as addressed above in Section III.C.1, Plaintiffs' ECPA claim, applicable

6    nationally, remains in-play. In short, this objection provides no basis to overturn the Court's

7    finding at Preliminary Approval that "these attorneys are competent and capable of exercising the

8    responsibilities of Class Counsel and that Settlement Class Representatives will adequately

9    protect the interests of the Settlement Class." Dkt. 135 ¶ 7. As the reasonableness and fairness of

10   the proposed Settlement attest, the Class Representatives and Class Counsel continue to

11   adequately (and zealously) represent the Class.

12                          **5.      Objections to Notice**

13          There are four objections and one comment regarding the Notice Plan's reach, method,

14   notice period, provision of an estimated payment. *See* Dkts. 137, 142, 160, 161, 163. The Notice

15   Plan was implemented pursuant to the Court's order, and its results comport with the Settlement

16   Administrator's expectations. *See* Weisbrot Decl. ¶¶ 7–10. Respectfully, none of these objections

17   undermine the Court's prior conclusion that the Notice Plan constitutes the best practicable notice

18   to the Settlement Class and satisfies the requirements of Rule 23 and the constitutional

19   requirement of due process. *See* Dkt. 135 ¶ 11.

20          Objections that Notice was deficient for "only" reaching the target 80 percent of the Class

21   are meritless, as such notice plans are regularly deemed sufficient. *See, e.g.*, *In re Google*

22   *Location Hist. Litig.*, No. 5:18-CV-05062-EJD, 2024 WL 1975462, at *3 (N.D. Cal. May 3,

23   2024) (granting final approval where notice plan generated impressions reaching an estimated

24   80% of the class); Weisbrot Decl. ¶ 7 (media notice reached approximately 83.33 percent of the

---

[12] This objection also argues, without any supporting authority, that Mr. Katz-Lacabe is an inadequate representative of the Class because he posted a note on Twitter confessing he is not knowledgeable about the specifics of the Notice Plan, *while at the same time correctly pointing people to the Settlement Website*. The objection is meritless. Class Counsel has been responsible for working with the Settlement Administrator to effectuate a massive, highly successful Notice Plan. Weisbrot Decl. ¶¶ 6–36.

1   target audience of over 256 million, translating to approximately 97% of the Class). Further,

2   media notice was only one component of the notice plan. Supplemental notice was also provided

3   via email to all reasonably identifiable potential Class Members for whom Oracle possessed email

4   addresses, ensuring a reach beyond 83.3 percent. Weisbrot Decl. ¶¶ 20–24.

5        Two objections insist that Notice should have been sent by U.S. Mail, but given the Class

6   size, that would have been prohibitively expensive. Dkt. 161, 173. "Courts routinely approve

7   email notice campaigns and, inevitably, some email messages will end up in a spam folder—just

8   as some postal mail will never reach its intended recipient." *In re Apple iPhone/iPod Warranty*

9   *Litig.*, No. CV-10-01610, 2014 WL 12640497, at *9 (N.D. Cal. May 8, 2014) (Seeborg, J.).

10       Three objectors complain that the 49-day Notice Period was too short, but it comfortably

11  exceeded the 35-day period specified in the Northern District of California's Procedural Guidance

12  for Class Action Settlements. *See* Dkts. 137, 160 and 172. Notice was properly effectuated during

13  this period, providing Class Members ample time to file claims and react to the Settlement. *See*

14  Sections II.B. and C., *supra*, and III.C.6., *infra*.

15                    **6.    Objections to the Claims Process**

16       As the Settlement Administrator reports, the claims processing functionality properly

17  operated throughout the duration of the claims period without any systemic issues that would

18  have impeded the submission of claims or opt-outs. Weisbrot Decl. ¶ 38. Inevitably, particularly

19  with a class this size, there are some individual frustrations with the claims process, as is evident

20  in some of the objections. *See* Dkts. 162, 172. For perspective, while there were over 3.2 million

21  claims successfully processed, only two objections were submitted concerning difficulties

22  reacting to the Settlement. Weisbrot Decl. ¶¶ 56, 63. The Settlement Administrator and Class

