Pages 1 - 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge Presiding

MICHAEL KATZ-LACABE, and DR.   )
JENNIFER GOLBECK, on behalf of )
themselves and all others )
similarly situated, )
                      )
        Plaintiffs, )
                      )
  VS. )     NO. 3:22-cv-04792-RS
                      )
ORACLE AMERICA, INC., a )
corporation organized under the)
laws of the State of Delaware, )
                      )
        Defendant. )
_____)

San Francisco, California
Thursday, November 14, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                  Embarcadero Center West
                  275 Battery Street - 29th Floor
                  San Francisco, California  94111
        BY:  **DAVID T. RUDOLPH, ATTORNEY AT LAW**
             **MICHAEL W. SOBOL, ATTORNEY AT LAW**
             **AMELIA HASELKORN, ATTORNEY AT LAW**
             **JOHN D. MAHER, ATTORNEY AT LAW**
             **NABILA ABDALLAH, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Stenographic Reporter

1    **<u>APPEARANCES</u>:  (CONTINUED)**

2    For Defendant:
                                MORRISON & FOERSTER LLP
3                               425 Market Street
                                San Francisco, California  94105
4                        BY:   **TIFFANY CHEUNG, ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - November 14, 2024**                    **1:38 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:** Calling Case 22-cv-4792, Katz-Lacabe vs. |
| 5 | Oracle America. |
| 6 | Counsel, please come forward and state your appearances. |
| 7 | **MR. RUDOLPH:** Good afternoon, Your Honor. David |
| 8 | Rudolph for the plaintiffs and the class, and with me is my |
| 9 | colleague Michael Sobol, my colleagues Amelia Haselkorn, |
| 10 | John Maher, and Nabila Abdallah. |
| 11 | **THE COURT:** Good afternoon. |
| 12 | **MS. CHEUNG:** Good afternoon, Your Honor. Tiffany |
| 13 | Cheung of Morrison & Foerster on behalf of defendant Oracle |
| 14 | America. |
| 15 | **THE COURT:** Good afternoon. |
| 16 | So this matter is on calendar for consideration of final |
| 17 | approval of this proposed class action settlement. |
| 18 | I have a few items that I want to go over with you, but I |
| 19 | thought I would start and look to the plaintiffs to comment |
| 20 | on -- in any way they want on the various objections that we've |
| 21 | received. The Court is aware of the fact that we've gotten, I |
| 22 | don't know, maybe 20-some-odd objections. Most of the |
| 23 | objections are not dissimilar from what we often see, which is |
| 24 | "We should get more money," and then issues with respect to the |
| 25 | fees. |

1      I will say before you even jump into this that, as I've

2    seen in the past many, many times now, sometimes those

3    objections are premised on the idea that "The claim is an

4    absolute winner and it's going to prevail and, therefore, I'm

5    not getting enough money."

6      As I'm sure you will point out here, we had some

7    preliminary motion practice, and I expressed in that, while I

8    denied the motion, I think this case had some serious obstacles

9    in going the distance.  So it isn't a circumstance, in my mind,

10   where it's, you know, a hundred percent sure claim that is,

11   therefore, how we value whether or not the recovery is

12   sufficient or not.  It's we look at the recovery in the

13   settlement context against the fact that there are significant

14   risks to this case ending up with anything but a zero value.

15     So with that said, go ahead.

16     **MR. RUDOLPH:**  Thank you, Your Honor.

17     And, first, I'd like to give you an update on the notice

18   and claims process, and then talk about the sufficiency of the

19   settlement, and I'll try to address some of the objections as

20   part of that process.

21     So just to update you on the notice and claims program,

22   the programs that Your Honor approved were successfully

23   implemented as planned.  The notice and claims programs have

24   been comprehensive and completely fair and have been executed

25   as the Court ordered.  And Angeion, which is the claims

administrator here, did a really excellent job and I think

that's accurately reflected in the declaration of Steven

Weisbrot.

    So to talk first about media notice --

      **THE COURT:**  One issue that we asked for you to address

in our guidance, just so the record is clear, the administrator

was chosen after a bidding process.

      **MR. RUDOLPH:**  He was.  He was chosen after a very

vigorous and aggressive bidding process.  And after spending a

lot of time obviously looking at the bids but talking with the

claims administrators, we decided that Angeion was the best

choice, and I think that the way that the notice program was

implemented and the success that we've had really bears that

out.