23  Counsel expended substantial efforts to interface with claimants and other Class Members to

24  ensure that each and every issue brought to their attention was addressed. Weisbrot Decl. ¶ 36;

25  Rudolph Decl. ¶¶ 4–5. Moreover, Class members were readily able to (and did) submit timely

26  exclusion requests under the Court-ordered procedure, as evidenced by the hundreds of opt-outs,

27  and no Class Member objected to the requirement to file an exclusion form by mail. Weisbrot

28  Decl. ¶ 43; *see* § III.A., *supra*.

1   While some objections claim that they did not learn of the Settlement until days before the

2   deadline, each of these objectors received *initial* emails weeks prior to the *reminder* emails they

3   ultimately responded to that they claim came late. Dkt. 163, 172; Weisbrot Decl. ¶¶ 58, 62, 66.

4   Another objection claims that the Settlement Website did not allow the objector to submit her

5   claim or be excluded, attaching an error message. Dkt. 162. The error appears to be likely

6   attributable to the objector, but in any event, the Settlement Administrator, as it did with a handful

7   of other persons who had similar difficulties (but did not object), reached out to assist with her

8   claim and will allow her to submit one if she so chooses. Weisbrot Decl. ¶ 57. Finally, one

9   objector was incorrectly concerned that information provided on the Claim Form would "permit

10   Angeion Group, LLC to sell their data." Dkt. 167; Weisbrot Decl. ¶ 61.

11   **7.      Objections Regarding Insufficient Information**

12   Some objectors argue that they should have been provided with "a copy of the 'digital

13   dossier' that Oracle allegedly compiled" on Class Members. Dkt. 139; *see also* Dkts. 152, 154,

14   164 and 173. These objections are misplaced. The Class Notice and available litigation

15   documents more than amply describe the depth and nature of the data the Plaintiffs allege Oracle

16   has complied on all Class Members, and it would be infeasible to provide tailored dossiers, each

17   likely consisting of tens of thousands of lines of data, to 220 million people as part of a notice

18   program. One objector, who states she obtained her OARRR, claims she should be able to view

19   the personal data Oracle has on the Class Representatives, objecting to the Court sealing the Class

20   Representatives' OARRRs. Dkt. 152. Such a requirement would be patently unfair to the Class

21   Representatives, would chill future assertions of privacy rights, and is unnecessary where the

22   nature of that personal data has been generally described.

23   **8.      Objection to the Claim and Exclusion Forms**

24   One objector challenges the Claim and Exclusion Forms' request to confirm that the

25   "acquisition, capture, or collection of [his] personal information by Oracle was without [his]

26   consent." *See* Dkt. 143. This objector states "a person may not know whether he consented on

27   some occas[]ion," and asserts that the "[lack of] consent is not necessary to make a claim in this

28   case." Dkt. 143 at 1. However, Plaintiffs allege that it would be "impossible for ordinary persons

1   to reasonably understand the true purpose and extent of Oracle's data collection, compiling of

2   digital dossiers, and other data exploitation practices, which are opaque, if not invisible, to

3   ordinary data subjects." SAC ¶ 101. As such, unless an individual undertook affirmative action to

4   knowingly consent to Oracle's data collection and compiling practices (action likely to be

5   memorable), Plaintiffs maintain that Oracle did not obtain consent. Nonetheless, consent is a

6   primary defense asserted by Oracle. That the Claim and Exclusion Forms seek confirmation that

7   an individual did not affirmatively consent, consistent with Plaintiffs' theory of the case, is

8   reasonable. *See Perkins*, 2016 WL 613255, at *9 ("Claim forms may require the claimant to attest

9   to some fact under penalty of perjury.") (citing *California v. IntelliGender, LLC*, 771 F.3d 1169,

10  1175 (9th Cir. 2014)).