    So with respect to the media notice, which was the primary

method that satisfied Rule 23 and due process, within the

notice period, the media campaign consisting of the internet

notice, paid search campaign, and engagement on social media

was completed.  Media notice was the best way to reach class

members here given the number of class members.

    And Angeion exceeded the goal of reaching 80 percent of

the target audience.  In fact, they were able to reach

83 percent.  The target audience is actually an overinclusive

number.  The class estimate is 220 million people.  This is

83 percent of 253 million people.  So it's a very large number

1    that's close to the number of class members.

2        The media notice was disseminated through major social

3    media outlets, through paid advertising.  And in addition to

4    that, there was quite a bit of sort of natural coverage where

5    news outlets like *U.S.A. Today* and *Associated Press* and we saw

6    even some local news channels picked up on it, explained to

7    class members that the settlement was real, which was a concern

8    that some settlement class members had, and how to file a

9    claim.

10       With respect to the e-mail notice, to stimulate claims we

11   supplemented the direct notice -- or the e-mail notice with

12   direct notice.  The settlement agreement required Angeion to

13   e-mail each class member for whom Oracle had an available

14   e-mail address.  That was originally a group of about

15   800 million e-mails.  That was eventually culled down mostly

16   through sort of duplication to around 456 million e-mails.

17   Those e-mails were sent out and then once that was done, an

18   additional 320 million reminder e-mails were sent out.

19       And as the Weisbrot declaration states, we think this is

20   actually the largest e-mail notice campaign that's ever taken

21   place in any class action.

22       While a few of the objectors complained that the e-mail

23   went to their spam and they didn't see them until closer to the

24   deadline, as this Court has noted, courts routinely approve

25   e-mail notice and it's inevitable that some messages will end

1    up in spam.

2        And, similarly, with respect to the class members who say

3    they didn't see the notice until closer to the deadline's

4    period, Angeion looked at those class members who were making

5    those objections and was able to determine that they were

6    actually responding to the reminder e-mails that were

7    specifically designed to go out closer to the deadline to

8    stimulate claims.

9        With respect to the claims process itself, the claims

10    process operated smoothly, and we're happy to report that

11    approximately 3.2 million class members were able to file

12    claims.

13        **THE COURT:**  Which is a claims rate of about what?

14    1.4?

15        **MR. RUDOLPH:**  It's 1.47.

16        **THE COURT:**  Okay.  How does that compare with

17    comparable -- that seems to be somewhat of a low claims rate.

18    You're saying in the papers to me it's actually a robust claims

19    rate.  So what do you want to say about that?

20        **MR. RUDOLPH:**  It's well within line of what we see in

21    privacy cases.  It's frequently in the 1 to 2 percent range.  I

22    believe the *Plaid* case, which is discussed in the Weisbrot

23    declaration, which was similarly situated in the respect that

24    it was a plaintiff -- I'm sorry -- defendant that the class

25    members didn't have privity with and weren't directly, you

1    know, interacting with.  So that fact would suppress claims

2    rate with -- in comparison to a case like -- that involves

3    Facebook or Google where people know the company, know that

4    they're interacting with them.

5        So this is really right within the range of what was

6    predicted.  We predicted 1.5 to 2.5.  So 1.47 is within a

7    fraction of the claims rate that the claims administrator

8    predicted.

9        And in light of that, we're able to estimate that each

10   class member will then approximately -- will receive

11   approximately $25, which is at the high end of what we had

12   potentially estimated.  And this is really meaningful

13   compensation for those who wanted to participate in this case

14   in light of the nature of the claims and the risks involved.

15       And --

16       **THE COURT:**  You asked me a kind of value the

17   injunctive relief, and I'm having a little trouble with that

18   because it seems -- and I know that there may be some

19   disconnect here between the parties, but from the injunctive

20   standpoint, what did you really accomplish?  Because my

21   understanding was that Oracle was shutting it down anyway.

22       **MR. RUDOLPH:**  Right.  So the injunctive relief had two

23   parts.  It had a change to the way that Oracle's data

24   collection practices operated.  So they needed to change their

25   data -- the "Core Tag" so that it wouldn't be collecting

1   referred URLs or information entered into forms.  So that's

2   actually a major systematic change in the way that Oracle was

3   collecting data from class members.

4        And it also had to institute a --

5        THE COURT:  Your position is the lawsuit prompted

6   this?