11              **9.      Objection to Settlement Administrator's Expenses**

12          One objection concerns the costs of the Notice Plan and settlement administration. Dkt.

13  148 at 4–7. The objection does not complain about the total anticipated $4.8 million cost, but

14  rather mistakenly assumes that there is no hard-cap on the Settlement Administrator's expenses

15  and that the number of Class Members who were notified will be unknown. *Id.* However, a hard-

16  cap *has* been placed on the Settlement Administrator's expenses, and the number of Class

17  Members notified through the Notice Plan *has* been reported. *See* Weisbrot Decl. ¶¶ 37, 45. Not

18  unusually, if circumstances change (*e.g.*, if the Court orders a second round of distribution), the

19  Settlement Administrator can apply for reimbursement of associated expenses. *Id.* ¶ 45. In any

20  event the Settlement Administrator's expenses are reasonable. *See In re Anthem, Inc. Data*

21  *Breach Litig.*, 15-MD-02617-LHK, 2018 WL 3960068, at *8 (N.D. Cal. Aug. 17, 2018) (granting

22  final approval where administration reached $23 million, or 20% of the $115 million settlement).

23  Another objector does "not trust this Settlement Administrator and would like them to be

24  replaced" because he "received 4 non-answer responses." Dkt. 167. As described by the

25  Settlement Administrator, this distrust is unwarranted. *See* Weisbrot Decl. ¶ 61.

26              **10.     Objections to the Sufficiency of Non-Monetary Relief**

27          Several objectors call for additional injunctive relief seeking further data privacy

28  protections from Oracle, including, *inter alia*, requests for lifetime credit monitoring (Dkt. 158),

removing personal data from the dark web and disclosing all data it has ever sold to third parties (Dkt. 160), and disclosing all revenue Oracle made from the practices at issue and shutting down its other business unrelated to this case (Dkt. 156, 163). These objections echo the refrain of most all other objectors who raise heartfelt concern over Oracle's practices. But, respectfully, these idealized solutions go well beyond the scope of remedies realistically attainable and may be unnecessary given Oracle's cessation of the practices at issues and its related deletion of relevant data. Moreover, the non-monetary relief assures the cessation of the wiretapping conduct at issue and the implementation of internal audits in the event Oracle decides at some point to restart the conduct. SA ¶ 3.5.

### 11.   Inapplicable Objections

Several bases for objections (referenced by docket number) are not applicable to this Settlement for various reasons:

- Dkt. 146 asserts that the Settlement "excuses Oracle's criminal activity underlying the complaint" (emphasis removed). The Settlement does not purport to release Oracle from any criminal charges.

- Dkt. 155 states that this lawsuit is "a waste of the court's time and tax payer money." This unspecific basis does not square with the findings at Preliminary Approval.

- Dkt. 160, asks that Oracle's executives be fined for, *inter alia*, violating the trust of the public, selling data to domestic and foreign governmental agencies. Similarly, Dkt. 165 expresses a "firm belief that the PEOPLE connected to Oracle who are relevant to these acts should face actual penalties, i.e. fines and jail time." However, the remedy of fines is not available in civil litigation such as this.

- Dkt. 161 requests that the Court amend Federal Rule of Civil Procedure 12 so that a class certified under Rule 23(b)(3) necessitates opt ins rather than opt outs.

- Dkt. 163 objects that "Oracle America, Inc. remains in business despite its apparent and purported illegal activities" and its "executives, employees, and others complicit in the apparent and purported illegal activities remain empowered." The business conduct complained of in this lawsuit has ceased, even if Oracle continues to do other business.

- Dkt. 164 asks the Court to "effectuate the fall of Capitalism" to gain back public trust in government institutions.

- Dkt. 168 states that "the CEO and Board are acting recklessly by spending shareholders money for no valid reason" and instead "should be forced to go to a juried trial, and a determination of wrongdoing should be settled." Oracle's shareholders' interests are not the subject of this litigation.

\*       \*       \*

In sum, while Plaintiffs and Class Counsel are sympathetic to the objectors' deep concern over Oracle's alleged misconduct and demand for just compensation, respectfully, their objections should not stand in the way of this extraordinary Settlement that will extend compensation to millions of Class Members who have asked for it.