7        MR. RUDOLPH:  We think it did, and we think the

8   settlement and the injunctive relief may have led to that -- to

9   that cessation.  It was a major change to the way the business

10  had to operate, and a month later the other shoe dropped, so to

11  speak, and the company --

12       THE COURT:  Let me ask Ms. Cheung.  I know this is

13  perhaps a point of contention.  I'm not sure at the end of the

14  day it's going to be all that important in light of the fact

15  that there is a monetary aspect to this as well, but do you

16  have a view on whether or not injunctive relief was achieved

17  here?

18       MS. CHEUNG:  Right.  And, Your Honor, as we stated in

19  our papers, we do dispute that this litigation caused Oracle

20  Advertising to decide to shut down its business.  Obviously the

21  fact that it was announced shortly after the settlement was

22  announced is -- indicates that it wasn't prompted by anything

23  that happened in this litigation because, of course, a decision

24  like that must start and discussions must start well in advance

25  of the public announcement.

1    So although the public announcement occurred shortly after

2    the settlement was announced, these discussions obviously had

3    started well in advance.  And as publicly reported, the reason

4    for the decision to shut down the business was based on failing

5    revenues.

6    **THE COURT:**  You're sort of on the horns of a dilemma

7    though, because you're a proponent of this settlement and

8    presumably would be in favor of providing as high a value on

9    the settlement as you can.  So that -- but even with that said,

10    your position is -- is your position essentially that I

11    shouldn't place any value on the -- what the plaintiffs

12    identify as injunctive relief that they have obtained?

13    **MS. CHEUNG:**  Well, the nonmonetary relief provision is

14    certainly a part of the settlement agreement and it has been --

15    it is included in the settlement agreement.  In terms of the

16    value and what is provided to the class, we do continue to

17    believe that it's fair in light of the monetary component to

18    the settlement.  As Your Honor indicated, that monetary value

19    is significant in light of the many challenges and obstacles

20    the plaintiffs would have had in this case achieving what would

21    be an all-out win.

22    There are many hurdles to achieving that; and in light of

23    that, the significant monetary value of the settlement is

24    far -- is beyond fair.

25    **THE COURT:**  Okay.  Let's go back to plaintiffs'

```
 1   counsel.  Go ahead.
 2          MR. RUDOLPH:  Yeah, there's two points I'd like to
 3   respond to there.
 4        The first is just to point out the injunctive relief will
 5   be in place in the event that Oracle decides to start this
 6   conduct again.  So there is that prohibition.  And there will
 7   be the auditing provision as well in the event Oracle decides
 8   to start this up again.
 9        And the other issue is, as we mentioned in our papers, we
10   have it's not direct evidence but there's a fair amount of
11   reporting suggesting that the privacy concerns were actually a
12   major driver in Oracle's decision to shut down the business,
13   and this case was repeatedly noted as sort of a major avatar of
14   that concern.
15        So returning to the claims process, Angeion and class
16   counsel -- I'm just sort of resituating us.  There were some
17   complaints about, you know, inability to access the website or
18   issues with submitting the claim form, and Angeion and class
19   counsel, as we state in our declaration, spent a lot of time
20   and effort trying to make sure that every class member who
21   reached out, had an issue, had that addressed.
22          THE COURT:  Angeion has been the administrator on
23   other data privacy cases.
24          MR. RUDOLPH:  That's correct.
25          THE COURT:  And that's what the declaration indicates.
```

1   And did they follow the same protocol as they did in prior data

2   privacy cases in terms of notices and claims processing and the

3   like?

4          **MR. RUDOLPH:**  I can't speak to that.  Mr. Weisbrot is

5   available if you're interested.

6          **THE COURT:**  No, that's all right.

7          **MR. RUDOLPH:**  But it's my understanding that this was

8   a very, very robust package, and we wanted to ensure that it

9   was as good as any privacy class action that's ever been

10  noticed.

11       Finally, with respect to opt outs, there were 487 timely

12  opt outs showing there was a fair and reasonable process for

13  those who wished to exclude themselves.

14       At preliminary approval, the Court inquired about having

15  exclusions versus U.S. mail.  We did proceed with that approved

16  process as the best method to suppress fraud; and, in fact, a

17  decision out of the Eastern District of Michigan in just the

18  last few weeks collected cases from across the country

19  requiring this process of a wet signature and having it mailed

20  in because it's a very common and effective way of handling opt

21  outs.

22       I'll just give you a cite for that real quick.  It's the

23  *In Re Chevy Bolt EV Battery Litigation* in the Eastern District

24  of Michigan.  The case number is 20-cv-13256.  A Docket

25  Number 177 issued on December 28th.

1    And so we think the number of opt outs and the fact that

2  there were no objections to that particular process speaks to

3  its fairness.