### D.       The Settlement Class Should Be Certified.

In the Preliminary Approval Order, the Court found that, for settlement purposes, on a preliminary basis: the proposed Settlement Class was sufficiently numerous to satisfy Rule 23(a)(1); that there were common questions of law and fact sufficient to satisfy Rule 23(a)(2); that the claims of the proposed Settlement Class Representatives were typical of the claims of the Settlement Class and therefore satisfied Rule 23(a)(3); and that Class Counsel and the Settlement Class Representatives would (and had) fairly and adequately represent the interests of the Class and satisfied Rule 23(a)(4). Dkt 135 ¶¶ 6, 7. The Court also preliminarily found that common questions predominate over individual questions and that a class action is superior to other methods for adjudicating the case, and therefore that the case satisfies Rule 23(b)(3). *Id.* at ¶ 6 (predominance and superiority). And the Court preliminarily appointed Class Counsel based its evaluation under Rule 23(g). *Id.* ¶ 7.

No developments have occurred since Preliminary Approval that would affect the Court's analysis of Rules 23(a), 23(b)(3), or 23(g). The limited and, respectfully, unpersuasive objections on this topic are addressed above in Section III.C. Plaintiffs therefore respectfully ask the Court to certify the Settlement Class, appoint the Named Plaintiffs as Settlement Class Representatives, and appoint Michael W. Sobol and David T. Rudolph of Lieff Cabraser Heimann & Bernstein, LLP as Settlement Class Counsel.

- 21 -

1

2

**E.     The Court Should Grant the Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards.**

3

As set forth in the Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff

4

Service Awards ("Fee Motion"), Class Counsel seeks an award of attorneys' fees in the amount

5

of $28,750,000, representing 25% of the Settlement Fund, the established benchmark within the

6

Ninth Circuit. *See* Dkt. 136. This request represents a lodestar multiplier, at the time of filing the

7

Fee Motion, of 2.91, which is well within the 1.0–4.0 multiplier range awarded in most

8

settlements with similar sized common funds.[13] *Id.*; Dkt. 136-1 ¶ 44. Class Counsel is also

9

entitled to reimbursement of their out-of-pocket expenses totaling $211,350.52. The requested

10

Service Awards in the amount of $10,000 to each of the two Class Representatives is reasonable.

11

The Fee Motion was timely filed on August 28, 2024, to allow Class Members the

12

opportunity to comment or object. Dkt. 136. Five objectors have objected to the fee request and

13

one to the request for service awards. *See* Dkts. 137 and 148 (same objector), 140, 150, 152, 157,

14

and 172. Oracle filed a comment to the Fee Motion.[14] None of these responses warrants denial or

15

modification of the requests in the Fee Motion, but regardless, approval of the Settlement is

16

independent from the Court's consideration of the Fee Motion. SA ¶ 8.3.

17

Respectfully, the objections to Class Counsel's fee request lack appreciation for the

18

jurisprudence that governs the economics of representative actions which allow for the

19

vindication of aggregated interests that would otherwise go unaddressed. The Fee Motion is

20

21

[13] Since preliminary approval, Class Counsel has expended 546.7 hours on this Settlement, decreasing the lodestar multiplier to 2.79. Rudolph Decl. ¶ 13. *See* Section II.C., *supra.*

22

[14] Oracle's comment was limited to providing what it deemed to be a "correction" regarding Class

23

Counsel's characterization of the Court's order to seal Plaintiffs' OARRRs, and the circumstances around Oracle's cessation of its ad tech business. *See* Dkt. 138 at 1. These quibbles have little if

24

any bearing on the Fee Motion. First, the Court's sealing order found "compelling" Plaintiffs' concern over releasing "detailed dossier[s]" because of their "comprehensiveness." Dkt. 77 at 17.

25

Second, Plaintiffs stand by their belief that this litigation contributed to Oracle's decision to exit its ad tech advertising business. *See* Ronan Shields and Seb Joseph, *As Oracle's ad business*

26

*collapses, layoffs and uncertainty ripple through the industry*, Digiday (June 25, 2024) https://digiday.com/marketing/as-oracles-ad-business-collapses-layoffs-and-uncertainty-ripple-

27

through-the-industry/ ("[S]eparate sources with contacts inside the organization claimed [privacy] concerns, ultimately, sealed the decision to close down the unit" in which "it faced [this] class

28

action lawsuit for allegedly using third-party trackers without consent to build profiles."). In any event, the Fee Motion is not based upon Oracle's change in business, but rather, the relief specified in the Settlement Agreement. *See* Dkt. 136 at 8.