4    **THE COURT:**  Let me direct your attention for a moment

5  to the incentive awards.  The $10,000 incentive award is on the

6  high side.  Your explanation to me was that the particular

7  named plaintiffs had personal information that was on the

8  record, although that was under seal in part, but -- and then

9  they submitted some of their devices to some forensic analysis

10  and the like.  Is that the basis on which you think it should

11  be a high-end incentive award?

12    **MR. RUDOLPH:**  That's part of the basis.  These were

13  very active plaintiffs who were deeply involved in the process,

14  the litigation process, and understanding the claims and going

15  through with discovery in the way that it needed to be.

16    They did have to subject all of their devices to complete

17  forensic imaging, which is essentially taking all of their

18  information, all of their personal information, all of their

19  browsing history, and a large portion of that was then made

20  available to Oracle for examination.

21    So this was really -- this was part of what the case was

22  about was, you know, what people did in private and how that

23  was being collected, and that was made available to Oracle; and

24  it was a major concern on behalf of the plaintiffs that, you

25  know, this was an invasive process.

1      There was that, and there was also the question of, you

2   know, given the sort of paradox that they have some notoriety

3   around being privacy advocates, that Dr. Golbeck, for example,

4   had -- is subject to harassment, unfortunately, and was

5   concerned that if some of the information that was at issue in

6   discovery here was put out in public, that it could exacerbate

7   that.

8      So we think these were courageous plaintiffs who really

9   went an extra step to prosecute these very comprehensive claims

10  about, you know, making available every aspect of their lives

11  that has some sort of digital receipt available to -- to the

12  defendant and ultimately potentially to the Court.

13      **THE COURT:**  So just to recap, it's a nonreversionary

14  settlement proposal, $115 million, as you say 3.2 million

15  claims.

16      Anything else you want to talk about about the nonattorney

17  fee part of this?  And then I want to turn to the attorneys'

18  fee issue.

19      **MR. RUDOLPH:**  Just briefly on the sufficiency of the

20  settlement, we -- as you noted at the beginning, we faced a

21  huge amount of uncertainty here, both on proving up our claims

22  on the merits and on damages.  Oracle in its filing runs

23  through the litany of issues.

24      There was risks around showing consent on a class-wide

25  basis.  There are technical challenges to the wiretapping

claims, and there's a question of whether jurors would

ultimately even find this conduct highly offensive.

     And damages here, this is not the kind of case where there

are out-of-pocket damages and there's some sort of

ascertainable sum certain that can be looked to as sort of the

ultimate recovery.

     No privacy case of this type has ever gone to trial; and

while we would argue that nominal damages shouldn't be the

limit, it could potentially be and we could be looking at a

situation where class members get a dollar a piece, and we were

able --

          THE COURT:  That's as opposed to some -- have some of

the data breach cases gone to trial?

          MR. RUDOLPH:  Right.  Exactly.  Exactly.  There were

some class members who seemed to be under the impression that

there was some malicious actor who was engaged in identity

theft and that they needed to be compensated for that.

     But this is -- these are really pure privacy harms, and

how to -- how those are going to be evaluated and how the value

of them is going to be determined at trial is still a complete

unknown.

     And just to reiterate, the 115 million is really -- it's a

very substantial sum.  We believe it's among the top 10 of any

privacy class action.  It appears to be the third largest of

any nondata breach class action, the first two involved

1    Facebook, and we think it's the largest where the defendant

2    wasn't in privity with the -- with the plaintiff.

3        And then one further point is that we pointed out a number

4    of comparators in our papers, both in the preliminary approval

5    and at final approval, showing the ranges that class members

6    have obtained, and $25 is really sort of smack in the middle of

7    that range.  They go from as high as, you know, 35 to $40 in

8    some instances down to $7.

9        And in the *Brooks vs. Thomson Reuters* case in front of

10   Judge Chen that just went through preliminary approval, the

11   estimated range there -- which involves a data broker and a

12   sort of similar profile, the estimated range of payments was 19

13   to $48.  So we really think this is a very strong settlement

14   that's supported by not just looking at the risks but looking

15   at comparators and seeing how these cases are usually resolved.

16        **THE COURT:**  Before we move on to attorneys' fees, we,

17   as I think I've mentioned, not in this case, in other cases

18   where you've all been involved, we as a district want to really

19   be more proactive on the post-distribution accounting analysis.