1  securely anchored to well-established Ninth Circuit principles and presents nothing out of the

2  ordinary experiences of this District Court. *See, e.g.*, Dkt. 136 at 8–22.[15]

3       Two of these objections seem to reject the notion that the Ninth Circuit's 25% benchmark

4  is equitable. *See* Dkt. 152 at 5 ("LCHB receiving 25% of the settlement . . . while Class Members

5  receive maybe $20 and waive all rights . . . is inequitable."); Dkt. 172. In evaluating the

6  benchmark percentage, courts are to consider factors established by the Ninth Circuit, including:

7  "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work;

8  (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5)

9  awards made in similar cases." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D.

10  Cal. 2008) ("The overall result and benefit to the class from the litigation is the most critical

11  factor in granting a fee award."). As discussed in the Fee Motion, consideration of all these

12  factors fully supports application of the 25% benchmark. *See generally* Dkt. 136 at 10–17. In

13  light of these factors, which objectors do not squarely address, including that Class Counsel

14  secured a large Settlement Fund, the application of the benchmark percentage is reasonable. *See*

15  *In re Apple iPhone/iPod Warranty Litig*, 40 F. Supp. 3d 1176, 1181 (N.D. Cal. 2014) (Seeborg,

16  J.) (a $53 million fund was "sufficiently large to implicate potential windfall concerns," yet

17  application of factors warranted awarding fees representing 25% of the fund and resulting in 3.62

18  multiplier of counsel's lodestar); *see also In re Anthem, Inc. Data Breach Litig.*, 2018 WL

19  3960068, at *28 (awarding 27% of a $115 million fund).

20       One objector[16] filed two objections offering conclusory remarks rich in rhetoric but which

21  fail to engage with the grounds put forward by Class Counsel in the Fee Motion or with the

---

[15] One of these objections, sent and filed after the deadline for objections, goes as far as to request that the Court overturn binding Ninth Circuit precedent, stating "[a]ll those courts have done is provide yet another justification for that which is unreasonable to begin with." Dkt. 172.

[16] The objector is Chris Williams, a lawyer in South Carolina, who introduced himself to Class Counsel by referring to them as "the money hungry attorneys at Leif [sic]." Rudolph Decl. ¶ 11, Ex. 3. His objections rely on rhetorical insults like, "Lef's [sic] attempt to waive the rights of 220+ million people" and "Lief's [sic] shenanigans," and churlishly misspelling "Lieff" throughout his court filings. Dkt. 137 at 3, 3 fn. 3. *Contra* Northern District of California Guidelines For Professional Conduct, 8 ("A lawyer should at all times be civil, courteous, and accurate in communicating with opponents or adversaries, whether in writing or orally.").

1   precedent and principles in the Ninth Circuit. Dkts. 137, 148.  To the extent any specific grounds

2   for his objections could be discerned, they are addressed as follows:

3           1.      The objector cites *City of Burlington v. Dague*, 505 U.S. 557 (1992) for the

4   incorrect proposition that the contingent nature of Class Counsel's representation should not be a

5   factor in determining a reasonable fee. *See* Dkt. 137 at 10. There are two problems with this.

6   First, that case is inapplicable; it holds that a fee enhancement was not permitted under the fee-

7   shifting provisions of the Solid Waste Disposal Act and Clean Water Act. *City of Burlington*, 505

8   U.S. at 567. Here, Class Counsel's fee request is not tied to a fee-shifting statute. Rather, "in class

9   action litigation the fee is determined on the basis of what a court finds to be reasonable" under

10  the percentage-of-the-fund and/or lodestar methods. *Vizcaino*, 290 F.3d at 1049–50; Fed. R. Civ.

11  P. 23(h); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941–42 (9th Cir. 2011).

12  Second, the Ninth Circuit recognizes that multipliers on counsel's lodestars are intended to

13  "mirror[] the established practice in the private legal market of rewarding attorneys for taking the

14  risk of nonpayment by paying them a premium over their normal hourly rates for winning

15  contingency cases." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002). The

16  objector states that the risks Class Counsel took on are not a sufficient basis for the requested fee,

17  but of course risk is not the sole factor.