20   So there is a form now that we have, and it -- I have to go

21   back and look if you provided for that in the agreement.  But

22   one way or the other, we want you to do it because we're trying

23   to get, you know, a handle on things like claims rates and

24   other things.

25        **MR. RUDOLPH:**  It is explicitly called out in the

1    proposed order that we provided to Your Honor.

2            **THE COURT:**  Okay.  So let's talk about the fees.

3        You are asking for the Ninth Circuit benchmark, as I

4    understand it, 25 percent.  That would be a 2.9 multiplier, I

5    think, if I read that correctly.

6            **MR. RUDOLPH:**  That's correct.

7            **THE COURT:**  In this case, you -- it's gone on for a

8    while.  We certainly had an active motion practice, a lot of

9    documentary discovery, as I understand it, didn't get into -- I

10   think you had one deposition or something.

11           **MR. RUDOLPH:**  That's correct.

12           **THE COURT:**  So, you know, you start out with the

13   benefit of the benchmark and that's, you know, our starting

14   point.

15       Why in this case do you think a multiplier is -- from the

16   lodestar is warranted?

17           **MR. RUDOLPH:**  Well, first, because of the nature of

18   the result itself.  This is -- we think this is really a

19   phenomenal settlement that delivered a huge amount of value to

20   class members.  It is the largest of any wiretap claim that --

21   largest settlement for any wiretap claim that we're aware of.

22       And the risks for this case were particularly acute

23   because it was such a novel theory that has never -- never been

24   litigated before.  We spent two years working up the theory,

25   working with experts, working with legal scholars trying to

develop theories that, you know, tracked in real time the
development of law and providing the strongest case we could
for these claims, and we were able to get them past several
motions to dismiss that were --

      **THE COURT:**  In fairness, though, as you will no doubt
point out to me now, not without a lot of effort because I
expressed a lot of concern about whether or not these were
viable claims.

      **MR. RUDOLPH:**  That's right.  We spent an enormous
amount of time doing the sort of backend to make sure that this
would get to a point where we could fully litigate the claims.

     And, you know, again just in terms of the risk profile and
the novelty of the claims, no other law firm filed a case, a
similar case.  There were no copycat cases.  We litigated this
entirely in-house with essentially the group of lawyers that
you see behind me.  And that's very unusual, very unusual in
this space; and, in fact, the 15 comparators that we pointed
you to at preliminary approval, not a single one of them
involved only one law firm.

     So we really think that that is -- that justifies, you
know, at a minimum, the benchmark.  We think it actually might
even justify an upward departure, but we're not asking for
that.  We're just asking for that.  And on the lodestar
cross-check, we think that's -- it's very reasonable and it's
well within the presumptively acceptable range.

1    THE COURT:  Ms. Cheung, anything you want to add?

2    MS. CHEUNG:  Nothing in addition to the response we've

3    already filed, Your Honor.

4    THE COURT:  Okay.  Well, I do think that this is a

5    fair, reasonable, and adequate settlement; and I think the

6    service award, it's an explanation to justify the high end of

7    incentive awards.  So I think the 10,000 is also appropriate.

8    The costs are what they are, the 211,000 and change.

9    And I think the fees -- the benchmark is kind of our

10   starting point, and I do think in this case that it was

11   actively litigated.  And as I've indicated now a couple times,

12   this was a challenging case for the plaintiffs, and I think

13   they did a good job.  So I'm prepared to go ahead and approve

14   the settlement.

15   So you gave me a proposed order.

16   MR. RUDOLPH:  Yes.

17   THE COURT:  And I'll go back again and perhaps reserve

18   the right to tweak it a bit, but is there anything in there

19   that datewise needs to be submitted assuming this is the date

20   of final approval?

21   MR. RUDOLPH:  I don't know that there are any dates

22   that need to be filled in.  What I will say is the parties just

23   conferred and there are a few minor tweaks that we'd like to

24   make, and we can commit to submitting that to you by tomorrow.

25   THE COURT:  Okay.

1           **MR. RUDOLPH:**  Okay.

2           **THE COURT:**  Good.

3      All right.  Very well.  Thank you.

4           **MR. RUDOLPH:**  Thank you, Your Honor.

5           **MS. CHEUNG:**  Thank you, Your Honor.

6              (Proceedings adjourned at 2:05 p.m.)

7                        ---oOo---

1

2

3                    __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Monday, April 14, 2025

8

9

10

11   _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                  U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25