18          2.      The objector makes a reference that the multiplier renders the fee request

19  unreasonable. Dkt. 137 at 9–10 ("After including the 2.83 multiplier requested by Lief [sic], the

20  hourly rates are absurd."). However, Class Counsel's multiplier of less than 2.91 is within the

21  1.0–4.0 range awarded in "the vast majority" of "common fund cases with settlements ranging

22  from $50-200 million." *In re Lidoderm Antitrust Litig.*, 2018 WL 4620695 at * 3 (N.D. Cal.

23  2018); *see also In re Apple iPhone/iPod Warranty Litig*, 40 F. Supp. 3d at 1181 (multiplier of

24  3.62); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (approving a 2.83

25  multiplier); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. at 633 (approving a 4.71

26  multiplier). Moreover, Class Counsel's rates, upon which the multiplier is determined, are

27  regularly approved as reasonable in the context of class action settlements. Dkt. 136 at 27–29; *see*

28

1    *also Grey Fox, LLC v. Plains All-Am. Pipeline, L.P.*, No. CV 16-03157 PSG (JEMx), 2024 WL

2    4267431, at *5 (C.D. Cal. Sept. 17, 2024) (approving Class Counsel's 2024 rates).

3        3.    The objector states that "the billing descriptions provided by Lief [sic] are vague

4    and incomprehensible" because they do not include "line-by-line contemporaneous billing

5    records." Dkt. 137 at 10. However, express guidance from this District instructs attorneys to

6    submit "[d]eclarations . . . as to the number of hours spent on various categories of activities

7    related to the action by each biller, together with hourly billing rate information," and regularly

8    approves billing records reporting such categories. Northern District of California's Procedural

9    Guidance for Class Action Settlements, Final Approval § 2; *see, e.g.*, *In re Google Location Hist.*

10   *Litig.*, 2024 WL 1975462, at *15 (finding identical billing descriptions "provided sufficient

11   support for [class counsel's] proposed lodestar calculation"). This objection also contends that

12   Class Counsel's fee is not warranted because they only took one deposition (Dkt. 137 at 10), but

13   this ignores Class Counsel's extensive discovery efforts. Dkts. 132 at 12–13, 28–29; Dkt. 136 at

14   11, 23.

15       Finally, an objection concerns the $10,000 that Plaintiffs requested as service awards for

16   the two Settlement Class Representatives. *See* Dkt. 150 at 9–10 ("Lead Plaintiffs should not be

17   awarded the amount of $10,000, when the amount that they recovered for the Class is less than 50

18   cents per class member."). As explained in Plaintiffs' Motion for Fees, Service Awards are

19   generally awarded based on the Class Representatives' time and efforts in furtherance of the

20   litigation and are found reasonable when they amount to a low percentage of the common fund, as

21   these do. *See* Dkt. 136 § III (total requested Service Awards amount to 0.17 percent of the

22   Settlement Fund). Dkt. 150 does not cite a single case in support of her objection.

23   **IV.    CONCLUSION**

24       Plaintiffs respectfully request that the Court (1) certify the Settlement Class, and confirm

25   appointment of Settlement Class Representatives, Settlement Administrator, and Class Counsel;

26   (2) grant final approval of the Settlement as fair, reasonable, and adequate; (3) award attorneys'

27   fees, expenses, and service awards as requested in Plaintiffs' previously filed motion (Dkt. 136);

28   and (4) enter final judgment as to Oracle in this Action.

1

2    Dated: October 31, 2024                Respectfully submitted,

3                                  */s/ Michael W. Sobol*

4                                  Michael W. Sobol (SBN 194857)
msobol@lchb.com

5                                  David T. Rudolph (SBN 233457)
drudolph@lchb.com

6                                  Jallé H. Dafa (SBN 290637)
jdafa@lchb.com

7                                  John D. Maher (SBN 316157)
jmaher@lchb.com

8                                  Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com

9                                  Nabila Abdallah (SBN 347764)
nabdallah@lchb.com

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

10                               275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

11                               Telephone:  415.956.1000
Facsimile:  415.956.1008

12                               *Attorneys for Plaintiffs and the Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28